**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

GRACE ESTABROOK,
ELLEN HOLMQUIST, and
MARGOT KACZOROWSKI,

                    Plaintiffs,

     v.

THE IVY LEAGUE COUNCIL OF
PRESIDENTS, PRESIDENT AND
FELLOWS OF HARVARD COLLEGE,
TRUSTEES OF THE UNIVERSITY OF
PENNSYLVANIA,
and NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,

                    Defendants.

Civil Action No. _____

**COMPLAINT FOR DAMAGES,**
**DECLARATORY, AND CLASS RELIEF**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

JURISDICTION & VENUE ........................................................................................... 4

THE PARTIES................................................................................................................. 4

    PLAINTIFFS ............................................................................................................. 4

    DEFENDANTS ......................................................................................................... 7

THE NCAA's PURPOSEFUL MISINTERPRETATION OF TITLE IX ..................... 9

    The 2010 NCAA Transgender Eligibility Policy Is Discriminatory On Its Face ............ 10

    The NCAA Transgender Eligibility Policies Conflict with Title IX's Foundational
    Principle That Title IX Protects Against Discrimination Based on Biological Sex ......... 11

    The 2010 NCAA Transgender Participation Policy Failed to Effectively Accommodate
    the Physical Abilities of Women and Give Women Equal Competitive Opportunities in
    Comparison to Men.................................................................................................... 12

    The NCAA Purports to Interpret Title IX for Its Members ............................................. 17

ADDITIONAL FACTUAL ALLEGATIONS ............................................................. 19

IVY LEAGUE'S TRANSGENDER ELIGIBILITY POLICIES ................................. 20

ORGANIZATION AND PRACTICES OF THE NCAA.............................................. 21

    NCAA's Role in Controlling College Sports for its Members ......................................... 21

    NCAA Role in Supporting Mental and Physical Health, Safety and Performance of
    Student-Athletes in Collegiate Sport ............................................................................ 32

THE ASSOCIATION-WIDE NATURE OF THE NCAA'S TRANSGENDER ELIGIBILITY
POLICIES ..................................................................................................................... 36

NCAA'S RECENT HISTORY OF DISCRIMINATION TOWARDS WOMEN ...................... 38

NCAA'S DEVELOPMENT AND IMPLEMENTATION OF TRANSGENDER ELIGIBILITY
POLICIES ..................................................................................................................... 40

    Origin of the 2010 Transgender Participation Policy ...................................................... 41

DISCRIMINATORY IMPACTS OF THE NCAA'S CURRENT TRANSGENDER
ELIGIBILITY POLICIES ............................................................................................ 43

    Testosterone Suppression Does Not Bridge the Male-Female Sport Performance Gap .. 49

    The NCAA's Transgender Eligibility Policies Allow Men to Compete Against Women
    While Retaining Higher Levels of Testosterone Than Women ....................................... 51

UPENN ROSTERS A MALE ON ITS  2021-2022 WOMEN'S SWIMMING AND DIVING
TEAM .......................................................................................................................... 53

HOW THE IVY LEAGUE INFLUENCED THE NCAA'S CURRENT TRANSGENDER
ELIGIBILITY POLICIES ............................................................................................ 60

January 6, 2022, Ivy League Declaration of Public Support for the 2010 Transgender Participation Policy .................................................................................................. 60

January 19, 2022, NCAA Board of Governors Announces NCAA Will Follow Transgender Eligibility Rules of U.S. Governing Bodies of Olympic Sports ................. 61

Ivy League Pressure Campaign Against the NCAA ........................................................ 63

February 1, 2022, USA Swimming Adopts Transgender Eligibility Rules..................... 64

February 10, 2022, NCAA Declines to Apply USA Swimming Rules ........................... 66

2022 IVY LEAGUE SWIMMING AND DIVING CHAMPIONSHIPS.................................... 67

Thomas's Access and Use of the Women's Locker Rooms ............................................. 74

CLASS ACTION ALLEGATIONS ......................................................................................... 75

Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(1)..................... 77

Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(2)..................... 78

Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(3)..................... 78

COUNT I ................................................................................................................................. 79

COUNT II ............................................................................................................................... 83

JURY DEMAND .................................................................................................................... 86

PRAYER FOR RELIEF ........................................................................................................ 86

## INTRODUCTION

1.      This is an action under Title IX of the Education Amendments of 1972, (Pub. L. 88-352), codified at 20 U.S.C. § 1681(a) ("Title IX"), to remedy sex[1] discrimination against the women who participated in or should have participated in the 2022 Ivy League Women's Swimming & Diving Championships ("2022 Ivy League Championships") from February 16 to 19, 2022.

2.      The Presidents and Fellows of Harvard College ("Harvard") hosted the 2022 Ivy League Championships at Harvard's Blodgett Pool in Cambridge, Massachusetts.

3.      For the first time in the history of the Ivy League, The Ivy League Council of Presidents a/k/a Council of Ivy Group Presidents ("Ivy League"), including the Presidents of Harvard, and the University of Pennsylvania ("UPenn"), allowed a trans-identifying male[2] swimmer, Lia Thomas, rostered by the Trustees of UPenn on the UPenn women's swimming team ("UPenn Team") to compete against the female swimmers in Ivy League competitions, including the 2022 Ivy League Championships.

4.      Before the 2021-2022 college swimming season UPenn swim coach Mike Schnur bragged that he had a "secret weapon."

5.      But as Harvard University and Ivy League officials prepared Blodgett Pool for the 2022 Ivy League Championships the fact that Thomas – a lanky 6'4'' male swimmer who had

---

[1] "Sex" is used here to refer solely to binary, biological sex. *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (Title IX defines "sex" "based on biology and reproductive function."); *Black's Law Dictionary* (5th ed. 1979) ("**Sex.** The sum of the peculiarities of structure and function that distinguish a male from a female organism[.]"); *see also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) ("sex" in the Civil Rights Act of 1964 "refer[s] only to biological distinctions between male and female").

[2] "Women" "men" "male" "female" "he" "she" "him" and "her" are used herein in their strict biological sense as used in Title IX's sport-specific regulations adopted in chronological proximity to Title IX's passage, without regard for "gender identity."

previously competed on the UPenn men's swimming team – was competing on the UPenn swim team was no secret, and his domination of women swimmers in meet after meet had become international news.

6.    Nor was UPenn's secret weapon a secret to the Ivy League Council of Presidents. Behind closed doors a plan to strike a public blow for trans-identifying men competing in women's sports had long been in the works.

7.    Ivy League Executive Director Robin Harris and members of the Ivy League Council of Presidents had labored for months behind the scenes to engineer a public shock and awe display of monolithic support for biological unreality and radical gender ideology by America's oldest and most storied educational institutions.

8.    The 2022 Ivy League Championships would be the culmination of the Ivy League's public campaign meant to manipulate public opinion and change the NCAA Division I collegiate sports landscape for trans-identifying men who want to compete in women's college sports against women.

9.    The Ivy League's plan was to crown a man as a women's champion in one of the most iconic swimming venues in America as scores of national and international journalists described the scene as a landmark civil rights accomplishment to be venerated.

10.    The Ivy League's belief was that crowning a man an Ivy League champion in women's swimming would normalize cross-sex competition in previously sex-separated sports categories and render inevitable nationwide acceptance of a new set of gender norms for college sports.

11.    To bring its vision to fruition, the Ivy League engaged in a season-long pressure campaign to keep Thomas eligible to compete and prevent women from speaking up for their equal rights.

12.    Ivy League women swimmers became captive and collateral damage to the Ivy League's illegal social science experiment.

13.    Robin Harris was shocked when, at the last minute, less than a month before the 2022 Ivy League Championships, a NCAA rule change threatened to derail the Ivy League's plans and render Thomas ineligible.

14.    Harris quickly jumped into action, spearheading a pressure campaign to bring the NCAA to heel.

15.    The Ivy League had won when the NCAA backed down and changed its nationwide rules to bring Thomas back into compliance and renew Thomas' eligibility.

16.    The Ivy League's pressure campaign demonstrates that the NCAA controls college athletics nationwide and when a powerful player like the Ivy League exerts extortive pressure the NCAA will change the rules of the college game nationwide.

17.    The NCAA's capitulation ensured that the Ivy League got its way and Thomas remained eligible to compete both in the 2022 Ivy League Championships and in the 2022 NCAA national championships to come.

18.    To no one's surprise, Thomas dominated the competition at the 2022 Ivy League Championships, setting pool records in every individual event in which Thomas swam and reaching the top of the victor's podium four times.

19.    Thomas' name even now displaces the names of rightful women champions in Harvard's Blodgett Pool and at UPenn.

20.    After the season, UPenn nominated Lia Thomas for the NCAA Woman of the Year award.

21.    Women swimmers throughout the Ivy League were left shattered by the disregard of their rights and opportunities in order to create new rights and opportunities in women's sports for a man with biological advantages they could not hope to match.

22.    Now, three women swimmers from the 2021-2022 UPenn women's swimming team who were discriminated against by the Ivy League, NCAA, UPenn and Harvard and harmed by Thomas depriving them of equal opportunities as women to compete and win, while being denied the opportunity to protect their privacy in separate and equal locker rooms, bring this lawsuit to establish that Thomas's participation in college women's swimming, including at the 2022 Ivy League Championships, injured them and violated federal law.

## JURISDICTION & VENUE

23.    This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343.

24.    Plaintiffs' claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202.

25.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, namely the 2022 Ivy League Championships.

## THE PARTIES

### PLAINTIFFS

26.    Plaintiff **Grace Estabrook** is a former NCAA Division I swimmer who competed at the University of Pennsylvania and in the 2022 Ivy League Championships.

27.    Estabrook began swimming competitively at age seven (7).

28.     She grew up swimming for Carmel Swim Club in Carmel, Indiana – one of the best youth swimming programs in the country – and was the captain of the Carmel High School Swimming & Diving Team during her senior year of high school in 2018.

29.     Estabrook was a breaststroke specialist. In high school, she competed in the 100 and 200-yard breaststroke, 200 and 400-yard individual medley ("IM"), and the 100 and 200-yard backstroke.

30.     In high school Estabrook was a three-time team state and national champion (2016-18), a two-time individual state champion in the 200-yard Medley Relay (2017-18), a three-time scholastic All-American (2016-18), a four-time Scholar Athlete (2015-18), a two-time selection to the Indiana All-State Team (2017-18), and a three-year Junior National Qualifier.

31.     Estabrook became interested in UPenn's collegiate swimming and diving program because of its excellence at both the athletic and academic level.

32.     During recruitment, Estabrook met the head coach for the UPenn Swimming and Diving Program, Mike Schnur. Coach Schnur told Estabrook that UPenn needed breaststroke swimmers.

33.     After considering other NCAA Division I swimming programs, Estabrook ultimately decided to enroll at UPenn and join the UPenn team in the fall of 2018.

34.     Estabrook swam for UPenn during the following seasons: 2018 to 2019, 2019 to 2020, and 2021 to 2022.

35.     Estabrook generally swam the 200-yard IM, 100 and 200-yard breaststroke, and the 200-yard and 400-yard medley relay for UPenn.

36.     Estabrook qualified for the Ivy League Championships every year she swam for UPenn except the 2021 championships, which were cancelled due to the COVID-19 pandemic.

37.    Plaintiff **Margot Kaczorowski** is a former NCAA Division I swimmer who competed at the University of Pennsylvania and in the 2022 Ivy League Championships.

38.    Kaczorowski began swimming competitively at age four (4). She grew up in Hadden Heights, New Jersey and swam for Haddon Heights High School and the Jersey Wahoos Swim Club.

39.    Kaczorowski was a freestyle sprinter. In high school, she competed in the 50, 100, and 200-yard freestyle and the 100 and 200-yard butterfly.

40.    After considering other NCAA Division I swimming programs, Kaczorowski ultimately decided to enroll at UPenn and join the UPenn team in fall 2019.

41.    Kaczorowski swam for UPenn during the following seasons: 2019 to 2020, 2020 to 2021 (most of which was cancelled due to the COVID-19 pandemic), 2021 to 2022, 2022 to 2023, and 2023 to 2024.

42.    Kaczorowski generally swam the 50, 100, and 200-yard freestyle, the 100-yard butterfly, and the 400 and 800-yard freestyle relays for UPenn.

43.    Kaczorowski qualified for the Ivy League Championships every year she swam for UPenn except the 2021 championships, which were cancelled due to the COVID-19 pandemic.

44.    Plaintiff **Ellen Holmquist** is an NCAA Division I swimmer who competed at the University of Pennsylvania and would have competed in the 2022 Ivy League Championships but for Thomas competing on the UPenn Women's Team.

45.    Holmquist began swimming competitively at age 5. She grew up in Wilton, Connecticut and swam for Wilton High School and the Wilton Wahoos Swim Club.

46.    Before college, Holmquist was the captain of her swim club and was a two-time USA Swimming Scholastic All-American.

47. After considering other NCAA Division I swimming programs, Holmquist ultimately decided to enroll at UPenn and join the UPenn team in fall 2020.

48. Holmquist swam for UPenn during the following seasons: 2020 to 2021 (most of which was cancelled due to the COVID-19 pandemic), 2021 to 2022, 2022 to 2023, and 2023 to 2024.

49. Holmquist generally swam the 400 IM and 200 IM, 500-yard freestyle, 100 and 200-yard breast stroke for UPenn.

50. Holmquist qualified for and swam in the Ivy League Championships every year she swam for UPenn except the 2021 championships, which were cancelled due to the COVID-19 pandemic, and the year that Thomas competed on the UPenn Team in 2022.

## DEFENDANTS

51. Defendant Ivy League (i.e., **The Ivy League Council of Presidents**) is an unincorporated association with its principal place of business in Princeton, New Jersey.

52. At all relevant times, the Ivy League has acted as an agent of the institutions of higher education that have belonged to the Ivy League athletic conference since its formation in 1954, which include Brown University, The Trustees of Columbia University in the City of New York, Cornell University, The Trustees of Dartmouth College, Harvard University, The Trustees of the University of Pennsylvania, Princeton University, and Yale University (collectively the "Ivy League Schools").

53. The Ivy League, through its executive director and administrative staff, coordinates the athletic activities of the Ivy League Schools including setting the athletic eligibility standards and athletic eligibility requirements for the Ivy League Schools.

54. The Ivy League is a member athletic conference of the NCAA and all Ivy League Schools are member institutions of the NCAA.

55.    All Ivy League Schools are recipients of federal funding.

56.    The Ivy League exercises controlling authority over relevant aspects of the athletic programs and activities of the Ivy League Schools and is thereby a covered entity under Title IX.

57.    Defendant Harvard, (i.e., **President and Fellows of Harvard College** is a non-profit corporation formed under the laws of the Commonwealth of Massachusetts with its principal place of business in Cambridge, Massachusetts. The President and Fellows of Harvard College is the legal name and duly empowered governing board of Harvard University.

58.    Harvard owns and controls the Blodgett Pool, a competitive swimming pool at which Harvard hosted the Ivy League Championships.

59.    The pool has permanent seating for seating for 1,200 spectators, and there is room on the pool deck to accommodate 500 swimmers, coaches, and officials.

60.    The Blodgett Pool has men's and women's locker rooms.

61.    Defendant UPenn (i.e., **Trustees of the University of Pennsylvania**) is a non-profit corporate formed under the laws of the Commonwealth of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.

