UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GRACE ESTABROOK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE IVY LEAGUE COUNCIL OF PRESIDENTS, *et al.*,<br><br>Defendants. | Case No. 1:25-cv-10281-WGY<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT NATIONAL COLLEGIATE ATHLETIC ASSOCIATION'S MOTION TO DISMISS** |

**I.    INTRODUCTION**

This lawsuit asserts Title IX claims against Harvard, UPenn, the Ivy League, and the NCAA because a transgender athlete competed in the 2022 Ivy League Women's Swimming and Diving Championships at Harvard's Blodget Pool. Over the last year, the participation of transgender athletes in women's sports has become a contentious topic, to say the least. But the Court need not address any of those difficult substantive issues to dismiss the NCAA from this lawsuit.

The U.S. Supreme Court has held that the NCAA is not covered by Title IX. *NCAA v. Smith*, 525 U.S. 459 (1999) (*Smith I*). The Supreme Court has also held that the NCAA does not control its member schools by promulgating rules. *Tarkanian v. NCAA*, 488 U.S. 179 (1988). Plaintiffs' attempts to avoid that binding precedent from our Nation's highest court fail as a matter of law. Plaintiffs have not stated a claim against the NCAA under Title IX nor can they. The Court should dismiss all claims against the NCAA with prejudice.

Alternatively, the Court has the discretion to stay this action for judicial efficiency, if it chooses to do so, until the Northern District of Georgia rules in a first-filed action on the same

NCAA Title IX coverage issues arising from substantially identical allegations from the same counsel.

## II.     PLAINTIFFS' ALLEGATIONS

### A.     Allegations Regarding the 2022 Ivy League Women's Swimming and Diving Championships

Plaintiffs allege that the University of Pennsylvania ("UPenn") selected Lia Thomas, a transgender student-athlete, to participate on UPenn's women's swimming team. (Compl., ¶¶ 63, 265-275). They allege UPenn included Thomas on the roster of swimmers it would bring to the 2022 Ivy League Women's Swimming and Diving Championships, specifically selecting the swimming events in which Thomas would compete: 100, 200, and 500-yard freestyle, 200 and 400-yard freestyle relay, and the 400-yard medley relay. (*Id.* at ¶¶ 348-352, 364).

Plaintiffs allege the Ivy League Council of Presidents ("Ivy League"), through its Policy Committee, set the rules for eligibility in the 2022 Ivy League Championships. (*Id.* at ¶¶ 118, 124). The Ivy League chose to adopt the same eligibility policy as the NCAA and chose to allow Thomas to compete in the 2022 Ivy League Championships. (*Id.* at ¶¶ 3, 314).

Plaintiffs allege that the President and Fellows of Harvard College ("Harvard") hosted the 2022 Ivy League championships and controlled the pool and facilities. (*Id.* at ¶¶ 2, 58). They allege Harvard made decisions about locker room assignments and usage during that swim meet. (*Id.* at ¶¶ 383-384).

Plaintiffs dedicate several pages to allegations describing the creation of the NCAA's 2010 Transgender Student-Athlete Participation Policy. Plaintiffs do not allege that the NCAA controlled UPenn's selection of its swim team roster, UPenn's management of its team practices and facilities, or Harvard's organization of the locker rooms and facilities at the 2022 Ivy League Championships. Nor could they. The NCAA's 2010 Transgender Student-Athlete Participation

2

Policy is an eligibility policy and governed when a transgender student athlete, rostered by a member institution, could compete on a women's team in NCAA competitions. (*See* Dkt. 1-2).