62.    At all relevant times, UPenn has had a Division I women's swimming and diving team.

63.    During the 2021 to 2022 swimming season, UPenn rostered a trans-identifying male swimmer, Lia Thomas, on its women's swimming team.

64.    UPenn selected Thomas to the women's swimming and diving team roster that it took to the Ivy League Championships.[3]

---

[3] https://www.meetresults.com/2022/ivies/rosters.pdf (last accessed February 4, 2025).

65.    Defendant NCAA (i.e., **National Collegiate Athletic Association**) is an unincorporated association with headquarters and principal place of business in Indianapolis, Indiana at 700 West Washington Street, Indianapolis, Indiana 46202.

66.    The NCAA is an unincorporated association comprised of more than 1,100 member colleges and universities as well as multi-sport membership athletic conferences in which colleges and universities are members.

67.    NCAA members are primarily (more than 90%) institutions which receive federal funds and are subject to Title IX.

68.    The NCAA was established by two or more entities which are covered by Title IX.

69.    The NCAA is an educational organization principally engaged in the business of providing education services.

70.    NCAA "[m]ember institutions and conferences believe that intercollegiate athletics programs provide student-athletes with the opportunity to participate in sports and compete as a vital, co-curricular part of the educational experience." NCAA Constitution (Const.), Preamble.

71.    The NCAA exercises controlling authority over the programs and activities of its members institutions and is thereby a covered entity under Title IX

## THE NCAA'S PURPOSEFUL MISINTERPRETATION OF TITLE IX

72.    Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

73.    The 2010 NCAA Transgender Student-Athlete Participation Policy ("2010 Transgender Participation Policy"), in effect in February 2022 discriminated against women based on sex and deprived women of equal opportunity in comparison to men in college sports regulated

by            the            NCAA.,            *Available*            *at*

https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderStudentAthleteParticipation

Policy.pdf  (last accessed February 4, 2025). **Appendix A.**

74.    The decision to implement and refuse to change the 2010 Transgender Participation

Policy was an Association-wide decision made by the NCAA Board of Governors.

75.    The 2010 Transgender Participation Policy was intentionally designed and was

purposefully implemented and enforced by the NCAA to give NCAA member institutions to which

Title IX applies an excuse for violating Title IX by allowing men to compete on women's teams

in intercollegiate sports and impose a nationwide rule that requires colleges, universities, student-

athletes and other to uncritically accept and comply with the subordination of women's rights to

the interests of a relatively small number of men.

**The 2010 NCAA Transgender Eligibility Policy Is Discriminatory On Its Face**

76.    At all relevant times, the NCAA was aware of significant scientific research

demonstrating that men have inherent athletic advantages over women, including the biological

fact that men naturally produce far more testosterone than women.

77.    The NCAA justified the 2010 Transgender Participation Policy, which was

uniformly applicable in NCAA Divisions I, II and III, in part on the idea that biological differences

between men and women which create sport performance advantages for men can be overcome by

a program of testosterone suppression in men who identify as transgender.

78.    However, the 2010 Transgender Participation Policy requires that men who wish

to compete on women's teams complete only "one calendar year of testosterone suppression

treatment" without any requirement to achieve a maximum threshold of testosterone and with no

policy to confirm the actual testosterone threshold a man achieves after a year of testosterone

suppression treatment, much less a threshold that is comparable to the threshold of testosterone that women can achieve without doping.

79.     During all relevant times, NCAA policies treated anabolic agents, including testosterone, and hormone and metabolic modulators as banned substances and tested year round for such substances.

80.     On its face, the 2010 Transgender Participation Policy permits a testosterone suppression threshold that can be far higher *than the highest testosterone level women can produce without doping*. No policy in the NCAA applies to give women a similar hormonal advantage in competition.

81.     Thus, the 2010 Transgender Participation Policy discriminates on its face against women.

**The NCAA Transgender Eligibility Policies Conflict**
**with Title IX's Foundational Principle That Title IX**
**Protects Against Discrimination Based on Biological Sex**

82.     The 2010 Transgender Participation Policy *applied in every single NCAA women's sport* until each sports winter 2022 NCAA Championships.

83.     The 2010 Transgender Participation Policy was grounded in the same premise: that testosterone suppression and personal choice alone can make a man eligible to compete on a women's sports team.

84.     Title IX was enacted by Congress to increase opportunities for biological women.

85.     Congress recognized when enacting Title IX that men and women are not interchangeable.

86.     Therefore, the NCAA's premise that eligibility to compete on a women's team can be based not on "sex" but instead upon testosterone suppression and personal choice conflicts with

Title IX because Title IX protects women based on biological sex and the plain language of the statute does not authorize the reimagining of sex to mean something other than biological sex.

87.    The NCAA reinterprets the term "sex" in Title IX to require biological women to cede opportunities to those whom the NCAA defines as "transwomen" but which faithful adherence to the plain language of Title IX requires be defined as "men" for purposes of applying Title IX to college sports.

88.    Title IX cannot be reasonably interpreted to permit men to take women's places in women's sports merely if men are willing to suppress their testosterone level.

89.    Therefore, the 2010 Transgender Participation Policy violated Title IX as it flowed from the fundamentally flawed starting point that for purposes of Title IX compliance "sex" can be redefined by entities covered by Title IX.

90.    The 2010 Transgender Participation Policy that authorized men to take the place of women on women's college sports teams, in women's college sports locker rooms, and in NCAA national championships, thereby diminishing opportunities for women, was impermissible *per se* under Title IX.

### The 2010 NCAA Transgender Participation Policy Failed to Effectively Accommodate the Physical Abilities of Women and Give Women Equal Competitive Opportunities in Comparison to Men

91.    As explained below, *see infra* at ¶¶ 193-202, women already have fewer athletic opportunities in NCAA collegiate sports than do men.

92.    Title IX's implementing regulations and guidance require that, if an entity subject to Title IX provides athletic programs or opportunities separated by sex, then it must do so in a manner that "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

93.     One aspect of assessing "equal athletic opportunity for members of both sexes" is ascertaining, **"[w]hether the** selection of sports and **levels of competition effectively accommodate the** interests and **abilities of both sexes**." 34 C.F.R. § 106.41(c)(1) (emphasis added).

94.     On the effective accommodation prong, the "governing principle" is that "the athletic interests and abilities of male and female students must be equally **effectively accommodated**." 44 Fed. Reg. 71,413, 71,414 (1979) (the "Policy Interpretation") (emphasis added). More specifically, the covered entity (in this case the NCAA and each member institution that receives federal financial assistance) must accommodate the physical abilities of girls and women "to the extent necessary to provide equal opportunity in . . . levels of competition," and competitive opportunities "which equally reflect their abilities." *Id*. at 71,417-418.

95.     As another aspect of equal athletic opportunity, implementing regulations and guidance state that male and female athletes "should receive equivalent treatment, benefits and opportunities." Policy Interpretation, 44 Fed. Reg. 71,414 (emphasis added). Factors two through ten of 34 C.F.R. § 106.41(c) are used to evaluate "equal" teams. The "equal treatment" to which girls and women are entitled includes equal "opportunities to engage in . . . post-season competition," *id*. at 71,416, equal opportunities for public recognition, 34 C.F.R. § 106.41(c), and the right to be free of any policies which are "discriminatory in . . . effect" or that have the effect of denying "equality of athletic opportunity." *Id*. at 71,417.

96.     In 1979, the Department of Education Office for Civil Rights (OCR) issued a policy interpretation of Title IX and the Regulations to provide more specific guidance about the statute's application to intercollegiate athletics. Policy Interpretation, 44 Fed. Reg. 71,413 *et seq*.

97.     The Policy Interpretation was further clarified by OCR through issuance of OCR's 1996 Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the "OCR Clarification"). 44 Fed. Reg. at 71,417.

98.     In determining "whether the selection of sports and levels of competition effectively accommodates the interests and abilities of members of both sexes," both the 1979 Policy Interpretation and the 1996 OCR Clarification state that compliance with the effective accommodation prong is assessed by examining:

a.     The determination of athletic interests and abilities of students,

b.     The selection of sports offered, and

c.     The levels of competition available, including the opportunity for team competition.

99.     Finally, an overall determination of compliance can be made based on:

a.     Whether the entity's policies are discriminatory in language or effect,

b.     Whether substantial and unjustified disparities exist in the program as a whole between male and female students, or

c.     Whether substantial disparities exist in individual segments between opportunities afforded to male and female students.

*See* Policy Interpretation, 44 Fed. Reg. 71,418.

100.     As the Title IX regulations enacted soon after the law was passed recognize, due to inherent biological differences women must be affirmatively protected with sex-separated sports teams, competitions, championships, and locker rooms to achieve equality and equal opportunity for women.

101.    Pursuant to 34 CFR § 106.33 "separate toilet, locker room, and shower facilities . . . provided for students of one sex shall be comparable to such facilities provided for students of the other sex."

102.    The 2010 NCAA Transgender Participation Policy deprived women of the required separate and comparable facilities by allowing men to access such facilities and deprive the women using them of bodily privacy.

103.    Specifically in terms of the requirements for women to have competitive opportunities "which equally reflect their abilities," equal "opportunities to engage in . . . post-season competition," and equal opportunities for public recognition, the NCAA's Transgender Eligibility Policies breach Title IX by permitting men to compete against women in women's competitions (including NCAA Championships) where a man may rely upon inherent aspects of their maleness, including physical and athletic advantages, to take women's places, titles and public recognition, which Title IX requires to be protected for women and made equally available to them.

104.    The NCAA's testosterone suppression rationale deprives women of equal opportunities as established by peer-reviewed scientific research. *See infra* at ¶¶ 241-252.

105.    That female athletes are harmed by having to compete against males is in no sense surprising or unexpected. "This is because it is neither myth nor outdated stereotype that there are inherent differences between those born male and those born female and that those born male, including transgender women and girls, have physiological advantages in many sports." *Adams*, 57 F.4th at 819 (special concurrence; citing scientific literature).

106.    The NCAA's 2010 Transgender Participation Policy was not sex neutral in operation but *disproportionality burdened female athletes* by reducing female competitive

opportunities, forcing women athletes to compete against men in sex-separated sports, depriving women of equal opportunities to protect their bodily privacy, and authorizing men to access women's safe spaces necessary for women to prepare for athletic competition, including showers, locker rooms and restrooms.

107.    The NCAA and the other Defendants knew or should have known that the NCAA's 2010 Transgender Participation Policy violated Title IX because they result in numerous discriminatory impacts against women ("Discriminatory Impacts"), including:

a.    preventing women from even knowing whether they are competing against men in women's sports,

b.    authorizing men to compete on women's teams or in the women's category of competitions,

c.    permitting men to be awarded points, prizes, awards, medals, trophies, places, rankings, or results in women's competitions,

d.    allowing men to access women's showers, locker rooms, restrooms and other such safe spaces and depriving women of the right to know biological men are accessing their safe spaces,

e.    depriving women of equal access to separate showers, locker rooms, and associated restroom facilities which protect their right to bodily privacy,

f.    diminishing equal opportunities and resources for women,

g.    diverting opportunities and resources to men,

h.    subjecting women to a loss of privacy and emotional harm,

i.    depriving women of a fair opportunity to compete in college sports,

j.      depriving women of a fair opportunity to prepare to compete in college sports by allowing men to access women's spaces including women's locker rooms,

k.      depriving women of a fair opportunity to compete for titles, placements, and recognition at NCAA national championships, and

l.      suppressing the free speech rights of women and men advocating for the rights of biological women to a fair opportunity to compete, separate and equal locker rooms and a correct application of Title IX.

**The NCAA Purports to Interpret Title IX for Its Members**

108.   The NCAA's Transgender Student-Athlete Resources which include updated transgender participation policies and guidance documents are publicly available at https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx     (last     accessed February 4, 2025).

109.   The last two NCAA Presidents have told Congress that the NCAA's Transgender Eligibility Policies complied with Title IX and that any revisions to the NCAA's Transgender Eligibility Policies must comply with Title IX.

110.   A NCAA August 2011 guidance document from the NCAA Office of Inclusion is entitled *NCAA Inclusion of Transgender Student-Athletes* (the "*NCAA Guidance on Transgender Student Athletes*" or "*NCAA Guidance on TSA*").[4]

111.   The *NCAA Guidance on TSA* states, "[t]he purpose of this resource is to *provide guidance to NCAA athletic programs about how to ensure transgender student-athletes* fair,

---

[4] https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderHandbook.pdf  (accessed February 4, 2025).

respectful, and *legal access* to collegiate sports teams *based on current* medical and *legal knowledge*."[5]

112.    The NCAA purports to base upon Title IX its guidance to college and universities on "legal access" for transgender student-athletes.[6]

113.    Through the 2010 Transgender Eligibility Policy and subsequent guidance the NCAA instructs its member colleges and universities how these colleges and universities *must* interpret Title IX to comply with NCAA rules.

114.    For instance, the *NCAA Board of Governors Statement on Transgender Participation* issued on April 12, 2021, states "The NCAA Board of Governors firmly and unequivocally supports the opportunity for transgender student-athletes to compete in college sports," and references the NCAA's "*long-standing policy* that provides a more inclusive path for transgender participation in college sports,"[7] including a hyperlink directly to the *NCAA Guidance on TSA*.

115.    Another NCAA resource made available to colleges and universities is entitled: "*On The Team: Equal Opportunity for Transgender Student Athletes*" ("*On The Team*").[8]

---

[5] *Id.* (*NCAA Guidance on TSA*, p. 2).

[6] *Id.* (*NCAA Guidance on TSA*, p. 5 (referencing "federal laws, regulations, and legal decisions"), p. 15 ("Colleges and universities often have legal obligations to provide equal opportunity to student-athletes[.]"), p. 16 ("state and federal non-discrimination laws . . . prohibit discrimination based on gender identity and expression"), pp. 16-17 (recommending as a "best practice" to adopt a " athletics departmental policy addressing the participation of transgender student-athletes that is consistent with school policy and state or federal non-discrimination laws"), p. 28 (identifying Title IX and the Equal Protection Clause of the Fourteenth Amendment as sources of federal law upon which the *NCAA Guidance on TSA* is based).

[7]    https://www.ncaa.org/news/2021/4/12/ncaa-board-of-governors-statement-on-transgender-participation.aspx (last accessed February 4, 2025) (emphasis added).

[8]    https://www.nclrights.org/wp-content/uploads/2013/07/TransgenderStudentAthleteReport.pdf (last accessed February 4, 2025), accessible through link on NCAA website at: https://www.ncaa.org/sports/2016/12/8/five-ways-to-have-an-lgbtq-inclusive-athletics-department.aspx#TCOC (last accessed February 4, 2025).

116.    The *On The Team* Report, written by the National Center on Lesbian Rights and the Women's Sports Foundation, likewise conveys "*guidance to* high school and *collegiate athletic programs about* how to ensure transgender student athletes fair, respectful, and *legal access* to school sports teams."[9]

117.    *On The Team* is an earlier version of the NCAA-branded *NCAA Guidance on TSA* which likewise purports to found the NCAA's guidance on its interpretation of Title IX.[10]

## ADDITIONAL FACTUAL ALLEGATIONS

### IVY LEAGUE'S ORGANIZATION AND CONTROL OF IVY LEAGUE SCHOOLS ATHLETIC PROGRAMS

118.    The Ivy League was established by the 1954 Ivy Group Agreement. The 1954 Ivy Group Agreement established eligibility rules for intercollegiate athletic competition among the Ivy League member schools.