      **B.**     **Allegations Regarding the NCAA's Funding**

Plaintiffs allege that many of the NCAA's member institutions are federal funding recipients and covered by Title IX. (Compl. ¶ 67). Plaintiffs do not (and cannot) allege that the NCAA receives federal funds directly. Their only federal funding allegations about the NCAA relate to separate concussion research (the "Grand Alliance"), which they describe as a "research program" and a "partnership" funded *separately* by the NCAA and the U.S. Department of Defense. (*Id.* at ¶¶ 168-180; *see id.* at ¶ 175 (research program was "funded by the NCAA and DoD"); *see also id.* at ¶ 170 ("[t]he NCAA and the Department of Defense are teaming up to commit *$30 million for concussion education*"); ¶¶ 172-173 (at least $85 million of the $105 million that had been given to the Grand Alliance "has come from the federal government"); ¶ 174 ("additional funding from the NCAA and DoD"); ¶ 177 ("[t]he research funded by the NCAA and the federal government")). Plaintiffs also do not (and cannot) allege that the NCAA decides whether to accept the money contributed by the DoD or controls the money after contribution.

**III.**    **THE COURT SHOULD DISMISS THE TITLE IX CLAIMS AGAINST THE NCAA WITH PREJUDICE**

      **A.**     **Plaintiffs Do Not Sufficiently Allege That the NCAA Receives Federal Financial Assistance**

To sue the NCAA under Title IX (20 U.S.C. §1681 et seq.), "the plaintiffs must allege [the defendant] receives federal funding." *Faculty, Alumni, & Students Opposed to Racial Preferences v. Harvard Law Review Ass'n*, No. 18-12105-LTS, 2019 U.S. Dist. LEXIS 133181, at *23 (D. Mass. Aug. 8, 2019) (citing *Smith I* to rule that federal funding allegations were not "sufficient to justify dragging [defendant] past the pleading threshold"); *see also* 20 U.S.C. §1681(a) (Title IX applies only to "any education program or activity receiving Federal financial assistance.").

3

Twenty-five years ago, the Supreme Court held that a college athlete could not sue the NCAA under Title IX merely because it receives dues payments from colleges. *See Smith I*, 525 U.S. at 462 ("[E]ntities that only benefit economically from federal assistance are not" recipients of federal assistance under Title IX.). Since then, no court has applied Title IX to the NCAA due to its member institutions' receipt of federal funding. *See, e.g.*, *Sharp v. Kean Univ.*, 153 F. Supp. 3d 669, 674 (D.N.J. 2015) (dismissing Title IX claims because "there is no allegation that the NCAA has received Federal financial assistance such that it would be subject to suit under Title IX").

Plaintiffs attempt to bypass that high legal roadblock with allegations about the NCAA and DoD's "partnership" to fund their concussion research program, concluding that "from at least 2014 through the present the NCAA has been a direct and/or indirect recipient and beneficiary of financial assistance from the U.S. federal government." (Compl., ¶ 180). But that vague, alternative assertion fails on all three respects because (1) the "direct" funding assertion is factually insufficient; (2) the "indirect" funding assertion is legally insufficient; and (3) the "beneficiary" assertion is categorically insufficient.

### 1. The NCAA Is Not a Direct Funding Recipient

Plaintiffs fail to "plead[] factual content that allows the court to draw the reasonable inference" that the NCAA receives direct federal assistance. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Back Beach Neighbors Comm. v. Town of Rockport*, 63 F.4th 126, 130 (1st Cir. 2023) ("we credit neither conclusory legal allegations nor factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture"). Plaintiffs never allege any facts to show that the NCAA directly received DoD money or any other federal funds in the Grand Alliance.

4

Instead, the only reasonable inference from the *facts* as alleged in paragraphs 162 to 179 of the Complaint is that the NCAA contributes financial donations to a concussion research project that the DoD and the NCAA each fund separately. Plaintiffs describe both the NCAA and DoD contributing money *into* the research study. Without any factual averment to support an allegation that "the DoD provides the NCAA funding" (Compl., ¶ 169), Plaintiffs' unsupported legal conclusions that the NCAA receives "direct" federal financial assistance because of the Grand Alliance are entitled to no weight. (*See id.* at ¶ 180).