119.    The Ivy League adopted various other agreements and rules since 1954.

120.    The Ivy League operates pursuant to the Ivy Manual.

121.    The Ivy League is operated through inter-institutional committees, including the Ivy League Council of Presidents. The Ivy League Council of Presidents has full and final responsibility for the termination of all agreed policies of the Ivy League and with respect to the organization and operation of its committees.

122.    The Ivy League Council of Presidents is comprised of the Presidents of the eight Ivy League Schools.

123.    The Policy Committee of the Ivy League monitors Ivy League policies and recommends changes to the Ivy League Council of Presidents.

---

[9] *Id.*, p. 2 (emphasis added).
[10] *Id.* (*On the Team*, p. 50).

124.    The Policy Committee maintains a set of rules of eligibility for athletics ("Ivy League Eligibility Rules") consistent with the policies and principles agreed to by the Ivy League.

125.    The Ivy League Eligibility Rules are administered by the Ivy League Executive Director. The Executive Director is the Ivy League Council of Presidents' executive officer, charged with administering the Ivy League's rules and activities, by and among the Ivy institutions.

126.    The Ivy League Executive Director also represents the Ivy League Council of Presidents in NCAA and other national activities.

127.    The Ivy League Executive Director administers relevant Ivy League agreements and rules and national rules. The Ivy Manual requires each Ivy League School to furnish the Ivy League Executive Director such cooperation as is necessary for the Ivy League Executive Director to fulfill their duties.

128.    The Ivy League Executive Director is responsible for all eligibility decisions on behalf of the Ivy League.

129.    Robin Harris has been the Ivy League Executive Director at all relevant times.

130.    Every Ivy League School has an eligibility officer who is a member of the school's athletic department.

### IVY LEAGUE'S TRANSGENDER ELIGIBILITY POLICIES

131.    The Ivy League subscribes to the principles and practices approved by the NCAA.

132.    Ivy League eligibility rules may be more restrictive than NCAA eligibility rules but not less restrictive than NCAA eligibility rules. In other words, in some cases the Ivy League might be able to disqualify an athlete who qualifies under NCAA eligibility rules.

133.    Exceptions to Ivy League eligibility rules may be allowed in individual cases in which the circumstances are unusual and the Executive Director, after consulting with the Chair

of the Policy Committee, decides the exception is in accord with the spirit of the 1954 Ivy Group

Agreement.

134.    On information and belief, the Ivy League has encouraged the participation of

transgender student athletes in collegiate athletics since the NCAA adopted the 2010 Transgender

Participation Policy and has continuously applied the NCAA's Transgender Eligibility Policies.

135.    During the 2021-2022 women's swimming season the Ivy League promulgated a

statement to be read before all swim meets involving Ivy League Schools, as follows:

> Harvard Athletics and the Ivy League welcome you to today's event. We ask that
> you join our coaches, competitors and officials in practicing good sportsmanship in
> supporting your teams and in your conduct toward competitors, coaches, officials
> and other spectators. Racist, homophobic or transphobic language will not be
> tolerated. All participants, coaches, administrators and spectators are expected to
> refrain from any and all discriminary acts of verbal or physical abuse in
> connection with all Ivy League activities. Harvard University thanks you for
> creating an inclusive and respectful environment for all student-athletes, coaches
> and fans.

136.    The foregoing statement, which notably references "transphobic language" but

does not refer to sexism or discrimination against women, was read before all sessions of the 2022

Ivy League Championships and, with appropriate modifications regarding the name of the athletic

department in the location where the competition was being held, at all other Ivy League

competitions that year and for years thereafter.

## ORGANIZATION AND PRACTICES OF THE NCAA

### NCAA's Role in Controlling College Sports for its Members

137.    The NCAA requires its members to submit to NCAA rules and regulations

regarding, among other things:

      a.    how members may recruit student-athletes,

      b.    when members may recruit student-athletes,

      c.    when representatives of members may contact prospective student athletes,

d.      how members may provide benefits to student-athletes,

e.      the value of scholarships that may be provided to student-athletes,

f.      the value of other benefits that may be provided to student-athletes,

g.      how many scholarships can be given to student-athletes,

h.      how, when and for how long student-athletes and their teams may practice and train,

i.      the start date, end date and length of season in which student-athletes may play their sport(s),

j.      the grades that must be achieved by student-athletes,

k.      when games may be scheduled between NCAA member institutions,

l.      when games can be scheduled against non-NCAA members,

m.      who may coach members' student-athletes,

n.      who may tutor members' student-athletes,

o.      how many classes student-athletes must attend,

p.      what roles non-athlete students can play in the athletic departments of Association members,

q.      what roles supporters of a college or university can play in relation to an Association member's athletic department and student-athletes,

r.      what drugs and medications student-athletes can use without notification to the Association,

s.      what drugs are banned for use by student-athletes,

t.      the rules under which athletic contests between Association members will be played,

u.      the venues at which national championships among Association members will be played,

v.      the rules for national championships among Association members,

w.      the distribution of revenues from certain tournaments in which Association members may participate,

x.      when student athletes may consider transferring to another Association member,

y.      who is considered a male and who is considered a female for purposes of playing on member schools' sports teams, and

z.      the NCAA Transgender Eligibility Policies.

138.    According to the NCAA, its basic purposes are "to support and promote healthy and safe intercollegiate athletics, including national championships, as an integral part of the education program and the student-athlete as an integral part of the student body." NCAA Const., Preamble.

139.    To accomplish these purposes the NCAA's principal roles in the intercollegiate athletics programs of its member institutions are to:

a.      **Conduct all NCAA national championships**, NCAA Const., Preamble, NCAA Const., Art. 1.D. ("Intercollegiate athletics programs shall be conducted by the Association . . . in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes"); NCAA Const., Art. 2.A.2.a. ("The Association shall . . . Conduct all NCAA Championships."),

b.    **Oversee broadcasting, communications and media rights for all NCAA-conducted national championships and make financial distributions to members from such championships**, NCAA Const., Art. 2.A.2.a.,

c.    **Promote healthy and safe intercollegiate athletics**, through:

i.    **conducting championships in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes**, NCAA Const., Preamble, NCAA Const., Art. 1.D.; and *NCAA Mission and Priorities*, *available at*: https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx (last accessed February 4, 2025) ("Coordinate and deliver safe, fair and inclusive competition directly and by Association members: Set rules and guidelines and provide enforcement. Create programs that support outstanding performance on and off the field. Deliver excellent and inclusive championships."),

ii.    **developing and promulgating guidance, rules and policies based on consensus of the medical, scientific, sports medicine and sport governing communities, as appropriate, for student-athlete physical and mental health, safety and performance**, NCAA Const., Art. 2.A.2.b.; NCAA Const., Art. 2.D.1.d. (NCAA members must implement "NCAA guidance, rules and policies based on consensus of the medical, scientific, sports medicine, and sport governing communities" and must "make NCAA guidance, rules and policies available to student-athletes"); *NCAA Mission and Priorities*, *available at*: https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx (last accessed February 4, 2025) ("Provide world-class services to student-athletes and members that leverage the NCAA's collective scale: Lead research and promote innovation

that improves health, safety and performance. Provide capabilities and programming that fill in the gaps for members. Identify, co-create and distribute best practices to student-athletes and members.").

d. **Create diverse and inclusive environments in collegiate sport and . . . provide education and training with respect to the creation of such environments,** NCAA Const., Art. 1.F, and **Promote gender equity, diversity and inclusion in all aspects of intercollegiate athletics**, NCAA Const., Art. 2.A.2.c.,

e. **Adopt eligibility rules governing intercollegiate athletics and student-athletes** in areas such as recruiting, scholarships, benefits, name, image and likeness, performance enhancing drugs, and transgender eligibility, NCAA Const., Art. 1.E ("rules established by the Association"); NCAA Const., Art. 2.A.2.d. ("Establish the rules for sports competitions and participation"); NCAA Const. Art. 2.B.5 ("Each division shall establish policies and procedures for enforcement of Association and division rules and regulations, and the Association will provide requested support for divisional implementation."); ***NCAA Mission and Priorities***, available at: https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx ("Set rules and guidelines and provide enforcement."),

f. **Run the NCAA Rules "*Enforcement Process*" in each NCAA Division, which consists of:**

i. **Investigating violations of NCAA eligibility rules**, NCAA Const., Art. 2.A.2.g. ("Provide regulatory services as requested by each division"); NCAA Const. Art. 2.B.5 ("Each division shall establish policies and procedures for enforcement of Association and division rules and regulations, and the Association

25

will provide requested support for divisional implementation."); and ***NCAA Mission and Priorities***, available at: https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx ("Set rules and guidelines and provide enforcement."),

> ii.    **Conducting an independent, final and binding adjudication process** for potential violations by NCAA members of NCAA rules governing intercollegiate athletics, *Id.*

140.    With respect to the NCAA Enforcement Process (identified in sub-paragraph 139.f above) members institutions are required to "comply completely and promptly with the rules and regulations governing the division enforcement process and shall cooperate fully in that process as a condition of membership in the [NCAA]." NCAA Const., Art. 2.D.1.h.

141.    As explained in Paragraphs 137-140 above, NCAA member institutions expressly cede controlling authority to the NCAA to conduct the following six (6) aspects of each member's education program and educational experience regarding intercollegiate athletics:

> (1)    conducting and marketing NCAA championships,

> (2)    managing media rights and financial distributions regarding NCAA championships,

> (3)    developing guidance, rules and policies for student-athlete physical and mental health, safety and performance,

> (4)    providing education and training for diversity, equity and inclusion initiatives in intercollegiate sports,

> (5)    adopting eligibility rules governing intercollegiate athletics and student-athletes, and

(6)    running the eligibility rules enforcement process to which all member institutions, their staffs, coaches and student-athletes are subject and to which they submit.

142.    NCAA member schools in all three divisions are required to comply with the NCAA Constitution and Bylaws.

143.    The multi-sport athletic conferences, such as the Atlantic Coast Conference (ACC), Ivy League, Southeastern Conference (SEC), Big Ten Conference, Big 12 Conference, Pac-12 Conference and other college athletic conferences, are subject to the NCAA through the Article 2.C of the NCAA Constitution which makes it mandatory that all conferences:

a.    must adhere to the NCAA Constitution and the principles established by the relevant NCAA Division, including in the conduct of athletics events, and

b.    shall comply completely and promptly with the rules and regulations regarding the rules enforcement process existing in each NCAA Division, and

c.    shall cooperate fully in the rule enforcement process as a condition of membership in the NCAA.

144.    The NCAA is governed by the NCAA Board of Governors and the three NCAA Divisions (Division I, Division II, Division) which are constituent parts of the NCAA, created, described and authorized in the NCAA Constitution and are not separate entities. NCAA Const. Art. 2.A.3.d. (Board of Governors); NCAA Const. Art. 2.B (Divisions).

145.    The NCAA Board of Governors employs the NCAA President and alongside the three NCAA Divisions annually evaluates the NCAA President. NCAA Const. Art. 2.A.3.d(ii).

146.    The NCAA President is an ex officio member of the Board of Governors and acts to "accomplish the purposes of the [NCAA] as determined by the Board of Governors and [the Divisions via their divisional leadership bodies]." NCAA Const. Art. 2.A.3.e(i, ii, iv, v).

147.    The NCAA Board of Governors monitors adherence by the Divisions to the principles of the NCAA Constitution. NCAA Const. Art. 2.A.3.d(xi).

148.    The NCAA is a multi-billion-dollar business venture between the NCAA and its member institutions.

149.    Among other things, the NCAA receives the following benefits from its member institutions:

    a.    The ability to *recognize, publicize, and market* each member institution and their athletics teams as an NCAA member,

    b.    Agreement that member institutions and their athletics teams and athletic departments will participate in safety initiatives by the NCAA,

    c.    Participation by student-athletes in the safety initiatives of the NCAA,

    d.    Agreement that member institutions and their athletics teams and athletic departments will adhere to uniform rules of the game, including sports eligibility rules developed by the NCAA,

    e.    Agreement that member institutions and their athletics teams and athletic departments will comply with the NCAA's enforcement process for NCAA rules and initiatives,

    f.    Agreement that each member institution's *athletics teams* will participate in NCAA championships which the NCAA actively conducts, controls and monetizes,

g.      Participation by the athletics teams of its member institutions in NCAA championships for which the teams qualify,

h.      Agreement that *student-athletes* from the member institution's athletics teams will participate in NCAA championships for which the student-athletes' collegiate teams qualify,

i.      Participation by student-athletes in NCAA championships,

j.      Access to *data* from each member institution's student-athletes from which physical and mental health, safety and performance of student-athletes can be assessed,

k.      A commitment to *use and distribute* NCAA guidance, rules and policies for student-athlete physical and mental health, safety and performance,

l.      *Collaboration* from member institutions *in* student-athlete physical and mental health, safety and performance *research projects* identified by the NCAA,

m.      Agreement to participate in NCAA education programs, including programs related to physical and mental health, safety and performance of student-athletes and diversity, equity and inclusion in collegiate sports,

n.      *Implementation of the NCAA's education and training for diversity, equity and inclusion initiatives* in intercollegiate sports, and

o.      The payment of regular dues from NCAA member institutions.

150.    Each of the foregoing items which the member institutions give to the NCAA through NCAA membership *facilitate the NCAA's ability to develop and market a coherent collegiate sports product, and contribute to building the NCAA brand, and obtaining public acceptance* for the NCAA collegiate sports product and brand, which in turn enhances the college

sports product, brand and marketability of each NCAA member institution in the collegiate sports marketplace.

151.    Each NCAA member institution receives from the NCAA:

a.    NCAA marketing and conducting of intercollegiate athletics national championships,

b.    NCAA's management of media rights and financial distributions regarding NCAA championships,

c.    NCAA's development of guidance, rules and policies for student-athlete physical and mental health, safety and performance,

d.    NCAA's education and training concerning physical and mental health, safety and performance of student-athletes and diversity, equity and inclusion initiatives in intercollegiate sports,

e.    NCAA eligibility rules governing intercollegiate athletics and student-athletes, and

f.    The NCAA's eligibility rules enforcement process to which all member institutions and their athletic departments, staff, coaches, and student-athletes are subject.

152.    The NCAA receives substantial revenues from its operation and control of NCAA championships, including through negotiating media rights, ticket sales agreements, and corporate sponsorships for NCAA championships on behalf of NCAA members and being paid directly for those media rights, ticket sales and corporate sponsorships.

153.    The NCAA benefits from its relationship with its member institutions by, among other things, being able to keep a portion of the revenues which the NCAA generates from NCAA

collegiate national championships and a portion of the revenues generated from the NCAA brand, sales of merchandise, and other functions the NCAA performs.

154.    NCAA member institutions benefit from the increased value to their own brands and the brands of their multipurpose athletic conferences that results from the structures, coherence, and consistency provided by the NCAA such as:

a.      Consistent management and branding of national championships,

b.      National television, radio and other media rights deals and corporate sponsorships for national championships,

c.      Nationwide media accessibility to national championships,

d.      Uniform athlete safety and health rules and procedures,

e.      Uniform eligibility rules and procedures, and

f.      Uniform dispute resolution procedures.

155.    NCAA member institutions benefit from revenue sharing from the NCAA of a portion of revenues generated by the NCAA.