## 2. The NCAA Is Not an Indirect Funding Recipient

The NCAA's alleged participation in the Grand Alliance is also insufficient to constitute indirect funding because Plaintiffs fail to allege that the NCAA "is able to control decisions made with respect to the [federal] money," especially "the most important decision [of] whether the grant money should be accepted at all." *Smith v. NCAA*, 266 F.3d 152, 161 (3d Cir. 2001) (*Smith II*). The general rule is that courts "are hesitant to impose Title IX obligations on an entity that is not a direct recipient of federal financial assistance." *Id.* at 162. *Smith II* permitted Title IX claims to move forward against the NCAA only due to extensive factual allegations that the NCAA "effectively controlled" the National Sports Youth Program (NYSP) and its Fund that received federal funding.[1] For example, the *Smith II* plaintiffs alleged that "the NYSP Committee was an NCAA committee responsible for the administration of the NYSP" and "all the members of the

---

[1] Plaintiffs present no allegations here related to the NYSP. The NYSP was a federally funded initiative founded in the late 1960s to support socioeconomically disadvantaged youth and operated at over 200 higher education institutions until closures due to lack of financial support. A program with that same name continues independent of NCAA involvement at Case Western Reserve University. *See* https://thedaily.case.edu/more-than-a-sports-camp-national-youth-sports-program-drives-transformative-impact-at-cwru/#:~:text=Founded%20in%20the%20late%201960s,to%20lack%20of%20financial%20support (last visited Mar. 27, 2025).

[NYSP] Fund's Board of Directors were either employees of the NCAA or members of the NCAA's NYSP Committee," and that "upon dissolution of the [NYSP] Fund, its assets will be distributed exclusively to the NCAA." *Id.* at 161; *see also id.* at 162 ("The [NYSP] Fund has no employees and its business address is the same as the NCAA's.") (quoting *Bowers v. NCAA*, 118 F. Supp. 2d 494, 528 (D.N.J. 2000)). *Smith II* held that the allegations in that case "render[ed] the NCAA, the NYSP, and the [NYSP] Fund virtually indistinct," and, most importantly, the NCAA "was in a 'position to decide whether to "receive" federal funds and thereby accept the concomitant obligations of Title IX.'" 266 F.3d at 162 (citation omitted); *see also Doe v. League Sch. of Greater Boston, Inc.*, 2017 U.S. Dist. LEXIS 133011, *10 (D. Mass. 2017) (distinguishing private school that indirectly received funds earmarked for special education services for students placed at that school, from the NCAA under *Smith I*, which "merely benefited from federal funds" that were not earmarked for payment to the NCAA).

Plaintiffs' naked assertion of a "partnership" between the NCAA and the DoD to fund the Grand Alliance, and meager allegation that the NCAA "participates in the identification of NCAA member institutions that will conduct the scientific research" (Compl., ¶ 169), is neither the formal nor functional equivalent of the allegations that made the entities in *Smith II* virtually indistinct. Plaintiffs never allege that the NCAA controlled decisions with respect to the DoD money. Just the opposite. As described above, Plaintiffs allege merely that the DoD and the NCAA "are teaming up" to separately fund the Grand Alliance effort. (*Id.* at ¶ 160). As explained in the U.S. Army Medical Research and Development Command website Plaintiffs cite (*id.* at ¶ 177), the concussion research project is controlled "by principal investigators at three research institutions."[2]

---

[2] "Led by Dr. Thomas W. McAllister, the Indiana University School of Medicine serves as the Administrative and Operations Core and is the central coordination center for the CARE consortium. The University of Michigan houses the Longitudinal Clinical Study Core and is led

The Complaint's allegations demonstrate neither control nor receipt of the DoD funds, and therefore fall short of *Smith II* and are insufficient to impose a Title IX obligation on the NCAA.

### 3. Beneficial Status is Insufficient

Plaintiffs' attempt to hang Title IX liability on the NCAA being a "beneficiary" of federal funding fails as a matter of law. In *Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597 (1986), the Supreme Court concluded that merely having a beneficial relationship with an entity that receives federal funding is not sufficient to impose obligations arising out of a federal program. Plaintiffs' allegations that the Grand Alliance "contributes to the NCAA's mission" is legally insufficient for potential Title IX liability.