156.    One of the NCAA's fundamental tenets is that it distributes most of its revenue back to its membership.

157.    The NCAA distributes more than $600,000,000.00 annually to its members.

158.    The largest amount of NCAA revenue is distributed through what are known as the "Basketball Performance Fund" and the "Equal Conference Fund," which allocate revenue among conferences based on the participation of a conference's automatic qualifying team in, and a conference's overall performance at, the Division I Men's Basketball Championship.

159.    Certain NCAA member institutions benefit from other grants and other revenue streams which the NCAA generates and shares with some NCAA member institutions, such as research funding obtained by the NCAA from the U.S. federal government.

160.    The relationship between the NCAA and its member institutions is intended by the NCAA and its member institutions to, among other things, maximize the revenue flowing from college sports and reduce the expenses of members.

161.    NCAA members expect the NCAA to effectively and uniformly regulate and control the six areas of intercollegiate athletics set forth in Paragraph 141 above, to receive collaborative input from the member institutions and their member multi-sport conferences, and to make payments to members of NCAA revenues.

## NCAA Role in Supporting Mental and Physical Health, Safety and Performance of Student-Athletes in Collegiate Sport

162.    The NCAA supports mental and physical health, safety and performance in college sport through the work of playing rules committees for each NCAA sanctioned sport.

163.    Each playing rules committee makes changes to playing rules to enhance safety in sport and these recommendations are guided by the NCAA Injury Surveillance Program.

164.    The NCAA has since 1999 been invested in concussion research and the development of concussion education for student-athletes and health care providers to NCAA member institutions.

165.    The NCAA's focus upon concussion research and concussion education is consistent with the NCAA's constitutional responsibilities to member institutions and student-athletes of member institutions to promote healthy and safe intercollegiate athletics, to conduct national championships in a manner designed to protect, support and enhance the physical and

mental health and safety of student-athletes, and to develop and promulgate guidance, rules and policies for student-athlete physical and mental health, safety and performance.

166.    The constitutional principles of the NCAA ensure that student-athletes at all member schools are provided medical care and safety standards that reflect best practices, which are guided by cutting-edge research, education and policy.

167.    Promoting research and education regarding student-athlete health and safety and developing educational materials and guidance on student-athlete health matters such as concussions are core functions of the NCAA, including the NCAA's Sports Science Institute.

168.    NCAA-directed and funded concussion research was previously known as the NCAA National Sport Concussion Outcomes Study.

169.    Starting in 2014 the NCAA and the U.S. Department of Defense (DoD) entered a "partnership" through which the NCAA provides to the DoD data regarding injuries by student-athletes and the DoD provides the NCAA funding for education and research on sport concussion injuries, the NCAA participates in the identification of NCAA member institutions that will conduct the scientific research, the DoD and NCAA ultimately receive access to the government funded research, and the NCAA uses the research to revise its educational materials, protocols and rules for student-athletes.

170.    President Obama announced the NCAA-DoD education and research partnership known as the "Grand Alliance" on May 29, 2014, saying:

> Today, . . . I'm proud to announce a number of new commitments and partnerships . . . that are going to help us move the ball forward on [concussion education and research]. The NCAA and the Department of Defense are teaming up to commit *$30 million for concussion education and a study involving up to 37,000 college athletes* which will be the most comprehensive concussion study ever. And our service academies – Army, Navy, Air Force, and Coast Guard – are all signed up to support this study in any way that they can . . . These efforts are going to make

a lot of difference for a lot of people – from soldiers on the battlefield to students out on the football field.

171.    On the NCAA website, Chief Medical Officer Brian Hainline calls the Grand Alliance a "partnership" between the NCAA and the DoD, saying, "In partnership with the U.S. Department of Defense, the NCAA launched the landmark multi-million dollar NCAA-DoD Grand Alliance to fund the most comprehensive study conducted in the history of concussion research that includes an education and research grand challenge aimed at improving the culture of concussion reporting and management. . . The NCAA-DoD Grand Alliance includes two initiatives, the CARE Consortium, which will offer critical insights into the natural history and neurophysiology of sport-related concussion; and the Mind Matters Challenge, a $7 million initiative aimed at changing important concussion safety behaviors and the culture of concussion reporting and management." *Available at*: https://www.ncaa.org/sports/2016/8/3/concussion-data-and-research.aspx (last accessed February 4, 2025).

172.    An October 7, 2021, announcement stated that more than $105 million had been given to the Grand Alliance concussion education and study program.

173.    At least $85 million in funding for the NCAA-DoD Grand Alliance has come from the federal government.

174.    On October 8, 2021, NCAA Chief Medical Officer Hainline, said, "We are confident that this award from [the Medical Technology Enterprise Consortium through the U.S. Army Medical Research and Development Command], coupled with additional funding from the NCAA and DoD, will provide us the support to develop an array of interventions that mitigate possible long-term effects of concussion[.]"

175.    The current Health, Safety & Performance landing page on the NCAA website says "The NCAA-U.S. Department of Defense Concussion Assessment, Research and Education

Consortium is the largest concussion and repetitive head impact study in history. The project, funded by the NCAA and DoD, launched in 2014 and now includes participants on 30 campuses across the country. The CARE Consortium, part of the broader NCAA-DoD Grand Alliance, is composed of two major components: a clinical study core, which aims to define how symptoms and physical signs manifest and evolve over time in different people (known in the scientific community as the "natural history" of concussion), and the advanced research core, which seeks to identify the neurobiology of concussion and repetitive head impact exposure (how the brain itself is affected)." *Available at*:   https://www.ncaa.org/sports/2018/3/7/ncaa-dod-care-consortium.aspx (last accessed February 4, 2025).

176.    The NCAA and DoD have co-hosted multiple Grand Alliance Concussion Conferences for athletic trainers, team physicians, sports medicine clinicians and athletic health care administrators from NCAA member schools. *See* https://www.ncaa.org/news/2021/5/11/ncaa-dod-grand-alliance-conference-highlights-concussion-biomarker-research.aspx (last accessed February 4, 2025).

177.    The research funded by the NCAA and the federal government through the NCAA-DoD Grand Alliance has resulted in NCAA rule changes. For instance, "[t]he CARE consortium has resulted in changes in the NCAA football contact practice guidelines and the diagnosis and management of sports-concussion." *See* https://mrdc.health.mil/index.cfm/media/articles/2018/research_supporting_lifetime_of_brain_injury (last accessed February 4, 2025).

178.    The NCAA-DOD Grand Alliance and the millions in federal dollars contributed to the project are promoted on the NCAA website and by NCAA staff members in their outreaches to NCAA stakeholders and member institutions.

179.    By contributing to policy changes and NCAA-developed concussion guidance materials the federal funding obtained by the NCAA contributes to the NCAA's mission and to its standing with NCAA member institutions.

180.    For the reasons set forth above, from at least 2014 through the present the NCAA has been a direct and/or indirect recipient and beneficiary of financial assistance from the U.S. federal government.

### THE ASSOCIATION-WIDE NATURE OF THE NCAA'S TRANSGENDER ELIGIBILITY POLICIES

181.    The decision to implement the 2010 NCAA Transgender Participation Policy was an Association-wide decision made by the NCAA Board of Governors.

182.    The Board of Governors' decisions in this area fall directly within core areas which NCAA members have outsourced to the NCAA.

183.    The 2010 NCAA Transgender Participation Policy were collegiate sport eligibility rules over which NCAA member institutions have given the NCAA control.

184.    2010 NCAA Transgender Participation Policy applied to all intercollegiate competition in which member institutions or individual athletes could qualify for selection in NCAA Championships, which NCAA member institutions have given the NCAA control to conduct. *See NCAA Swimming & Diving Championships, Pre-Championships 2021-22 Manual*, Section 1.6, *available at* https://swimswam.com/wp-content/uploads/2022/03/2021-22D1XSW_MANUALPreChamps.pdf (last accessed February 4, 2025).

185.    For swimming competition in particular, all times for every swimming event that a student-athlete may hope to use to qualify for an NCAA Championship must be achieved in "bona fide competition," as defined in the NCAA Rules Book, must be achieved in swimming meets that adhere to the NCAA Swimming and Diving Rules, and student-athletes must meet eligibility

standards when a time standard is achieved. *See NCAA Swimming & Diving Championships, Pre-Championships 2021-22 Manual*, Section 2.2.

186.     The NCAA defines bona fide competition for Swimming & Diving as follows:

> Bona fide competition is defined as an event that conforms to all NCAA rules relevant to swimming and diving performances. They include the following:

> a.     Meet is open to the public (spectators);
> b.     Competition is between two or more teams of the same gender at the same time and site, from different collegiate institutions;
> c.     All NCAA competitors must be eligible by NCAA standards;
> d.     Meets must be in institutions' approved competition schedule;
> e.     Meets must have published results; and
> f.     Depending on the governing body, meet official(s) must be qualified and/or certified.
> Or
> g.     Any bona fide meet as defined above and that is sanctioned or approved by USA Swimming and USA Diving that follows NCAA rules and regulations.
> h.     Select USA Swimming and USA Diving meets which are acceptable for achievement [sic] of time standards, consideration standards and optional entry standards may be designated each year by the NCAA Swimming and Diving Championship Committee.

> Examples include USA Swimming National Championships, FINA Short Course World Championships and USA Swimming Pro Series meets.

*NCAA Swimming & Diving, 2021-22 and 2022-23 Swimming & Diving Rules Book*, Rule 9, *available at* https://swimswam.com/wp-content/uploads/2023/05/NCAA-Swimming-and-Diving-Rules-Book-2021-2023.pdf (last accessed February 4, 2025).

187.     The NCAA founded the 2010 Transgender Participation Policy upon what the NCAA characterizes as nondiscrimination and inclusion principles which the NCAA refers to as

"core principles" and over which the NCAA Constitution gives the NCAA primary responsibility in shaping collegiate sport policies.

188.    The NCAA regarded its 2010 Transgender Participation Policy as integral to athlete health and safety, an area which the NCAA Constitution reflects that NCAA member institutions have given the NCAA authority to develop guidance and standards.

189.    Compliance by member institutions with the 2010 Transgender Participation Policy fell within the rules enforcement process which the NCAA Constitution makes the responsibility of the NCAA.

190.    Compliance by NCAA member institutions with the 2010 Transgender Participation Policy was mandatory.

191.    The 2010 Transgender Participation Policy affected student-athlete eligibility, impact student-athlete health, and can influence NCAA regulated competitions, including NCAA Championships.

192.    However, development of the 2010 Transgender Participation Policy was largely driven by the NCAA's Inclusion Department and the NCAA's Committee to Promote Cultural Diversity and Equity.

**NCAA'S RECENT HISTORY OF
DISCRIMINATION TOWARDS WOMEN**

193.    The NCAA has a long history of failing to govern intercollegiate sport in a way that provides equal opportunities for women.

194.    For instance, University of Notre Dame Head Women's Basketball Coach Muffet McGraw said in March, 2021, "the fact there's a huge disparity between men's and women's [NCAA] sports is hardly breaking news. We have been fighting this battle for years . . . What

bothers me is that no one on the NCAA's leadership team even noticed. . . This is the issue that women have been battling for decades."

195.    Numerous statistical measures demonstrate the NCAA's lack of adequate attention to women's sports and its discrimination against women.

196.    In 2021 an external review of eight-five NCAA Championship tournaments in twenty-four sports across all three NCAA divisions (the "Kaplan Report") identified inequities in ten women's sports.

197.    Phase 1 of the Kaplan Report found that "[t]he NCAA's current organizational structure and culture prioritizes men's basketball over everything else, contributing to gender inequity."

198.    Excluding basketball, in the 2018 to 2019 season the NCAA spent $1,697 less per woman participant in Division I and national championship spending.

199.    Research has found that Division I athletic departments at NCAA member institutions spend approximately twice as much on men's programs compared to women's programs.

200.    Champion Women and the California Women's Law Center report, based on data from the U.S. Department of Education, that most intercollegiate athletic departments of NCAA members are not meeting any of the standards Title IX sets for schools to demonstrate equity in sports opportunities.

201.    They report that NCAA member institutions would need to provide women an additional 148,030 sports opportunities to match the same ratio of opportunities that are offered to men.

202.    Such inequities led Carolyn Maloney Chairwoman of the House Committee on Oversight and Reform and fellow members of Congress Jackie Speier and Mikie Sherrill to write to NCAA President Mark Emmert on March 14, 2022, that, "[i]n creating and perpetuating structural inequities between men's and women's championships, and failing to implement substantive changes that would rectify these inequities, [the] NCAA is violating the spirit of gender equity as codified in Title IX."

## NCAA'S DEVELOPMENT AND IMPLEMENTATION OF TRANSGENDER ELIGIBILITY POLICIES

### The 2010 Transgender Participation Policy

203.    The NCAA's 2010 Transgender Participation Policy stated that men who wished to compete in NCAA competition on a women's team[11] could do so by "completing one calendar year of testosterone suppression treatment."[12]

204.    No specific level of testosterone suppression was required.

205.    Nor was independent testing or monitoring of hormone levels or of testosterone suppression required.

206.    Nor did that policy include any provisions requiring evaluation of any competitive advantage of male athletes competing on a women's team or require any evaluation of increased risk of injury to women student-athletes.

---

[11] The Policy (as updated in 2022 to, in the wording of the NCAA, "remove outdated language") refers to such individuals as "[a] trans female (MTF) student-athlete being treated with testosterone suppression medication for gender dysphoria[.]"
[12]
https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderStudentAthleteParticipation Policy.pdf (last accessed February 4, 2025).

**Origin of the 2010 Transgender Participation Policy**

207.    The 2010 Transgender Participation Policy was not supported by any scientific research or study commissioned by the NCAA.

208.    The 2010 Transgender Participation Policy was not recommended by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sport.

209.    The 2010 Transgender Participation Policy was not recommended by any NCAA committee with a primary responsibility for competitive fairness, sports medicine, sports safety analysis, sports safety research,  or sport rulemaking.

210.    The origin of the 2010 Transgender Participation Policy was a report entitled *On The Team: Equal Opportunity for Transgender Student Athletes* from the National Center on Lesbian Rights and the Women's Sports Foundation in October 2010 that provided guidance on how colleges and universities should accommodate the interests of student-athletes who have transitioned or are transitioning from one gender to another (the "Report").[13]

211.    The Report was co-authored by the National Center for Lesbian Rights' Director of the Sports Project Helen Carroll and GLESN (Gay, Lesbian and Straight Education Network) project director Pat Griffin, who has overseen educational efforts for lesbian, gay, bisexual and transgender issues in sports for the Women's Sports Foundation, the Report stresses that any transgender student-athlete "should be allowed to participate in any gender-segregated sports activity so long as that athlete's use of hormone therapy, if any, is consistent with the national governing body's existing policies on banned medications."

212.    The Report emerged after the National Center for Lesbian Rights and the Gay, Lesbian and Straight Education Network sponsored a "think tank" entitled "Equal Opportunities

---

[13]    https://www.nclrights.org/wp-content/uploads/2013/07/TransgenderStudentAthleteReport.pdf (last accessed February 4, 2025).

for Transgender Student-Athletes" in 2009 that included representatives from the NCAA, the National High School Federation, and experts on transgender issues from disciplines ranging from law and medicine to advocacy and athletics. The think-tank goals were to develop model policies and identify best practices for high school and collegiate athletics programs to ensure the full inclusion of transgender student-athletes.