### B. Plaintiffs' Ceding Control Theory Has Been Rejected

Plaintiffs cannot avoid dismissal through an alternative argument that the NCAA's member schools allegedly cede control of their federally funded programs to the NCAA. No court has ever applied Title IX to the NCAA under a "ceding control" theory, and the Third Circuit has explicitly rejected that argument twice, relying on Supreme Court precedent. In *Smith II*, the plaintiff alleged that the NCAA exercised controlling authority because it promulgated rules governing intercollegiate athletics, required its members to agree to those rules, and made individual eligibility and waiver decisions. 266 F.3d at 154, 157. The court affirmed a decision dismissing those claims because control over eligibility rules does not amount to control over the federally-funded athletic programs managed and operated by its members. *Id.* at 157.

*Smith II* relied on *Cureton v. NCAA*, which held as a matter of law "that the NCAA['s] members *have not ceded controlling authority* to the NCAA by giving it the power to enforce its

---

by Dr. Steven Broglio; and, led by Dr. Michael McCrea, the Medical College of Wisconsin directs the Advanced Research Core."
https://mrdc.health.mil/index.cfm/media/articles/2018/research_supporting_lifetime_of_brain_injury (last visited Mar. 27, 2025)

eligibility rules directly against the students." 198 F.3d 107, 117-18 (3d Cir. 1999) (emphasis added). *Cureton* specifically rejected the argument that Plaintiffs appear to be making here: "[W]e cannot understand how the fact that the NCAA promulgates rules and regulations with respect to intercollegiate athletics somehow means that the NCAA has controlling authority over its members' programs or activities receiving Federal financial assistance." *Id.* at 118. Members following those rules is not enough to establish the requisite level of control because "they have the option, albeit unpalatable, of risking sanctions or voluntarily withdrawing from the NCAA." *Id.* at 116. Both *Smith II* and *Cureton* relied on the Supreme Court's holding in *Tarkanian*, 488 U.S. at 192, "that the NCAA does not 'control' its members" (in the context of Section 1983 of the Civil Rights Act).

The "ceding control" theory applies in extremely limited circumstances and requires explicit allegations of complete operational and financial control. Plaintiffs must allege facts to show that the "entity truly assumes control of a federally funded program." *Smith II*, 266 F.3d at 157. Plaintiffs' allegations here do not establish that members ceded to the NCAA control over their athletic programs. Their allegations regarding the NCAA's rulemaking and Transgender Eligibility Policies at best mirror those that failed as a matter of law in *Smith* and *Cureton*. Indeed, Plaintiffs affirmatively allege that member institutions *retained* control of their programs: UPenn controlled the selection of its swim team roster (Compl., ¶¶ 63, 265-275, 348-352) and the Ivy League member schools controlled and administered the rules for their own Ivy League Championships (*id.* at ¶¶ 118, 124, 125, 132).

      C.      **Leave to Amend Would Be Futile**

The Court should dismiss Plaintiffs' claims against the NCAA with prejudice because, after several attempts nationwide, Plaintiffs' counsel can allege no new facts to support Title IX coverage. Although "the amendment policy is a liberal one [and] the Court must give leave freely

8

when justice so requires . . . the Court ought not permit futile claims to move forward." *Weinberg v. Grand Circle Travel, LLC*, 891 F. Supp. 2d 228, 252 (D. Mass. 2012) (citations and internal quotation marks omitted). A court can dismiss with prejudice after several attempts at stating a complaint. *See, e.g.*, *United States v. All Funds on Deposit in Lee Munder Wealth Planning Res. Account No. \*\*\*-\*\*1080*, 137 F. Supp. 3d 125, 132 (D. Mass. 2016) (dismissing with prejudice after "third attempt").