213.    The Report offers a comprehensive discussion of what the term "transgender" means and how to provide access and equal opportunities to the individuals it applies to.

214.    In April 2011, the NCAA Executive Committee heard a presentation regarding transgender student-athletes and noted the NCAA's effort to better educate institutions about accommodating the interests of student-athletes who are transitioning and to develop Association-wide policies regarding transgender student-athlete participation in college sports.

215.    In August 2011 the NCAA Executive Committee approved the 2010 Transgender Participation Policy.

216.    The NCAA's August 2011 decision to approve the 2010 Transgender Participation Policy was the conclusion of a process, which included input from NCAA member committees, including the Student-Athlete Advisory Committees, other sports governance consultants, the Women's Sports Foundation and the National Center for Lesbian Rights.

217.    The 2010 Transgender Participation Policy remained unchanged and fully stated the NCAA's policy regarding the eligibility of transgender individuals until the winter 2022 NCAA Championships and throughout the Ivy League Championships.

### DISCRIMINATORY IMPACTS OF THE NCAA'S CURRENT TRANSGENDER ELIGIBILITY POLICIES

**The Premise of the NCAA's Transgender Eligibility Policies—that Men Can Equally, Fairly, and Lawfully Compete in Women's Sports Through Testosterone Suppression—is Flawed**

**The Male-Female Sport Performance Gap**

218.    The reason for sex-separated sport (*i.e.*, for creating separate men's and women's teams or a separate women's category) and the reason the Title IX regulations endorse sex-separated sports teams is to give women a meaningful opportunity to compete that they would be denied were they required to compete against men.

219.    Biological differences between men and women prevent meaningful competition between men and women in all sports contested at a collegiate level in NCAA Divisions I, II and/or III.

220.    Developmental biologist Dr. Emma N. Hilton and sport physiologist Dr. Tommy R. Lundberg report that "the performance gap between males and females . . . often amounts to 10 – 50% depending on sport." Hilton, E.N., Lundberg, T.R., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine* (2021) 51:199-214, p. 199.

221.    Hilton and Lundberg note that the sport performance gap between men and women is not limited to certain sports but applies generally to most skills necessary for success in sport. *Id*. Here is a chart that illustrates male sport performance advantages across a wide group of discrete sport skills:

**Fig. 1** The male performance advantage over females across various selected sporting disciplines. The female level is set to 100%. In sport events with multiple disciplines, the male value has been averaged across disciplines, and the error bars represent the range of the advantage. The metrics were compiled from publicly available sports federation databases and/or tournament/competition records. *MTB* mountain bike



Reproduced from: Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine*, (2021) 51:199-214, p. 202, Fig. 1.

222.    The source of male athletic performance advantages over women (sometimes described as the "Male-Female Sport Performance Gap") is attributed by many scientists to genetic differences between males and females and the effects higher levels of testosterone have on the male body throughout male development.

223.    The developmental and physiological effects brought about by genetic differences between males and females and higher levels of circulating testosterone in males begin well before puberty.

224.    In the womb and in the 6-9 month "mini puberty" phase immediately post birth natal males experience endogenous synthesis and secretion of higher levels of testosterone than natal females, triggering differentiation in male body structure beginning even before birth.

225.    The result is "is a clear sex difference in both muscle mass and strength even adjusting for sex differences in height and weight. On average women have 50% to 60% of men's upper arm muscle cross-sectional area and 65% to 75% of men's thigh muscle cross-sectional area, and women have 50% to 60% of men's upper limb strength and 60% to 80% of men's leg strength. Young men have on average a skeletal muscle mass of >12 kg greater than age-matched women at any given body weight."[14] The impact of these differences is "an obvious performance enhancing effect, in particular in sports that depend on strength and (explosive) power, such as track and field events."[15]

226.    Also, "levels of circulating hemoglobin are androgen-dependent and consequently higher in men than in women by 12%[.]"[16] Increased levels of hemoglobin are due to the fact that, "[t]estosterone increases secretion of and sensitivity to erythropoietin, the main trophic hormone for erythrocyte production and thereby hemoglobin synthesis[.]"[17] These effects from testosterone and erythropoietin "[i]ncreas[e] the amount of hemoglobin in the blood [with] the biological effect of increasing oxygen transport from lungs to tissues, where the increased availability of oxygen enhances aerobic energy expenditure. This is exploited to its greatest effect in endurance sports. . . It may be estimated that as a result the average maximal oxygen transfer will be ~10% greater in men than in women, which has a direct impact on their respective athletic capacities."[18]

227.    Further, due to the impacts of testosterone, and perhaps other factors, on male development, "on average men are 7% to 8% taller with longer, denser, and stronger bones,

---

[14] Handelsman, D.J., Hirschberg, A.L., Bermon, S., "Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance," *Endocr. Rev.* 2018 Oct; 39(5): 803-829.
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*

whereas women have shorter humerus and femur cross-sectional areas being 65% to 75% and 85%, respectively, those of men."[19] The athletic advantages conferred by men's larger and stronger bones includes, "greater leverage for muscular limb power exerted in jumping, throwing, or other explosive power activities" and greater male protection from stress fractures.[20]

228.    Additionally, there is a sex difference in pulmonary function which "may be largely explained by the androgen-sensitive difference in height, which is a strong predictor of lung capacity and function."[21]

229.    There are many ways to illustrate the Male-Female Sport Performance Gap and demonstrate that men competing on women's teams is incompatible with equal opportunities for women.

230.    A point of comparison that helps put the Male-Female Sport Performance Gap in perspective is to understand that *every* women's world record in *every* track and field event is bested *every* year by dozens, and in many cases hundreds, of high school age males.

---

[19] *Id*.
[20] *Id*.
[21] *Id*.

231.   The following chart illustrates the performance gap by comparing the times of three 400m female Olympic gold medalists to thousands of males in 2017:



Above chart used with permission from Ross Tucker and derived from: Coleman, D.L., Joyner, M.J., Lopiano, D., "Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule," *Duke Journal of Genera Law & Policy*, Vol. 27:69-134, p. 89.

232.   As demonstrated in the chart, in a single year tens of thousands of males outperformed the best female 400m runners in the world.

233.    Here is a table which shows that high school boys ages 14-15 have eclipsed many women's world records by large margins:

**Table 3**  Selected junior male records in comparison with adult elite female records

| Event | Schoolboy male record | Elite female (adult) record |
| --- | --- | --- |
| 100 m | 10.20 (age 15) | 10.49 |
| 800 m | 1:51.23 (age 14) | 1:53.28 |
| 1500 m | 3:48.37 (age 14) | 3:50.07 |
| Long jump | 7.85 m (age 15) | 7.52 m |
| Discus throw | 77.68 m (age 15) | 76.80 m |

*M* meters

Time format: minutes:seconds.hundredths of a second

Reproduced from: Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," Sports Medicine, (2021) 51:199-214, p. 204, Table 3.

234.    These examples reflect that the plain language of Title IX which speaks in terms of binary, biological sex (*i.e.*, male and female) is supported by science.

235.    There are relevant and large differences between the sexes in terms of athletic and physical capacity and this translates into a large Male-Female Sport Performance Gap.

236.    Thus, in terms of fairness and equality for women competing in collegiate sport, the eligibility line of "biological sex" drawn by Title IX is the appropriate dividing line to ensure equal athletic opportunities for women.

237.    Deviation from the biological line drawn by Title IX harms women and deprives them of equal opportunities to men by making them compete against men, which reduces women's sport opportunities, is not fair, and in many cases can be unsafe.

238.    Despite the science-backed dividing line for eligibility in women's sport provided by Title IX, which is sex and sex alone, the NCAA chose to define eligibility in women's collegiate sport in terms of testosterone suppression by allowing men to compete as women by suppressing testosterone to a certain level that is still above the female range.

239.    Testosterone suppression can never undue the permanent effects of male development.

240.    A male can never become female and female athletes are not the equivalent of men with low testosterone.

**Testosterone Suppression Does Not Bridge the
Male-Female Sport Performance Gap**

241.    As explained above, the NCAA gives men who wish to compete against women the option to suppress testosterone to a level that is still above the highest level a female can produce without doping.

242.    The NCAA Transgender Eligibility Policies require only a year of testosterone suppression before a man may compete against women.

243.    However, peer reviewed scientific research papers confirm testosterone suppression does not bridge the Male-Female Sport Performance Gap.

244.    In one peer reviewed article researchers studied the effects of a year of hormone suppression on males and found that while males on hormone suppression experienced some reduction in muscle mass, they "generally maintained their strength levels."[22]

245.    In another report, researchers Hilton and Lundberg concluded "that under testosterone suppression regimes typically used in clinical settings, and which comfortably exceed the requirements of sports federations for inclusion of transgender women in female sports categories by reducing testosterone levels to well below the upper tolerated limit, *evidence for loss of the male performance advantage*, established by testosterone at puberty and translating in elite athletes to a 10–50% performance advantage, *is lacking*."[23]

246.    Hilton and Lundberg continued:

Rather, the data show that strength, lean body mass, muscle size and bone density are only trivially affected. The reductions observed in muscle mass, size, and strength are very small compared to the baseline differences between males and females in these variables, and thus, there are major performance and safety implications in sports where these attributes are competitively significant. These data significantly undermine the delivery of fairness and safety presumed by the criteria set out in transgender inclusion policies, particularly given the stated prioritization of fairness as an overriding objective (for the IOC). If those policies are intended to preserve fairness, inclusion and the safety of biologically female athletes, sporting organizations may need to reassess their policies regarding inclusion of transgender women.

*Id.*

247.    Peer reviewed scientific studies confirm testosterone suppression does relatively little to mitigate the strength, speed, size, power and other athletically relevant differences between men and women (*i.e.*, the Male-Female Sport Performance Gap).

---

[22] Wiik, Anna, et al., "Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals," *J Clin Endocrinol Metab*, March 2020, 105(3):e805–e813, available at: https://academic.oup.com/jcem. (accessed Mar. 14, 2024)

[23] Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine*, (2021) 51:199-214, p. 211.

248.    A review published in April 2023 reported there have been a total of 19 published peer reviewed research reports on the effects of testosterone suppression (as part of gender affirming hormone treatment or "GAHT") on performance.[24]

249.    "Collectively, the existing research indicates that while GAHT affects biology, the changes it creates are minimal compared to the initial biological differences between typical males and typical females, which means that both biological attributes and performance differences are retained even after years of GAHT." *Id.*

250.    "In spite of testosterone suppression in transwomen reducing circulating hemoglobin concentration to the levels of reference women, all of these reviews came to the conclusion that even after 3 years of testosterone suppression there are still lasting male athletic advantages in transwomen." *Id.*

251.    Thus, while testosterone suppression is the backbone of the NCAA's Transgender Eligibility Policies and a basis upon which the NCAA authorizes men to compete in women's sports after only a year of testosterone suppression, peer reviewed scientific research confirms the NCAA's reliance upon testosterone suppression is not supported by reliable scientific data.

252.    Nor has the NCAA ever published any data or studies supporting its testosterone suppression policy.

**The NCAA's Transgender Eligibility Policies Allow Men to Compete Against Women While Retaining Higher Levels of Testosterone Than Women**

253.    The ranges of testosterone produced by men and women do not overlap.

254.    Men produce far more testosterone than women and there is a significant gap

---

[24] "Should Transwomen be allowed to Compete in Women's Sports?" Brown, Gregory A., Ph.D. and Lundberg, Tommy, Ph.D., available at: https://www.sportpolicycenter.com/news/2023/4/17/should-transwomen-be-allowed-to-compete-in-womens-sports (last accessed February 4, 2025).

between the upper end of the testosterone range for women and the lower end of the testosterone range for men.

255.    A 2018 metanalysis established that in healthy individuals there is "a clear bimodal distribution of testosterone levels, with the lower end of the male range being four- to five-fold higher than the upper end of the female range (males 8.8-30.9 nmol/L, females 0.4-2.0 nmol/L)." Clark RV, Wald JA, Swerdloff RS, *et al.*, "Large divergence in testosterone concentrations between men and women: Frame of reference for elite athletes in sex-specific competition in sports, a narrative review." *Clin Endocrinol* (Oxf). 2019; 90:15–22. https://doi.org/10.1111/cen.13840.

256.    After the NCAA changed its Transgender Eligibility Policies in 2022, in 19 out of 25 women's sports the NCAA only requires men who want to compete against women to show testosterone suppression to a level of less than 10 nanomoles per liter (<10 nmol/L).

257.    The <10 nmol/L testosterone threshold used by the NCAA for granting eligibility to men to compete against women in most NCAA sports is five times higher than the upper end of the female testosterone range, twenty-five times higher than the testosterone level of females at the lower end of the female range, and *includes testosterone levels that are within the normal male range* of 8.8 nmol/L to 30.9 nmol/L.

258.    Importantly, the female range of 0.4 nmol/L to 2.0 nmol/L *includes elite female athletes*.

259.    This means that even after "suppression" men are allowed to compete in the women's category with testosterone levels far higher than any female athlete could ever achieve without doping.

260.    Moreover, under current NCAA rules, some men (those falling within the lower end of the normal male testosterone range (*i.e.*, between 8.8 to 10.0 nmol/L or so) could compete in NCAA women's sports without substantially reducing their testosterone level at all.

261.    These facts further confirm the NCAA's policy disparately impacts women.

262.    Plaintiffs do not concede that rules that permit a man to compete in women's scholastic sports through engaging in any level of testosterone suppression can pass muster under Title IX.

263.    But, even were it to be found that relying upon male testosterone suppression to permit men to access women's sports and sports teams could preserve fair competition for women in sports, *the NCAA's current eligibility rules* cannot preserve equal opportunity and would still fail under Title IX because the policies *provide a testosterone advantage to men that women cannot replicate without doping* and a man competing on a women's team is taking opportunities directly from women.

264.    In addition, as explained below, the <10 nmol/L testosterone suppression level, which is a central feature of the current NCAA Transgender Eligibility Policies was formally dispensed with years ago by the International Olympic Committee (IOC).

### UPENN ROSTERS A MALE ON ITS
### 2021-2022 WOMEN'S SWIMMING AND DIVING TEAM

265.    Lia Thomas formerly swam for the UPenn men's swimming and diving team.

266.    In the Fall of 2019, Margot Kaczorowski was three weeks into college when UPenn swimming coach Mike Schnur called a meeting of women's swim team members only.

267.    Margot entered the meeting where Coach Schnur announced, "this is Will's meeting," turning the meeting over to men's swim team member Will Thomas who was sitting in the meeting amongst the women's swim team members.

268.    Margot knew Thomas only as a men's swim team member who was then dating a women's swim team member.

269.    Thomas responded simply: "I'm transgender and starting next year I'm going to be competing on the women's team."

270.    Margot was shocked, upset, and angry, all at the same time.

271.    She recalls crying in her googles as she attempted to practice following the blunt announcement by Thomas.

272.    UPenn women's swimmers were encouraged by Coach Schnur and other members of the UPenn administration and athletic department not to talk about Thomas's revelation.

273.    When UPenn women swimmers asked about whether Thomas would use the women's locker room they were assured by Coach Schnur that Thomas would be changing elsewhere and would not use the women's locker room.