Although the operative complaint is the first filed in this Court, it is actually Plaintiffs' counsel's **fourth** attempt to allege facts to support the application of Title IX to the NCAA. A year ago, the same counsel filed an action in the Northern District of Georgia presenting the same core issue of whether Lia Thomas's participation in college swimming violates Title IX. *Gaines v. National Collegiate Athlete Association, et al.*, No. 1:24-cv-01109-TRJ (N.D. Ga). That *Gaines* complaint acknowledged the holding in *Smith I* that the NCAA's member schools' receipt of federal funds did not subject the NCAA to Title IX. (Dawson Decl., Exh. 1, at ¶ 39). The same plaintiffs' counsel made their first attempt to plead around that binding authority by asserting the NCAA was in a "joint venture" with its member schools, and that they had delegated "aspects" of their programs and rulemaking to the NCAA and therefore had ceded control of their athletic programs to the NCAA. (*Id.* at ¶¶ 44-49).

But when the NCAA moved to dismiss those allegations as insufficient to establish Title IX liability, the same counsel amended with a second, very different attempt to avoid *Smith I*, pivoting to funding allegations about the "Grand Alliance" concussion research project. (Dawson Decl., Exh. 2, at ¶¶ 159-170). When the defendants moved to dismiss that first amended complaint, the *Gaines* plaintiffs again amended. But despite having a third opportunity to present sufficient Title IX allegations against the NCAA (and with the benefit of seeing the NCAA's meritorious

9

arguments against the "Grand Alliance" allegations), plaintiffs' counsel added no new facts on that topic. When plaintiffs' counsel made a fourth attempt to assert Title IX liability against the NCAA in the *Estabrook* complaint here, they again added no new facts about the "Grand Alliance" but just repeated verbatim the insufficient allegations from *Gaines*. (*Compare* Dawson Decl., Exh. 3, at ¶¶ 165-176 *with* Compl., ¶¶ 169-180).

Plaintiffs' counsel has tried and tried again, but they cannot allege sufficient facts to state a Title IX claim against the NCAA. The necessary facts do not exist. Accordingly, amendment would be futile, and the Court should dismiss the NCAA with prejudice.

## IV.   PLAINTIFF ESTABROOK LACKS STANDING

Independently, the Court should dismiss the claims of Plaintiff Estabrook because she presents only an ideological objection to Thomas's participation but not a concrete, personalized harm necessary for Article III standing. To establish standing, "the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quoting *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 560 n.1 (1992)). "Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection" to a given act. *Id.*; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 432-41 (2021) (inaccuracies in credit reporting files not disseminated to third parties and noncompliant letters did not cause concrete harm).

Plaintiff Estabrook's allegations are different from those of her co-defendants. Plaintiff Kaczorowski alleges that she competed against Thomas in the Ivy League Championship and placed seventh behind Thomas. (Compl., ¶ 371). Plaintiff Holmquist alleges that she missed being named to UPenn's team for the Ivy League Championship by one spot because of Thomas's participation. (*Id.* at ¶¶ 355-56). Plaintiff Estabrook fails to allege either harm, or any other. Estabrook made the UPenn team that went to the 2022 Ivy League Championships and then

10

primarily swam breaststroke events in which Thomas did not compete. (*Id.* at ¶¶ 364, 366, 367). She does not allege any bodily privacy violation from Thomas's presence in the locker room, admitting that "her events generally did not overlap with Thomas's." (*Id.* at ¶ 385). Nor does she allege any other harm the Court could redress. For example, vacating Ivy League records would not give her a higher placement.[3] Accordingly, the Court should dismiss Estabrook's claims with prejudice.