274.    Thomas took a gap year during the 2020 to 2021 season and, on information and belief, underwent testosterone suppression therapy to comply with the 2010 Transgender Participation Policies.

275.    Thomas began practicing and competing with the UPenn Women's Swimming and Diving Team in the Fall of 2021.

276.    However, Thomas's gap year to undergo testosterone suppression therapy did not remove Thomas's retained male advantage.

277.    On April 5, 2022, *Swimming World Magazine* published a comparison of Thomas's times in NCAA competitions when competing in the male vs. female categories.

278.    *Swimming World's* analysis demonstrates Thomas' Retained Male Advantage when competing in the female category.

279.    The article explained:

Just how much of an advantage did Lia Thomas possess over biological females? The numbers paint a clear picture. The fact that the University of Pennsylvania swimmer soared from a mid-500s ranking (554th in the 200 freestyle; all divisions) in men's competition to one of the top-ranked swimmers in women's competition tells the story of the unfairness which unfolded at the NCAA level.

In her final meet, Thomas finaled in three events at the NCAA Championships, highlighted by a victory in the 500 freestyle. She also finished fifth in the 200 freestyle and was eighth in the 100 freestyle. Although she didn't contest the event at the NCAA Champs, Thomas had one of the country's top times in the 1650 freestyle. Here's a look at her performances throughout the season, including their comparative status to her times as a member of Penn's men's squad.

- In the 500 freestyle, Thomas' time of 4:33.24 from her <u>NCAA-title swim</u> handed her the fastest time in the nation by more than a second over Arizona State's **Emma Nordin** (4:34.87). Additionally, Thomas' difference from her personal best with the Penn men's program was just 6%, as opposed to the typical 10% to 11% difference generally seen between men and women.

- Thomas' best time in the 200 freestyle ended up being her 1:41.93 mark from the Zippy Invitational in December. That effort ultimately ended up 3.76% slower than her best time before her transition. Again, that time was between 7% and 8% faster than the typical separation between men and women.

- When Thomas won the 200 freestyle at the Ivy League Champs in 1:43.12, she was even with runnerup **Samantha Shelton** at the midway point, but crushed the Harvard swimmer over the last 100, highlighted by a 25.04 split for the last 50 yards. The closing split of Thomas was faster than the finishing laps of **Missy Franklin** in her American-record performance, and the best closing effort of the likes of **Katie Ledecky**, **Mallory Comerford** and **Siobhan Haughey**, among others.

- In the 100 freestyle, Thomas' best time prior to her transition was 47.15. At the NCAA Championships, she posted a prelims time in the event of 47.37. That time reflects minimal mitigation of her male-puberty advantage.

- During the last season Thomas competed as a member of the Penn men's team, which was 2018-19, she ranked 554th in the 200 freestyle, 65th in the 500 freestyle and 32nd in the 1650 freestyle. As her career at Penn wrapped,

she moved to fifth, first and eighth in those respective events on the women's deck.[25]

280.    When UPenn's women's swimmers returned to school in the fall of 2021 they were shocked to discover that Thomas was being allowed to use the women's locker room at UPenn and would be allowed to use the women's locker room at swim meets.

281.    Margot Kaczorowski only learned that Thomas had been authorized by UPenn to use the women's locker room when she walked in the women's locker room to find Thomas in front of her changing his clothing.

282.    Shocked, Margot immediately left the locker room and sought out Coach Schnur who had previously assured her that Thomas would not use the women's locker room.

283.    Through tears Margot told her coach that Thomas' use of the locker room was not right. In response, Schnur claimed that he knew it was wrong but there was nothing he could do.

284.    Throughout the 2021-2022 season, although using the women's locker room, Thomas did not always practice with the UPenn Women's Swimming Team because Thomas would often outpace the women during practice.

285.    So, while Thomas used the women's locker room, Thomas often continued to practice with the UPenn Men's Swimming and Diving Team.

286.    The Plaintiffs complained to Coach Schnur about Thomas's participation on the women's swim team and Thomas's use of the women's locker room but were repeatedly told that there was nothing that could be done about it.

---

[25] "A Look At the Numbers and Times: No Denying the Advantages of Lia Thomas," Swimming World Magazine, April 5, 2022, by John Lohn, Editor-in-Chief, *available at*: https://www.swimmingworldmagazine.com/news/a-look-at-the-numbers-and-times-no-denying-the-advantages-of-lia-thomas/ (last accessed February 4, 2025).

287.    Coach Schnur told the Plaintiffs that decisions such as Thomas' participation on the UPenn Team,  Thomas' participation on the UPenn Team that would compete at Harvard in the Ivy League Championships, and Thomas's presence in the women's locker room at UPenn and at away swim meets were all being made above him and implied that he would be fired by UPenn if he did not allow Thomas to use the women's locker rooms and compete on the UPenn women's swim team.

288.    Each of the Plaintiffs was repeatedly emotionally traumatized by the violation of her privacy and the requirement that she share the women's locker room with a male.

289.    At the Zippy Invitational in Akron, Ohio, the mid-season meet for the UPenn women's swim team, Thomas swam the fastest times in the nation in women's freestyle events from the 200 free to the mile.

290.    Throughout the 2021 to 2022 women's swimming season while Thomas was competing on the UPenn women's team Thomas was dominant and took places and results away from women competing in dual meets and Ivy League meets.

291.    The unfairness of Thomas regularly taking placements and records from women was discouraging and demoralizing to Plaintiffs, robbing them of full enjoyment of their experience as a member of the UPenn women's swim team.

292.    Thomas's dominant competitive performances focused national attention upon the NCAA's 2010 Transgender Participation Policy.

293.    Week after week media focus and attention upon the UPenn women's swim team grew. This too deprived the women swimmer of focus and caused the 2021 to 2022 season to be chaos filled, demoralizing and draining. All of the focus was upon Thomas, the man on the

women's swim team, and not upon the women on the team. This too deprived the Plaintiffs and their teammates of their equal opportunities as women swim team members.

294.    In December 2021, administrators from UPenn called a mandatory women's swimming team meeting with all the members of the UPenn Women's Swimming and Diving Team, except for Thomas who did not attend the meeting. The administrators' meeting was about Thomas's participation on the Women's team.

295.    The administrators explained that one purpose of the meeting was to address the national media attention that Thomas was attracting and the women's team members' concern about Thomas's participation on the UPenn Women's team.

296.    Rudy Fuller, Senior Associate Athletic Director, Lauren Procopio, Associate Athletic Director, a representative of the UPenn LGBTQ Center, and a representative from UPenn Counseling and Psychology Services ("CAPS") spoke to the UPenn Women's team.

297.    These administrators affirmed that Thomas would continue to swim on the women's team, stating: "Lia swimming is a non-negotiable."

298.    The UPenn administrators went on to tell the women that if the women spoke publicly about their concerns about Thomas' participation on the Women's Team, the reputation of those complaining about Thomas being on the team would be tainted with transphobia for the rest of their lives and they would probably never be able to get a job.

299.    The UPenn administrators told the women that if anyone was struggling with accepting Thomas's participation on the UPenn Women's team, they should seek counseling and support from CAPS and the LBGTQ center.

300.    The administrators also invited the women to a talk titled, "Trans 101."

301.    Thus, the women were led to understand that UPenn's position was that if a woman on the team had any problem with a trans-identifying male being on her team that woman had a psychological problem and needed counseling.

302.    Margot Kaczorowski spoke with Lauren Procopio after this meeting, in tears, telling Procopio "I know you know this is wrong." But Procopio disagreed with Margot, responding that she supported the Ivy League and NCAA policy.

303.    After this meeting, Plaintiffs and other women on the UPenn Women's team feared reprisal from UPenn administrators if they spoke out against Thomas's participation on the UPenn Women's team.

304.    In January 2021 the UPenn women's swimming team took a training trip to the State of Florida.

305.    To avoid public and/or media attention UPenn women's swimming team members on the trip were instructed to remove or cover with duct tape any references to "UPenn" or "University of Pennsylvania" swimming on their backpacks, sweatsuits and other gear.

306.    All team members except for Thomas complied with the directive to cover UPenn references on their clothing during this trip.

307.    The UPenn's women's team regularly trained at a public water park during their Florida training trip.

308.    During these training sessions in Florida the UPenn's women's team shared the water park and the women's locker room at the water park with members of the public.

309.    The members of the UPenn women's team were shocked that Thomas used the public women's locker room at the water park and undressed in the presence of children that appeared to be as young as 4 years old.

310.    Members of the UPenn women's team do not believe that Coach Schnur, Lia Thomas or anyone from UPenn advised the operators of the water park that a male was using the women's locker room.

311.    Watching Thomas using a public locker room with little girls as young as four years old was traumatizing to many members of the UPenn women's swim team and is one Margot Kaczorowski's and Grace Estabrook's saddest memories of their time on the UPenn women's swim team.

### HOW THE IVY LEAGUE INFLUENCED THE NCAA'S CURRENT TRANSGENDER ELIGIBILITY POLICIES

312.    UPenn swim team members were told by Coach Schnur and UPenn administrators that UPenn administrators coordinated closely with the NCAA and the Ivy League to ensure that Thomas would be eligible for the 2021-2022 women's swimming season.

313.    These statements about close coordination between UPenn, the Ivy League and the NCAA regarding Thomas' eligibility led the UPenn Women's Team members to understand the resisting or protesting the participation of Thomas on the team or presence in the locker room would be futile and could result in the women being removed from the team or from UPenn.

### January 6, 2022, Ivy League Declaration of Public Support for the 2010 Transgender Participation Policy

314.    On January 6, 2022, in response to public attention on the performances of Thomas the Ivy League issued the following statement supporting the 2010 Transgender Participation Policy:

**PRINCETON, N.J.** – The Ivy League releases the following statement of support regarding Penn's Lia Thomas' participation on the women's swimming & diving team:

*Over the past several years, Lia and the University of Pennsylvania have worked with the NCAA to follow all of the appropriate protocols in order to comply with the NCAA policy on transgender athlete participation and compete on the Penn*

*women's swimming and diving team. The Ivy League has adopted and applies the same NCAA policy.*

*The Ivy League reaffirms its unwavering commitment to providing an inclusive environment for all student-athletes while condemning transphobia and discrimination in any form.*

*The league welcomes her participation in the sport of women's swimming and diving and looks forward to celebrating the success of all of our student-athletes throughout the season.[26]*

**January 19, 2022, NCAA Board of Governors Announces**
**NCAA Will Follow Transgender Eligibility Rules of**
**U.S. Governing Bodies of Olympic Sports**

315.    On January 19, 2022, also apparently in response to growing public concerns regarding the performances of Thomas in collegiate swimming competitions, the NCAA Board of Governors made an announcement which did not change the NCAA's policy of allowing men identifying as transgender to compete on collegiate women's teams.

316.    However, the announcement purported to align the NCAA's transgender eligibility policy with the sport-by-sport rules of NGBs in Olympic sports.

317.    The NCAA Board of Governors press release stated:

**Board of Governors updates transgender participation policy**
**Policy will take effect immediately, and impacted athletes can regain eligibility later if approved by divisions**

Media Center
Posted: 1/19/2022 8:41:00 PM

The NCAA Board of Governors on Wednesday voted in support of a sport-by-sport approach to transgender participation that preserves opportunity for transgender student-athletes while balancing fairness, inclusion and safety for all who compete. The new policy, effective immediately, aligns transgender student-athlete participation for college sports with recent policy changes from the United States Olympic and Paralympic Committee and International Olympic Committee.

---

[26]    https://ivyleague.com/news/2022/1/6/general-the-ivy-league-releases-statement-of-support-regarding-penns-lia-thomas-participation-in-womens-swimming-diving.aspx (accessed Mar. 14, 2024)

Like the Olympics, the updated NCAA policy calls for transgender participation for each sport to be determined by the policy for the national governing body of that sport, subject to ongoing review and recommendation by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports to the Board of Governors. If there is no NGB policy for a sport, that sport's international federation policy would be followed. If there is no international federation policy, previously established IOC policy criteria would be followed.

The Board of Governors urged the divisions to provide flexibility to allow for additional eligibility if a transgender student-athlete loses eligibility based on the policy change provided they meet the newly adopted standards.

The policy is effective starting with the 2022 winter championships. Transgender student-athletes will need to document sport-specific testosterone levels beginning four weeks before their sport's championship selections. Starting with the 2022-23 academic year, transgender student-athletes will need documented levels at the beginning of their season and a second documentation six months after the first. They will also need documented testosterone levels four weeks before championship selections. Full implementation would begin with the 2023-24 academic year.

"We are steadfast in our support of transgender student-athletes and the fostering of fairness across college sports," said John DeGioia, chair of the board and Georgetown president. "It is important that NCAA member schools, conferences and college athletes compete in an inclusive, fair, safe and respectful environment and can move forward with a clear understanding of the new policy."

"Approximately 80% of U.S. Olympians are either current or former college athletes," said Mark Emmert, NCAA president. "This policy alignment provides consistency and further strengthens the relationship between college sports and the U.S. Olympics."

Additionally, the NCAA's Office of Inclusion and the Sport Science Institute released the Gender Identity and Student-Athlete Participation Summit Final Report. The report assists ongoing membership efforts to support inclusion, fairness, and the mental and physical health of transgender and non-binary student-athletes in collegiate sport.

318.    Via the revised transgender eligibility policies as stated above, the NCAA pledged to apply sport-by-sport the eligibility policy of the relevant U.S. Olympic Sport National Governing Body (NGB), or, if the NGB had no policy, the rules of the relevant international sport federation.

319.     As of January 19, 2022, when the NCAA issued its public pledge to follow the eligibility rules of the relevant NGB or international sport federation, neither FINA (then the name of the international swimming federation) nor USA Swimming had rules on their books regarding eligibility for transgender athletes.

320.     Instead, the policy of USA Swimming was to refer "[p]rotests regarding an athlete's competition category [to the USA Swimming] National Eligibility Appeal Panel[.]" USA Swimming 2022 Rulebook Rule 102.23.2.

321.     Thus, the NCAA's January 19, 2022, announcement created immediate ambiguity regarding the eligibility of Thomas for the upcoming Ivy League and NCAA Swimming Championships.

### Ivy League Pressure Campaign Against the NCAA

322.     The Ivy League's Executive Director Robin Harris swiftly condemned the NCAA's January 19, 2022 announcement that it would follow the eligibility rules of USA Swimming instead of the 2010 NCAA Policy on Transgender Student-Athlete Participation.

323.     Immediately after the NCAA's January 19, 2022, announcement Robin Harris, complained to multiple media outlets about the NCAA's shift in policy, stating "I was shocked; I was dismayed; I was angry. The NCAA has never in my 30 years implemented a new policy that could negatively impact a student-athlete's eligibility immediately. And that is what they've done here."[27]

324.     Robin Harris told another media outlet "It's wrong. It's unfair. This is a perfect example of the risks and the uncertainty that is created when the N.C.A.A. chose to implement a

---

[27]     https://www.espn.com/college-sports/story/_/id/33145647/ncaa-missed-opportunity-new-transgender-athlete-policy (last accessed February 4, 2025).

policy immediately without any specificity. This is reactionary and it creates uncertainty, and the impact it creates on our transgender athletes is something I'm concerned about."[28]

325.    Ignoring the wishes and suffering of many of its female swimmers, on January 20, 2022, UPenn issued a public statement saying, "In support of our student-athlete, Lia Thomas, we will work with the NCAA regarding her participation under the newly adopted standards for the 2022 NCAA Swimming and Diving Championship."[29]

326.    Thereafter, Robin Harris met with Thomas and/or UPenn's athletics department in late January or early February 2022 and discussed suing the NCAA if the NCAA did not allow Thomas to compete.