## V. IN THE ALTERNATIVE, THE COURT MAY STAY THIS ACTION UNDER THE FIRST-TO-FILE RULE

The NCAA believes that Supreme Court precedent requires the dismissal of the Complaint against the NCAA with prejudice. But, in the alternative, the Court may, in its discretion, stay this action for judicial efficiency and await the Northern District of Georgia rules on whether the NCAA is subject to Title IX in the previously filed, substantially similar *Gaines* case. That case—filed a year ago by the same counsel—presents the same core issue of whether Lia Thomas's participation in college swimming violates Title IX. The parties have fully briefed motions to dismiss involving legal questions that are at issue in this case, including whether Title IX applies to the NCAA and whether Title IX requires schools to provide separate athletic teams as the exclusive means of providing equal athletic opportunity. The Court may choose to await the rulings on those earlier-filed briefs, which may inform the issues here. Discovery has not started in the *Gaines* action,[4] where plaintiffs have amended their complaint twice.

Because of concerns about "wasted resources because of piecemeal litigation, the possibility of conflicting judgments, and a general concern that the courts may unduly interfere

---

[3] Indeed, vacating records from the 2022 meet at Blodget Pool could *harm* Estabrook, given that she swam *with* Thomas in the "400 Medley Relay." (Compl., ¶¶ 366-67 (finishing "4th")).

[4] Pursuant to the Northern District of Georgia's Local Rules, discovery does not commence until thirty days after an answer is filed. LR 26.2, NDGa.

with each other's affairs," the "usual practice is for the court where the case was first filed to resolve the issues, and the other court to defer by either staying, transferring, or dismissing the action." *Thakkar v. United States*, 389 F. Supp. 3d 160, 170 (D. Mass. 2019) (quoting *TPM Holdings v. Intra-Gold Indus.*, 91 F.3d 1, 4 (1st Cir. 1996)). Courts routinely stay later-filed similar cases when an earlier filed action would "narrow the issues" or "assist in the determination of the questions of law involved." *Taunton Gardens Co. v. Hills*, 557 F.2d 877, 879 (1st Cir. 1977). Courts look at the similarity of the issues and similarity of the parties in the two overlapping cases; the rule does not require the issues and parties be identical. *Waithaka v. Amazon.com, Inc.*, 404 F. Supp. 3d 335, 350-51 (D. Mass. 2019).

Here, the same counsel filed *Gaines* before *Estabrook*[5] and the two cases present similar issues. The core issue in both cases is whether it was a Title IX violation to allow Lia Thomas, a transgender student-athlete, to compete in intercollegiate swimming events. The legal punchlines of both lawsuits are the same: "Title IX requires sex-separation *from men* where women have less opportunity than men without it" and Lia Thomas's inclusion "constitutes sex discrimination against women within the meaning of Title IX." (*Compare* Compl, ¶¶ 418, 422 *with* Dawson Decl., Exh. 3 (*Gaines* Sec. Am. Compl.) at ¶¶ 759, 843). In both cases, plaintiffs seek Title IX damages against the NCAA for other swimmers and seek to vacate Lia Thomas's competition results.

Indeed, the two cases are so similar that more than *50%* of the paragraphs in the *Estabrook* complaint are taken "virtually verbatim" from *Gaines*, a hallmark of a first-filed problem that calls for efficient coordination of the two cases, even where some differences exist. *Jimenez v. Kohl's Dep't Stores, Inc.*, 480 F. Supp. 3d 305, 307 (D. Mass. 2020); *accord Waithaka*, 404 F. Supp. 3d at 351. More than 200 *Estabrook* paragraphs are completely identical (except for some substitution

---

[5] This case has a 2025 case number; *Gaines* has a 2024 case number.