### February 1, 2022, USA Swimming Adopts Transgender Eligibility Rules

327.    Then, on, February 1, 2022, less than two weeks after the NCAA Board of Governors' announcement, USA Swimming adopted detailed transgender eligibility rules.

328.    USA Swimming announced the following eligibility criteria:

The elite athlete policy will be implemented by a decision-making panel comprised of three independent medical experts and eligibility criteria will consist of:

- Evidence that the prior physical development of the athlete as a male, as mitigated by any medical intervention, does not give the athlete a competitive advantage over the athlete's cisgender female competitors.

- Evidence that the concentration of testosterone in the athlete's serum has been less than 5 nmol/L (as measured by liquid chromatography coupled with mass spectrometry) continuously for a period of at least thirty-six (36) months before the date of application.

---

[28]    https://www.athleticbusiness.com/operations/governing-bodies/article/15288134/ncaa-to-review-usa-swimmings-new-transgender-policy (last accessed February 4, 2025).

[29]    https://www.espn.com/college-sports/story/_/id/33109160/penn-work-ncaa-support-transgender-swimmer-lia-thomas-participation-swimming-diving-championships (last accessed February 4, 2025).

Athletes will need to abide by USA Swimming's Athlete Inclusion, Competitive Equity and Eligibility Policy to be eligible to set USA Swimming National Age-Group Records in the 13-14 age group and above or to be eligible to set an American Record, per the USA Swimming Rules & Regulations, in a competition category which is different than the gender assigned to the athlete at birth.[30]

329.    USA Swimming required testosterone suppression *under the maximum threshold for 36 months* before the date of application, something Thomas could not achieve as Thomas had not been suppressing testosterone for the previous 36 months, nor had any scientific analysis been conducted to establish Thomas did not retain male competitive advantage.

330.    Thus, had the USA Swimming policy been applied by the NCAA consistent with its Board of Governors' January 19, 2022 announcement, Thomas would not have been eligible to compete in the Ivy League Championships.

331.    The very next day on February 2, 2022, the NCAA stated it was unsure whether the new NCAA policy would be applied to Thomas.

332.    At that time an NCAA spokeswoman confirmed that the NCAA's Competitive Safeguards and Medical Aspects of Sports Committee would "meet at the end of February to review the new USA Swimming Policy."

333.    However, Robin Harris was working behind the scenes to ensure that the USA Swimming Rule would be rejected by the NCAA.

334.    Harris and the Ivy League enlisted an array of individuals to engage in a non-stop pressure campaign against the NCAA, including seeking legal counsel and threatening legal action if Thomas was prevented by NCAA rules from competing in the Ivy League championships or the NCAA championships.

---

[30]    https://www.usaswimming.org/news/2022/02/01/usa-swimming-releases-athlete-inclusion-competitive-equity-and-eligibility-policy (last accessed February 4, 2025).

335.     In response to USA Swimming's policy change, sixteen UPenn swimmers, including Plaintiffs Estabrook, Holmquist and Kaczorowski, signed a letter stating "We, 16 members of the Penn Women's Swimming Team and our family members, thank USA Swimming, for listening to our request to prioritize fairness for biological women in our elite competitions," the letter said. "We ask that Penn and the Ivy League support us as biological women, and not engage in legal action with the NCAA to challenge these new Athlete Inclusion Policies."

336.     Word was out that the Ivy League was threatening the NCAA behind the scenes and insisting that Thomas be allowed to compete in the upcoming women's competitions regardless of the rules and regardless of unfairness to women.

337.     The NCAA soon capitulated, and the Ivy League got its way, using the NCAA structure and apparatus to impose radical gender ideology upon federally funded colleges and universities throughout the entire country.

**February 10, 2022, NCAA Declines to Apply USA Swimming Rules**

338.     Notwithstanding the NCAA Board of Governors' January 19, 2022, announcement supposedly adopting "a sport-by-sport approach to transgender participation" in which "transgender participation for each sport [would] be determined by the policy for the national governing body of that sport," *the NCAA Board of Governors rejected USA Swimming's rules*.

339.     On February 10, 2022, the NCAA announced that "implementing additional changes at this time could have unfair and potentially detrimental impacts on schools and student-athletes intending to compete in 2022 NCAA women's swimming championships[.]"[31]

---

[31]     https://www.ncaa.org/news/2022/2/10/media-center-csmas-subcommittee-recommends-no-additional-changes-to-testosterone-threshold-for-trans-women-at-2022-womens-swimming-and-diving-championships.aspx (last accessed February 4, 2025).

340.    Instead, the NCAA announced that student-athletes who had been following the 2010 Transgender Participation Policy need only demonstrate a serum testosterone level below the "maximum allowable limit" for that sport within four weeks of the championship.

341.    Thus, USA Swimming's rule requiring testosterone suppression for at least thirty-six months in advance of competition and requiring scientific review of retained male competitive advantage was rejected by the NCAA Board of Governors before any review of USA Swimming by the NCAA's CSMAS committee and just days after the Board of Governors said it intended to follow the transgender eligibility rules of U.S. NGBs.

342.    The Ivy League and Robin Harris' insistence and threat of litigation caused the NCAA's transgender policies to be altered nationwide affecting athletic competitions by federally funded schools coast-to-coast.

343.    The NCAA said that notwithstanding USA Swimming's lower 5 nanomole per liter limit, the testosterone threshold for women's swimming would be 10 nanomoles per liter, double the threshold in the new USA Swimming policy.

344.    Thus, although Thomas did not qualify to compete in the women's category under USA Swimming's rules, the NCAA Board of Governors, the Ivy League, UPenn and the NCAA conspired and collaborated together to permit Thomas to compete for the remainder of the 2022 season, including in the Ivy League Championships and in the 2022 NCAA Division I Women's Swimming and Diving National Championships under a far less stringent standard.

## 2022  IVY LEAGUE SWIMMING AND DIVING CHAMPIONSHIPS

345.    Robin Harris worked closely with representatives of Harvard in the lead up to the 2022 Ivy League Championships, planning locker room usage and media relations opportunities, to maximize enjoyment of the event for Thomas and enhance media focus upon Thomas' anticipated record-breaking performances.

67

346.    Harris and the Ivy League ensured that Harvard officials would read the Ivy League's statement regarding transphobic comments before every session of the 2022 Ivy League Championships.

347.    Harris worked with Harvard to ensure that Thomas would be allowed to compete and have full access to the women's locker room at the 2022 Ivy League Championships.

348.    Despite Thomas being a distance freestyle swimmer, Coach Schnur picked Thomas to swim the 100 and 200 freestyle for the Ivy League Championships.

349.    At this time, UPenn already had one of the fastest distance freestyle swimmers in the country.

350.    Coach Schnur told the team that he switched Thomas from these distance events to the 100 and 200-yard freestyle because he knew Thomas would be one of the fastest in the pool at the Ivy League Championships in those events, which would maximize points for UPenn.

351.    It is a significant accomplishment and honor to be selected to compete on the UPenn swim team in the Ivy League Championships.

352.    Some 30 women swim on the UPenn women's swim team during the season and in dual meets, however, only 17 swimmers and 3 divers are chosen to compete on the team in the Ivy League Championships.

353.    Prior to the 2022 Ivy League Championships Coach Schnur organized a swim-off involving five swimmers to compete for the seventeenth and last swimming spot on the UPenn women's swim team that would compete in the 2022 Ivy League Championship.

354.    Sophomore swimmer Ellen Holmquist was one of the competitors in the swim-off which was held on Friday, February 4, 2022.

355.    Coach Schnur appeared to avoid Ellen for several days after the swim-off, eventually telling her that she had missed making the Ivy League Championship team by one spot.

356.    In other words, Thomas competing on the UPenn women's team deprived Ellen Holmquist the opportunity to compete in the 2022 Ivy League Championships as a member of the UPenn team.

357.    Holmquist was devastated by not making the UPenn 2022 Ivy League Championships team and her confidence was shaken.

358.    Plaintiffs Margot Kaczorowski and Grace Estabrook prepared to compete in the 2022 Ivy League Championships but Ellen Holmquist was left out due to the unlawful actions of the Ivy League, Harvard University and UPenn.

359.    Women swimmers at the 2022 Ivy League Championship at Harvard reported a chaotic environment dominated by a singular focus upon Thomas and a near total disregard for the women competing.

360.    The Ivy League's standard statement regarding transphobic comments was repeated again and again throughout the meet.

361.    Media statements by the Ivy League, Harvard, and UPenn gave substantial recognition to Thomas to the exclusion and detriment of female athletes.

362.    Unequal attention by these entities was given to maximizing the exposure of, and public accolades for, Thomas, while in comparison largely ignoring the accomplishments of female athletes.

363.    Female participants in the 2022 Ivy League Championships saw their most important athletic competition purposefully turned into a public spectacle geared to maximizing Thomas' notoriety and support for Thomas shattering sex-based gender norms.

364.    At the 2022 Ivy League Championships, Thomas competed in the 100, 200, and 500-yard freestyle events, the 200 and 400-yard freestyle relay, and the 400-yard medley relay.

365.    At the Ivy League Championships, Kaczorowski also competed in the 100 and 200-yard freestyle events, and the 200 and 400-yard freestyle relay.

366.    At the Ivy League Championships, Grace Estabrook competed in the 100 and 200-yard breaststroke and the 400-yard medley relay.

367.    These swimmers finished with the following results at the Ivy League Championships, *see* **Appendix B** (2022 Ivy Leage Championships Results):

| Event | Swimmer | Finish |
|---|---|---|
| Day One: February 16, 2022 | | |
| 200 Medley Relay | Kannan (Lead off) Maizes Chong Kaczorowski (Anchor) | 5th |
| 800 Freestyle Relay | Thomas (Lead off) Kaczorowski Kalandadze O'Leary (Anchor) | 3rd |
| Day Two: February 17, 2022 | | |
| 500 Freestyle | Thomas | 1st (pool record) |
| 50 Freestyle | Kaczorowski | 15th |
| 200 Freestyle Relay | Kaczorowski (Lead off) Thomas Kannan Carter (Anchor) | 4th |
| Day Three: February 18, 2022 | | |
| 200 Freestyle | Thomas | 1st  (pool and meet record) |

| | Kaczorowski | 7th |
|---|---|---|
| 100 Breaststroke | Estabrook | 7th |
| 400 Medley Relay | Kannan (Lead off) Estabrook Chong Thomas (Anchor) | 4th |
| Day Four: February 19, 2022 | | |
| 100 Freestyle | Thomas | 1st (pool and meet record) |
| 200 Breaststroke | Estabrook | 9th |
| 400 Freestyle Relay | Thomas Kaczorowski Kannan Carter | 1st (pool record) |

368.    In every individual event that Thomas swam at the Ivy League Championships, Thomas set a pool record – that is, the best women's time ever swam in the Harvard Blodgett Pool.

369.    In two of Thomas's individual events, Thomas also set a meet record – that is, the best time for that event in the history of the Women's Ivy League Championships.

370.    Every individual time that Thomas swam during the Ivy League championships was at least a "B" standard qualifying time for the NCAA Championships.

371.    In the 200-yard freestyle event, Kaczorowski would have finished sixth instead of seventh but for Thomas's participation in that event.

372.    In the 100-yard freestyle event, the second-place finisher from Yale University, would have set a pool and meet record for that event but for Thomas's participation in that event.

373.    In every event in which Thomas participated every Ivy League Championship participant who finished after Thomas finished one place lower than what they would have but for Thomas's participation.

374.    The screenshot below of a Twitter posted, taken from the UPenn's website, shows that Thomas finished the 500-yard freestyle event more than half a pool length ahead of the second place finisher:



375.    Four times Thomas took the top podium spot from women swimmers who would have stood there but for Thomas's participation in the Ivy League Championships. This screenshot,

---

[32] https://pennathletics.com/news/2022/2/17/womens-swimming-and-diving-womens-swimming-diving-in-fourth-after-day-two-of-ivy-championships.aspx (last accessed February 4, 2025).

taken from the UPenn website, shows Thomas standing atop the podium for the 500-yard freestyle event.



376.    Thomas's participation in the Ivy League Championships drew massive media attention.

377.    Thomas's participation cast a shadow over the entire event both because competitors knew that Thomas was taking women's places and podiums and because almost attention on the 2022 Ivy League Women's Swimming and Diving Championships was focused upon a man.

378.    Both Estabrook and Kaczorowski participated in other Ivy League Championships before and after the 2022 Ivy League Championship. Both recall the 2022 event feeling very unlike the other championships in which they had competed.

379.    Both Estabrook and Kaczorowski recall the 2022 Ivy League Championship as a public spectacle centered around Thomas rather than a celebration of the achievements of the women who had worked all season to compete in their respective events.

---

[33] https://pennathletics.com/news/2022/2/17/womens-swimming-and-diving-womens-swimming-diving-in-fourth-after-day-two-of-ivy-championships.aspx (last accessed February 4, 2025).

380.    Estabrook recalls a constant feeling of tension and unspoken hostility between those who wanted Thomas to participate and those who did not but had been intimidated into silence.

381.    During their participation in their relays, both Estabrook and Kaczorowski felt shame for swimming with Thomas, recognizing that Thomas tainted the results of their swims and made the competition unfair for opponents.

382.    Participation in the relays was tainted by the fact that Thomas had taken a spot away from one of their teammates and had caused a rival school to place one place lower than they would have without Thomas's participation.

**Thomas's Access and Use of the Women's Locker Rooms**

383.    During the Ivy League Championships, Harvard converted the Men's Locker Room at Blodgett Pool into a second Women's Locker Room, assigning four schools to the original Women's Locker Room and assigning the other four schools to the newly converted second Women's Locker Room.

384.    Harvard did not provide a unisex bathroom or separate bathroom for Thomas to use or for any other women to use who did not want to use the Women's Locker room while Thomas was using it. Instead, Harvard participated in the conspiracy with the NCAA, Ivy League, and UPenn to allow Thomas to participate in the Ivy League Championships and use the women's locker rooms.

385.    Estabrook chose to use the Locker Room assigned to UPenn because her events generally did not overlap with Thomas's. However, it was a disruption to her peace and preparation for her swims knowing that Thomas could walk in at any moment while she was changing.

386.    Kaczorowski's events did overlap with Thomas and she could not avoid changing at the same time that Thomas did. Accordingly, Kaczorowski chose not to use the locker room

assigned to UPenn to protect her privacy and avoid the disruption and distraction of sharing a locker room with a man.

387.    For nearly three years following the Ivy League Championships, Plaintiffs and others similarly situated have dealt with feelings of abandonment, betrayal, humiliation, and harassment, and with the ramifications of losses of placement, ill treatment, emotional turmoil, and invasion of privacy generated by the Defendants' purposeful actions of conspiring and collaborating in 2022 to allow Thomas to compete at the Ivy League Championships and use the Women's Locker rooms at Harvard's Blodgett Pool.