12

of proper nouns, such as party names and swim meet locations) to *Gaines*. Both complaints contain nearly 11 identical pages of allegations that people assigned male at birth retain a competitive advantage over people assigned female at birth. (*Compare* Compl. at pp. 43-53 *with* Dawson Decl., Exh. 3 at pp. 76-89). Numerous pages in both complaints similarly describe Lia Thomas's participation, media attention, use of women's locker rooms, and how her placement on the UPenn team and in competitions took a spot or medal from another woman. (*Compare* Compl. at pp. 69-75 *with* Dawson Decl., Exh. 3 at pp. 117-123). Both complaints contain more than 15 pages of similar allegations about the development of the NCAA's transgender participation policy. (*Compare* Compl. at pp. 9-19, 38-42, 66-67 *with* Dawson Decl., Exh. 3 at pp. 3-16, 54-60, 72-74). The allegations within the *Estabrook* plaintiffs' two Title IX counts are nearly identical to Title IX counts in Gaines. (*Compare* Compl. at pp. 79-86 *with* Dawson Decl., Exh. 3 at pp. 174-180, 193-196). The *Gaines* issues subsume the *Estabrook* issues, and additional issues in *Gaines* do not prevent application of the first-filed doctrine. *See Thakker*, 389 F. Supp. 3d at 174-75 (ordering a stay even where the *second-to-file* plaintiff asserted additional claims, because the basic constitutional challenge to military security screenings and holds on naturalization applications was the same).

      The parties are also sufficiently similar. Deference to a first-filed action is particularly appropriate where a second-filed putative class may be subsumed by the first. *Waithaka*, 404 F. Supp. 3d at 350 (it is "extremely difficult to ignore the efficiency gains that might result from consolidation" of two overlapping class actions); *Jimenez*, 480 F. Supp. 3d at 307 (first-filed rule applied where a proposed class of Massachusetts plaintiffs was subsumed within a first-filed nationwide class). In class actions, "the classes, and not the class representatives, are compared." *Thakkar*, 389 F. Supp. 3d at 172. The *Gaines* action purports to bring claims on behalf of a

13

nationwide class defined to include all "future, current, or past NCAA women's athletes." (Dawson Decl., Exh. 3, at ¶¶ 728, 729). Plaintiffs here are subsumed by that putative class.

The NCAA is a defendant in both actions. Given the similarity of the core issues, the presence of different defendants in each action doesn't matter. "Parties may be sufficiently similar even 'where only one of several defendants in the second filed action is the same as the first filed action.'" *Thakkar*, 389 F. Supp. 3d at 173 (quoting *McGlynn v. The Credit Store, Inc.*, 234 B.R. 576, 580 (D.R.I. 1998)). Here, as in *Thakkar*, the presence of different defendants "does not affect the character of the present suit." *Thakkar*, 389 F. Supp. 3d at 173; *see also Blackwell v. Midland Credit Mgmt.*, No. 2:18-cv-2205-RMG, 2018 U.S. Dist. LEXIS 177788, *7-8 (D.S.C. Oct. 15, 2018) (addition of a defendant did not defeat first-to-file rule); *Weinstein v. Metlife Inc.*, No. 06-04444 SI, 2006 U.S. Dist. LEXIS 83115, *11 (N.D. Cal. Nov. 6, 2006) ("[t]he addition of defendants is not dispositive"). Particularly here, the swapping of the other defendants (e.g., the schools that hosted the respective athletic events) does not meaningfully alter the issues raised.

Accordingly, if the Court is so inclined, it has ample grounds to exercise its discretion and stay this case until the Northern District of Georgia federal court settles the pleadings in *Gaines*.

## VI.    CONCLUSION

The Motion to Dismiss should be granted and the Complaint should be dismissed with prejudice against the NCAA.

Respectfully submitted this 21st day of April 2025.

        */s/ Cari K. Dawson*
        Lon F. Povich (BBO #544523)
        Austin P. Anderson (BBO #696414)
        ANDERSON & KREIGER LLP
        50 Milk Street, 21st Floor
        Boston, Massachusetts 02109
        (617) 621-6500
        lpovich@andersonkreiger.com

aanderson@andersonkreiger.com

Cari K. Dawson (*pro hac vice*)
Georgia Bar No. 213490
cari.dawson@alston.com
Christopher C. Marquardt (*pro hac vice*)
Georgia Bar No. 471150
chris.marquardt@alston.com
John E. Stephenson (*pro hac vice*)
Georgia Bar No. 679825
john.stephenson@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Defendant National Collegiate Athletic Association*