## CLASS ACTION ALLEGATIONS

### On behalf of Plaintiffs Estabrook, Holmquist, and Kaczorowski and others similarly situated

388.    Plaintiffs Grace Estabrook, Margot Kaczorowski and Ellen Holmquist are identified as putative class representatives to bring one or more class actions under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

389.    The foregoing individuals are adequate class representatives because they have competed, or in the case of Holmquist should have been able to compete, as NCAA athletes at the Ivy League Championships at Harvard's Blodgett Pool and have been subject to the NCAA's 2010 Transgender Participation Policy and its impact, they have been injured as a result of the violations of law described in this Complaint, they are similarly situated to the other members of the proposed classes, and they are actively interested in the claims of the class and willing to discharge all the responsibilities of class representatives.

390.    Through this action, Plaintiffs seek to represent a class of Ivy League women's swimmers who competed at or should have been able to compete at the Ivy League Championships held in 2022 at Harvard Blodgett Pool.

391.    The class size of the class of women who competed in the Ivy League Championships is believed to be approximately 206 individuals.[34]

392.    There are questions of law and fact common to all members of the class. Those common questions include, but are not limited to, the following:

    a.    Does Title IX prohibit competition and participation by males on women's teams in collegiate sport governed by the NCAA, Ivy League, Harvard and UPenn?

    b.    Do the NCAA's and/or Ivy League's eligibility rules, or aspects of them, as implemented by the Ivy League, Harvard and UPenn violate Title IX?

    c.    Should the records of the Ivy League, the NCAA, Harvard University (including the Blodgett Pool) and of UPenn be changed to remove records set by Thomas competing in the women's category at the Ivy League Championships?

    d.    Did Thomas taking a roster spot on the UPenn team for the 2022 Ivy League Championships violate Title IX?

    e.    Did Thomas' competition in the 2022 Ivy League Championships violate Title IX?

    f.    Did Thomas' use of the women's locker rooms at the 2022 Ivy League Championships violate Title IX?

    g.    Did Thomas take awards, public recognition, points, placements and other opportunities away from women at the 2022 Ivy League Championships, or women who should have competed at the 2022 Ivy League Championships, in violation of Title IX?

    h.    Are members of the class entitled to recover compensable, consequential and/or nominal damages for any or all of the foregoing violations of Title IX?

---

[34] https://www.meetresults.com/2022/ivies/rosters.pdf (last accessed February 4, 2025).

393.     The putative class representatives' claims are typical of the claims of the class because they, like the class members, have been injured, been threatened with injury, and/or had their rights deprived or threatened to be deprived due to the NCAA's, Ivy League's, Harvard's, and UPenn's actions, practices or policies and/or the Defendants all acting in concert.

394.     The putative class representatives will fairly and adequately protect the interests of the class because: (a) they are willing and able to represent the proposed class and have every incentive to pursue this action to a successful conclusion; (b) their interests are not antagonistic to those of the other class members; and (c) they have engaged counsel experienced in litigating class actions.

395.     The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims.

396.     Joinder of all 206 putative class members is impracticable.

**Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(1)**

397.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1) because prosecuting separate actions by individual class members would create a risk of: (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for one or more Defendants and/or (b) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interest of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

**Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(2)**

398.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making declaratory and final injunctive relief appropriate.

399.    Such generally applicable grounds consist of the adoption and/or maintenance of the 2010 Transgender Participation Policy at the Ivy League Championships.

400.    Such generally applicable grounds may also consist of the adoption and/or maintenance by the NCAA of the 2010 Transgender Participation Policy in concert with the Ivy League's, Harvard's, and UPenn's actions, policies and practices in violation of Title IX.

401.    This relief would predominate over monetary relief.

**Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(3)**

402.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3).

403.    The common questions of law and fact identified above predominate over questions affecting only individual members.

404.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation.

405.    Because all members of the class are geographically dispersed throughout the country and allege that they were subjected to the same Association-wide policy or practice of Title IX, requiring each class member to pursue their claims individually would entail needless duplication and would waste the resources of both the parties and the judiciary.

406.    The financial burden of proving the NCAA, Ivy League, Harvard, and UPenn engaged in the alleged actions, practices, and policies of discrimination would also make the prosecution of individual actions virtually impossible for most, if not all, members of the class.

## COUNT I

### Title IX Violations in Relation to the 2022 Ivy League
### Women's Swimming and Diving Championships

### Against the NCAA, Ivy League, Harvard, and UPenn

407.    Plaintiffs restate the foregoing paragraphs numbered 1 through 406 as if set forth fully herein.

408.    This Count I is brought on behalf of the Plaintiffs Estabrook and Kaczorowski, who participated in the Ivy League Championships with and against Thomas, and on behalf of Plaintiff Holmquist, who was cut from the UPenn Ivy Leage Championship roster because of Thomas's participation in the Ivy League Championships, on behalf of themselves and others similarly situated.

409.    At all relevant times, The NCAA ran educational programs or activities receiving direct or indirect federal financial assistance, including but not limited to NCAA Championships, the 2010 Transgender Eligibility Policy and the management of intercollegiate athletics for its members in the six areas identified above in Paragraph 141.

410.    A private right of action for damages and injunctive relief exists to enforce the guarantees of Title IX.

411.    This private right of action can be pursued to rectify discrimination against women in scholastic sport.

412.    A fundamental goal of Title IX and the original Title IX athletics regulations is to guarantee men and women an equal opportunity "to compete in athletics in a meaningful way." Sex Discrimination in Athletic Programs, 40 Fed. Reg. 52,655, 52,656 (Nov. 11, 1975).

413.    The athletics regulations enacted under Title IX provide that, "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 CFR § 106.41(c) (emphasis added).

414.    The reference to "sex" in Title IX is directed solely at binary, biological sex and not at gender identity.

415.    There is no alternative definition of "sex" for transgender persons as compared to non-transgender persons under Title IX.

416.    Under Title IX separate athletic teams for men and women are the norm.

417.    The Title IX regulations regarding scholastic sports authorize "separate teams for members of *each sex* where selection for such teams is based upon competitive skill." 34 CFR § 106.41 (emphasis added).

418.    However, sex separate teams are not merely authorized under Title IX, Title IX requires sex-separation *from men* where women have less opportunity than men without it.

419.    Thus, where sex separation has not been provided by a covered entity, Title IX authorizes women to pursue a remedy enforcing sex separation from men, including separate sports teams, competitions, competitive opportunities, awards, recognition, publicity, showers, and locker rooms, among other things.

420.    Not only must there be such separation from men where necessary to give women equal and meaningful opportunities but separate opportunities for women must be comparable in every way to opportunities for men.

421.    When sports are or must be separated by sex, equal and meaningful opportunity for women requires:

- "the interests and abilities" of women are separately and equally accommodated,[35]

- the women's team and all women's events are as equally open to women as the men's team and all men's events are to men,

- both sexes are provided separate and equal resources, including "locker rooms, practice and competitive facilities,"

- both sexes are provided separate and equal competitions and competitive opportunities, and

- eligibility rules (or other rules) do not burden women more than men.

422.   The NCAA's, Ivy League's, Harvard's, and UPenn's actions, practices, and/or policies described above deprived Plaintiffs and a class of individuals similarly situated of a meaningful and equal opportunity to compete in the Ivy League Championships and constitutes sex discrimination against women within the meaning of Title IX.

423.   Such discrimination includes, but is not limited to, the NCAA's, Ivy League's, Harvard's, and UPenn's

- implementation, enforcement, maintenance, and reinstatement of the 2010 Transgender Participation Policy,

- authorization of Thomas to compete on the UPenn Women's Swimming and Diving roster,

---

[35] Indeed, it is a general principle under Title IX that where single sex activities are provided to one sex, the other sex must be provided a substantially equal single-sex activity. For example, in another part of the Title IX regulations not applicable to scholastic athletics the regulation states that where a party covered by Title IX "provides a single-sex . . . extracurricular activity. . . [they] may be required to provide a substantially equal single-sex . . . extracurricular activity for students of the excluded sex…" 34 CFR § 106.34(b)(2).

- authorization of Thomas to compete in the Ivy League Championships,

- granting or awarding eligibility, points, titles, trophies, results, or records, to Thomas based on Thomas' participation in the Ivy League Championships, and

- authorization of Thomas to use women's toilets, showers, and/or locker rooms at the Harvard Blodgett Pool.

424.    A woman's loss of participation, records, awards and/or placement in an athletic competition as a result of competing against a transgender individual constitutes a concrete, particularized and redressable injury under Title IX.

425.    In addition to injunctive relief to correct the records of the sports organizations appropriate relief for such injury may include nominal and compensatory damages.

426.    The purposeful actions by the NCAA, Ivy League, Harvard, and UPenn upended and undermined the competitive seasons, mental and emotional health and well-being, bodily privacy, and academic and athletic experiences of hundreds of female swimmers and their families.

427.    The NCAA, Ivy League, Harvard, and UPenn knew that their actions described above violated Title IX and acted in bad faith.

428.    Harvard and UPenn run programs and activities receiving federal financial assistance and are thereby covered entities under Title IX.

429.    The NCAA and Ivy League exercise controlling authority over the programs and activities of Harvard and UPenn and are thereby covered entities under Title IX.

430.    Particularly given the high-profile nature of Thomas' qualification for the Ivy League Championships, the NCAA, Ivy League, Harvard, and UPenn knew or should have known

the Discriminatory Impacts and Title IX violations which did occur were likely to occur at the Ivy League Championships.

431.    The actions, practices, and/or policies of the NCAA, Ivy League, Harvard, and UPenn deprived Plaintiffs and a class of individuals similarly situated of a meaningful and equal opportunity to compete in in the Ivy League Championships and constituted sex discrimination against women within the meaning of Title IX.

432.    The discriminatory acts of NCAA, Ivy League, Harvard, and UPenn were so substantial, severe, pervasive, objectively offensive, and competitively unfair and/or created such a substantial safety risk that they effectively barred access to equal and meaningful opportunities for women competitors in the Ivy League Championships.

433.    The NCAA, Ivy League, Harvard, and UPenn acted with deliberate indifference to the known Title IX violations which injured Plaintiffs and others similarly situated and acted with conscious or reckless disregard of the rights of, and harms to, Plaintiffs and others similarly situated.

434.    Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below.

## COUNT II

### Title IX Violations in Relation to the 2022 Ivy League Women's Swimming and Diving Championships

### Against the NCAA, Ivy League, Harvard, and UPenn

435.    Plaintiffs restate the foregoing paragraphs numbered 1 through 406 and 409-421 as if set forth fully herein.

436.    This Count II is brought on behalf of Plaintiff Holmquist who was cut from the UPenn Ivy Leage Championship roster because of Thomas's participation in the Ivy League

Championships.

437.    The NCAA's, Ivy League's, Harvard's, and UPenn's actions, practices, and/or policies described above deprived Holmquist meaningful and equal opportunity to compete in the Ivy League Championships and constitutes sex discrimination against her within the meaning of Title IX.

438.    Such discrimination includes, but is not limited to, the NCAA's, Ivy League's, Harvard's, and UPenn's

- implementation, enforcement, maintenance, and reinstatement of the 2010 Transgender Participation Policy,

- authorization of Thomas to compete on the UPenn Women's Swimming and Diving roster,

- authorization of Thomas to compete in the Ivy League Championships,

- granting or awarding eligibility, points, titles, trophies, results, or records, to Thomas based on Thomas' participation in the Ivy League Championships, and

- providing a facility at which Thomas would compete in women's swimming events; and

- authorization of Thomas to use women's toilets, showers, and/or locker rooms at the Harvard Blodgett Pool.

439.    A woman's loss of participation in an athletic competition as a result of competing against a transgender individual constitutes a concrete, particularized and redressable injury under Title IX.

440.    Appropriate relief for such injury may include nominal and compensatory damages.

441.    The purposeful actions by the NCAA, Ivy League, Harvard, and UPenn upended and undermined Holmquist's competitive season, mental and emotional health and well-being, and academic and athletic experiences of hundreds of female swimmers and their families.

442.    The NCAA, Ivy League, Harvard, and UPenn knew that their actions described above violated Title IX and acted in bad faith.

443.    Harvard and UPenn run programs and activities receiving federal financial assistance and are thereby covered entities under Title IX.

444.    The NCAA and Ivy League exercise controlling authority over the programs and activities of Harvard and UPenn and are thereby covered entities under Title IX.

445.    Particularly given the high-profile nature of Thomas' qualification for the Ivy League Championships, the NCAA, Ivy League, Harvard, and UPenn knew or should have known the Discriminatory Impacts and Title IX violations which did occur were likely to occur for women who were eligible and qualified to compete in the Ivy League Championships.

446.    The actions, practices, and/or policies of the NCAA, Ivy League, Harvard, and UPenn deprived Holmquist and a class of individuals similarly situated of a meaningful and equal opportunity to compete in in the Ivy League Championships and constituted sex discrimination against women within the meaning of Title IX.

447.    The discriminatory acts of NCAA, Ivy League, Harvard, and UPenn were so substantial, severe, pervasive, objectively offensive, and competitively unfair and/or created such a substantial safety risk that they effectively barred access to equal and meaningful opportunities for Holmquist in the Ivy League Championships.

448.    The NCAA, Ivy League, Harvard, and UPenn acted with deliberate indifference to the known Title IX violations which injured Plaintiffs and others similarly situated and acted with conscious or reckless disregard of the rights of, and harms to, Holmquist.

449.    Wherefore, Holmquist requests that the Court grant the declaratory and monetary relief requested below.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

## **PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiffs respectfully pray that the Court grant the following relief against Defendants, jointly and severally:

1.    Declare that the NCAA, Ivy League, Harvard, and UPenn violated Title IX.

2.    Declare the extent of the violations so found.

3.    Declare that Thomas was ineligible to compete on the UPenn women's swimming team.

4.    Pursuant to Title IX, award Plaintiffs, and those class members similarly situated, all such injunctive relief and damages as are available under their various claims, including, actual damages, nominal damages, punitive damages, and compensatory damages, including, but not limited to, damages for pain and suffering, mental and emotional distress, suffering and anxiety, expenses costs and other damages against the NCAA, Ivy League, Harvard, and UPenn due to their wrongful conduct.

5.    Award injunctive relief vacating Thomas' records in the records of the Ivy League, the NCAA and all Ivy League member institutions, including Harvard and UPenn and ordering their removal from all public record boards controlled by the foregoing entities.

6.    Award Plaintiffs reasonable attorneys' fees, and costs; and

7.    Grant any other relief that the Court deems necessary, just, proper, and equitable.

Dated: February 4, 2025                    Respectfully submitted,

                                           */s/ William Bock III*
                                           William Bock III, Atty. No. 14777-49108[36]
                                           Justin R. Olson, Atty. No. 31450-59[37]
                                           Kroger Gardis & Regas, LLP
                                           111 Monument Circle, Suite 900
                                           Indianapolis, IN 46204
                                           Tel: (317) 692-9000
                                           Fax: (317) 264-6832
                                           E-mail: wbock@kgrlaw.com
                                           Email: jolson@kgrlaw.com

                                           */s/ Samuel J. Whiting*
                                           Samuel J. Whiting (BBO# 711930)
                                           Massachusetts Liberty Legal Center
                                           401 Edgewater Pl., Suite 580
                                           Wakefield, MA 01880
                                           Tel: (774) 462-7043
                                           Email: sam@malibertylegal.org

                                           *ATTORNEYS FOR PLAINTIFFS*

---

[36] Application for admission pro hac vice pending.
[37] Application for admission pro hac vice pending.