UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GRACE ESTABROOK, ELLEN HOLMQUIST, and MARGOT KACZOROWSKI, <br><br> Plaintiffs, <br><br> v. <br><br> THE IVY LEAGUE COUNCIL OF PRESIDENTS, PRESIDENT AND FELLOWS OF HARVARD COLLEGE, TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, and NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, <br><br> Defendants. | Civil Action No. 1:25-CV-10281 |

**TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................. 3

III.  ARGUMENT .................................................................................................... 4

    A.  Plaintiffs' Claims Are Time-Barred. ............................................................ 4

        i.  Plaintiffs' Title IX Claims Accrued Over Three Years Before the Complaint Was Filed. 5

        ii.  Plaintiffs' Claims Are Time-Barred Because Pennsylvania's Two-Year Statute of Limitations Applies. ................................................................... 7

    B.  Plaintiffs' Claims Fail Because Excluding Thomas from the Ivy League Championships Based on Her Transgender Status Would Violate Title IX. ................................................. 8

        i.  Because Penn Was Required to Follow The NCAA Policy, Applicable Legal Authority Mandated That Penn Allow Thomas to Swim at the 2022 Ivy League Championships. 9

    C.  Title IX Does Not Require Sex Separate Teams. ........................................ 11

    D.  Plaintiffs Failed to Plead a Violation of Title IX's Equal Opportunity Requirement. ...... 13

        i.  Plaintiffs Failed To Plead an Effective Accommodation Claim. ................. 14

        ii.  Plaintiffs Failed to Plead an Equal Treatment Claim. ............................. 16

    E.  Penn Had a Strong Basis in Evidence to Believe That It Would Violate Title IX If It ......... Excluded Thomas from the Ivy League Championships. ................................................. 17

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville,*
    75 F. 4th 760 (7th Cir. 2023) .................................................................................10, 19

*A.M. by E.M. v. Indianapolis Pub. Schs.,*
    617 F. Supp. 3d 950 (S.D. Ind. 2022) ...................................................................11

*Anders v. Cal. State Univ.,*
    No. 1:21-cv-179-AWI-BAM, 2021 WL 1564448 (E.D. Cal. Apr. 21, 2021) ........................16

*Anniston Mfg. Co. v. Davis,*
    301 U.S. 337 (1937)..............................................................................................11

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..............................................................................................4

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..............................................................................................4

*Bostock v. Clayton County,*
    590 U.S. 644 (2020)................................................................................... *passim*

*Czerwienski v. Harvard Univ.,*
    666 F. Supp. 3d 49 (D. Mass. 2023) .....................................................................4

*Delaware State College v. Ricks,*
    449 U.S. 250 (1980)...........................................................................................5, 7

*Doe v. Boyertown Area Sch. Dist.,*
    897 F.3d 518 (3d Cir. 2018).......................................................................12, 13, 19

*Doe v. Hanover Cnty. Sch. Bd.,*
    No. 3:24cv493, 2024 WL 3850810 (E.D. Va. Aug. 16, 2024)...............................11

*Doe v. Loyola Univ.,*
    Civil Action No. 18-6880, 2020 WL 1030844 (E.D. La. Mar. 3, 2020) .................5

*Doe v. Mercy Catholic Med. Ctr.,*
    850 F.3d 545 (3d Cir. 2017)..................................................................................4

*Doe v. Snyder,*
    28 F.4th 103 (9th Cir. 2022) ...............................................................................10

*Doe v. Town of Bourne,*
    No. Civ.A.02–11363–DPW, 2004 WL 1212075 (D. Mass. May 28, 2004).........................4, 5

*Doe v. Virginia Polytechnic Inst. & State Univ.*,
617 F. Supp. 3d 412 (W.D. Va. 2022) ...................................................................5

*Elliston v. Wing Enters., Inc.*,
146 F. Supp. 3d 351 (D. Mass. 2015) ...................................................................7

*Fowler v. Stitt*,
104 F.4th 770 (10th Cir. 2024) ..........................................................................10

*Frazier v. Fairhaven Sch. Comm.*,
276 F.3d 52 (1st Cir. 2002) ..................................................................................9

*Gordon v. Starwood Hotels & Resorts Worldwide, Inc.*,
238 F. Supp. 3d 229, 233 (D. Mass. 2017) ..........................................................8

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020), *cert. denied sub nom. Gloucester Cnty. Sch. Bd.
v. Grimm*, 141 S. Ct. 2878 (2021)............................................................9, 12, 13

*Holbrook v. Bos. Sci. Corp.*,
487 F. Supp. 3d 100 (D. Mass. 2020) (Young, J.) ..............................................7

*B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*,
98 F.4th 542 (4th Cir. 2024), *cert. denied sub nom. W. Va. State Bd. of Educ.
v. B.P.J. ex. rel. Jackson*, 145 S. Ct. 568 (2024)................................................11

*Kelley v. Board of Trs., Univ. of Ill.*,
35 F.3d 265 (7th Cir. 1994) ...............................................................................15

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941)..............................................................................................7

*L.W. by Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) ..............................................................................10

*Martin v. Clemson University*,
654 F. Supp. 2d 410 (D.S.C. 2009)......................................................................5

*McCormick v. Sch. Dist. of Mamaroneck*,
370 F.3d 275 (2d Cir. 2004)........................................................................14, 16

*Morris v. Government Dev. Bank of Puerto Rico*,
27 F.3d 746 (1st Cir. 1994)..................................................................................5

*Oirya v. Auburn Univ.*,
No. 3:17-cv-681-WC, 2019 WL 4876705 (M.D. Ala. Oct. 2, 2019), *aff'd*, 831
F. App'x 462 (11th Cir. 2020) ..............................................................................5

*Parents for Privacy v. Barr*,
   949 F.3d 1210 (9th Cir. 2020) .............................................................12

*Reid v. James Madison Univ.*,
   90 F.4th 311 (4th Cir. 2024) ..................................................................5

*Ricci v. DeStefano*,
   557 U.S. 557 (2009)...................................................................3, 17, 18

*Slusser v. Mountain West Conference*,
   No. 1:24-cv-03155-SKC-MDB, 2024 WL 4876221 (D. Colo. Nov. 25, 2024) ....................10

*Tenn. v. Dep't of Educ.*,
   104 F.4th 577 (6th Cir. 2024) ...............................................................13

*Tirrell v. Edelblut*,
   748 F. Supp. 3d 19 (D.N.H. 2024) .......................................................9, 10

*Tolliver v. Prairie View A&M, Univ.*,
   No. H-18-1192, 2018 WL 4701571 (S.D. Tex. Oct. 1, 2018) ...................................5

*Torre v. Columbia Univ.*,
   No. 97 Civ. 0981(LAP), 1998 WL 386438 (S.D.N.Y. July 10, 1998), *aff'd*,
   189 F.3d 462 (2d Cir. 1999)....................................................................5

*United States Sugar Corp. v. Env't Prot. Agency*,
   113 F.4th 984 (D.C. Cir. 2024)..............................................................11

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ..............................................................19

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic
   Ass'n*, 647 F.2d 651 (6th Cir. 1981).......................................................12

**Statutes**

20 U.S.C. § 1681(a) .............................................................................8, 19

**Other Authorities**

34 C.F.R. § 106.33 ...............................................................................12

34 C.F.R. § 106.41 ...................................................................12, 14, 16, 17

44 Fed. Reg. 71,413 (Dec. 11, 1979) ................................................14, 15, 17

86 Fed. Reg. 32,637 (June 22, 2021) ......................................................20

Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test,
    Off. of Civ. R., Dep't of Educ., 44 Fed. Reg. 71,413 (Jan. 16, 1996)......................................12

Exec. Order No. 13,988, 86 Fed. Reg. 7023 (Jan. 21, 2021)...................................................19, 20

Exec. Order No. 14,021, 86 Fed. Reg. 13803 (Mar. 8, 2021).......................................................20

*Participation Policy for Transgender Student Athletes*, NCAA,
    https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx
    (last accessed Apr. 18, 2025) ................................................................................................11

Restatement (Second) of Conflict of Laws § 142 ........................................................................7

Valarie M. Bonnette, Lamar Daniel, *Title IX Athletics Investigator's Manual*, OFF.
    OF CIV. R., DEP'T OF EDUC., (1990) https://eric.ed.gov/?id=ED400763 .................................15

## I.    INTRODUCTION

The University of Pennsylvania did what it has always tried to do with its sports programs: Follow the NCAA policies and the law. It did so then. It does so now. Plaintiffs bring claims that are time-barred, wrong on the merits, and which seek to embroil a University into a dispute it has no role in. The case should be dismissed.

Plaintiffs allege the Trustees of the University of Pennsylvania ("Penn") violated their Title IX rights because a swimmer by the name of Lia Thomas, a transgender woman, swam in one swim meet, the February 16-19, 2022 Ivy League Championships. Penn is an NCAA member institution. The NCAA's Transgender Student Athlete Participation Policy (the "Policy"), which dates back to 2010, governed when a transgender woman could compete on a women's team in NCAA competitions. NCAA member institutions with transgender student-athletes who seek to participate in an NCAA competition are required to follow the NCAA Policy. There is no dispute that Thomas, and Penn, followed the Policy. At the time Thomas swam in the Ivy League Championships, the federal government, through Executive Orders and interpretive guidance issued by the Department of Education ("DOE"), specifically told institutions like Penn the following: If you stop transgender athletes from competing on a team when they are otherwise eligible to do so, you violate Title IX.

The DOE grounded its position, in part, on the Supreme Court's 2020 decision in *Bostock v. Clayton County*. *Bostock* holds that discrimination against transgender individuals is discrimination on the basis of sex. Circuit court authority, both pre- and post-*Bostock*, including in Penn's Third Circuit holds the same: Title IX protects transgender individuals from discrimination.

Plaintiffs, nevertheless, bring this action premised on a theory that, after Thomas swam for the entire season in accordance with the NCAA Policy that remained in place and unchanged since 2010, Penn was required to single out and exclude Thomas from the Ivy League Championships because she was born male. Plaintiffs' Title IX claims fail for five independent reasons.

First, Plaintiffs' claims—brought more than three years after Plaintiffs learned they would be swimming with, and competing against, Thomas during the 2021-2022 season—are time-

barred. Irrespective of any potential limitations period applied by this Court, Plaintiffs admit that they were told that Thomas would compete on Penn's women's swim team at the Ivy League Championships more than three years before the filing of their Complaint.

Second, Plaintiffs' claims are based on a theory that Penn needed to single out Thomas because she was born male and is transgender. That theory fails. The plain language of Title IX and its regulations, the Supreme Court's decision in *Bostock*, and case law across circuits pre- and post-*Bostock* all make clear that excluding Thomas from the Ivy League Championships despite the NCAA Policy in place at the time would constitute unlawful discrimination against her. Stated simply, Penn could not exclude Thomas because of her transgender status without excluding her on the basis of sex even if sex is defined as "sex at birth."

Third, Plaintiffs' claims fail because Title IX does not require separation of sports teams based on "biological sex" or sex at birth. Schools are entitled to significant flexibility in meeting the requirements of Title IX. For example, co-ed teams are favored under Title IX's regulations for athletics. There is a carve-out *allowing* (but not *requiring*) sex separation in certain circumstances.

Fourth, even if this Court finds that Title IX permits singling out transgender athletes in some circumstances, Plaintiffs' claims still fail. Plaintiffs have not pled that Penn intentionally discriminated against them under Title IX because of their sex. Instead, they attempt to plead an "equal opportunity" claim under Title IX's regulations. They have not pled facts to plausibly establish that Penn's decision to allow one transgender athlete to compete in one swim meet violated Title IX's requirement that men and women be provided "equal athletic opportunity," as that term is used under Title IX's regulations and interpretive guidance. Title IX's implementing regulations set forth specific factors for evaluating equal opportunity, which are largely focused on *program-wide* disparities between resources and opportunities provided to men and women, or which require substantial deficiencies between comparable teams for a violation to occur. This case is not about Penn's athletics program writ large or differences in resources for men's and women's teams. It is about a single athlete swimming in a few races at the Ivy League Championships.

Fifth, assuming *arguendo* that the Plaintiffs could establish a Title IX claim, Penn had a strong basis in evidence, applying the standard set forth by the Supreme Court in *Ricci v. DeStefano*, to believe that excluding Thomas from the Ivy League Championships would itself be discriminatory and violate Title IX. Penn's strong basis in evidence is demonstrated by Plaintiffs' own Complaint, the NCAA Policy dating back to 2010, Supreme Court precedent in *Bostock*, legal authority pre- and post-*Bostock* (including in Penn's Third Circuit), presidential Executive Orders, and DOE enforcement guidance, all of which were in effect during the 2021-2022 season and the 2022 Ivy League Championships. Thus, Penn cannot be liable under Title IX.

## II.    FACTUAL BACKGROUND

Penn is a member of the NCAA. (Compl. ¶¶ 52, 54.) The NCAA, in turn, establishes and enforces uniform eligibility rules and procedures for intercollegiate athletics. (*Id.* ¶¶ 141, 149, 154.) This includes the eligibility rules set forth in the 2010 NCAA Transgender Student-Athlete Participation Policy, which was in effect from 2011 through the winter of 2022, including during the February 2022 Ivy League Championships. *Id.* ¶¶ 73, 82, 183-184, 190, 217; *see also* Ex. A (a copy of the policy linked in Complaint at ¶ 73).

In the fall of 2019, Thomas shared with Penn's NCAA Division I women's swim team members that she planned to participate on the women's team because she is transgender and identifies as a woman. (*Id.* ¶¶ 266-269.) But Thomas did not join the women's team right away. Instead, she followed the NCAA Policy that had been in place for a decade. That Policy provided that transgender female student-athletes were eligible to "compete on a women's team without changing it to a mixed team status" upon "completing one calendar year of testosterone suppression treatment." (*Id.* ¶ 78; *see* Ex. A.) Thomas took a gap year during the 2020-2021 season to undergo such treatment. (*Id.* ¶ 274.) Then, only after suppressing testosterone for at least one year, Thomas joined Penn's women's swim team in the fall of 2021. (*Id.* ¶ 275.)

Plaintiffs—three women who were on Penn's 2021-2022 women's swim team—were informed of Thomas' participation at the outset of the season and explicitly notified that her swimming on the team throughout the season was "non-negotiable" in December 2021. (*Id.* ¶¶

275, 280, 287, 294-297.) Thomas practiced with, and competed on, the women's team throughout the 2021-2022 season. (*Id.* ¶¶ 275, 290.)

The Ivy League Championships took place on February 16 through 19, 2022, at Harvard's pool. (*Id.* ¶¶ 1, 58.) Only two of the Plaintiffs—Grace Estabrook and Margot Kaczorowski—competed at the 2022 Ivy League Championships. (*Id.* ¶¶ 26, 37.) More than half the swimmers on Penn's women's team were chosen to compete in the Ivy League Championships, but Plaintiff Ellen Holmquist did not qualify. (*Id.* ¶¶ 44, 50, 352.) Thomas swam in four relay events *with* Ms. Estabrook and Ms. Kaczorowski, and their teams placed 1st, 3rd, and 4th twice. (*Id.* ¶¶ 367.) Thomas swam against Ms. Kaczorowski in one individual event in which Ms. Kaczorowski placed 7th. (*Id.*) Thomas did not swim in any individual events against Ms. Estabrook. (*Id.*) On February 4, 2025, more than three years after Plaintiffs were told Thomas would swim at the Ivy League Championships, they filed the instant Complaint. (*See* ECF No. 1.)

## III.    ARGUMENT

Dismissal under Rule 12(b)(6) is appropriate when a complaint fails to set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court must accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiffs. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The court is not required to "conjure up" unpled or unclaimed facts that "might turn a frivolous claim . . . into a substantial one." *Twombly*, 550 U.S. at 562 (citation omitted).

### A.    Plaintiffs' Claims Are Time-Barred.

Title IX does not contain a statute of limitations, so courts borrow limitations periods for personal injury actions governed by state law. *Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 77 (D. Mass. 2023). The statute of limitations for Title IX claims is two years under Pennsylvania law, and three years under Massachusetts law. *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 564 (3d Cir. 2017); *Doe v. Town of Bourne*, No. Civ.A.02–11363–DPW, 2004 WL 1212075, at *11 (D. Mass. May 28, 2004). Plaintiffs' claims are time-barred under either statute of limitations.

4

      **i.**       **Plaintiffs' Title IX Claims Accrued Over Three Years Before the Complaint Was Filed.**

Federal law governs the accrual period for Plaintiffs' Title IX claims. *Morris v. Government Dev. Bank of Puerto Rico*, 27 F.3d 746, 748–49 (1st Cir. 1994). Under federal law, the limitations period on a Title IX claim begins to run when a plaintiff knows, or has reason to know, of the injury on which the action is based. *Town of Bourne*, 2004 WL 1212075, at *11. Courts have consistently held that the clock on Title IX claims starts to run "when the decision is made and communicated to the injured party." *Doe v. Loyola Univ.*, Civil Action No. 18-6880, 2020 WL 1030844, at *7 (E.D. La. Mar. 3, 2020); *see also Torre v. Columbia Univ.*, No. 97 Civ. 0981(LAP), 1998 WL 386438, at *5 (S.D.N.Y. July 10, 1998), *aff'd*, 189 F.3d 462 (2d Cir. 1999) (a claim "accrues at the time the tenure decision at issue was made and communicated to the plaintiff").

As the Supreme Court explained in *Delaware State College v. Ricks*, "the proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." 449 U.S. 250, 258–59 (1980) (citation omitted); *see also Reid v. James Madison Univ.*, 90 F.4th 311, 320 (4th Cir. 2024) (applying the *Ricks* test to Title IX employment discrimination claims). Thus, for example, in *Doe v. Virginia Polytechnic Inst. & State Univ.*, 617 F. Supp. 3d 412, 433–35 (W.D. Va. 2022), the court applied *Ricks* to find that the plaintiff's Title IX claim based on a grant funding decision accrued when the plaintiff knew the research grant funds would be diverted to another graduate student. Likewise, in *Martin v. Clemson University*, 654 F. Supp. 2d 410, 421–22 (D.S.C. 2009), the court applied *Ricks* to find the plaintiff's claim accrued when she was denied tenure in April 2005, rather than in March 2007 when the university issued its final ruling on her appeal. Other examples abound. *See, e.g.*, *Tolliver v. Prairie View A&M, Univ.*, No. H-18-1192, 2018 WL 4701571, at *1 (S.D. Tex. Oct. 1, 2018) (a student's Title IX claims accrued when the student knew he was expelled, and his request to overturn the expulsion did not delay the accrual of his claims); *Oirya v. Auburn Univ.*, No. 3:17-cv-681-WC, 2019 WL 4876705, at *4–5 (M.D. Ala. Oct. 2, 2019), *aff'd*, 831 F. App'x 462 (11th Cir. 2020)

(dismissing Title IX claim as time-barred because the limitations period began to run on the date the plaintiff was told he would be dismissed from the university).

While Plaintiffs' Complaint concerns Thomas' participation in the 2022 Ivy League Championships, their Title IX claims accrued well before she dove into the Harvard pool. The Plaintiffs' own allegations make the matter indisputable:

a) "Thomas began practicing and competing with the UPenn Women's Swimming and Diving Team in the Fall of 2021." Compl. ¶ 275.

b) "When UPenn's women's swimmers returned to school in the fall of 2021 they were shocked to discover that Thomas was being allowed to use the women's locker room at UPenn and would be allowed to use the women's locker room at swim meets." *Id.* ¶ 280.

c) "The Plaintiffs complained to Coach Schnur about Thomas's participation on the women's swim team and Thomas's use of the women's locker room but were repeatedly told that there was nothing that could be done about it." *Id.* ¶ 286.

d) Thomas competed on the UPenn women's team "[t]hroughout the 2021 to 2022 women's swimming season[.]" *Id.* ¶ 290.

e) "In December 2021, administrators from UPenn called a mandatory women's swimming team meeting with all the members of the UPenn Women's Swimming and Diving Team, except for Thomas who did not attend the meeting. The administrators' meeting was about Thomas's participation on the Women's team." *Id.* ¶ 294.

f) "These administrators affirmed that Thomas would continue to swim on the women's team, stating: 'Lia swimming is a non-negotiable.'" *Id.* ¶ 297.

g) The 2010 Transgender Participation Policy, which Plaintiffs claim is "*impermissible per se under Title IX*," "*applied in every single NCAA women's sport* until each sports winter 2022 NCAA Championships." *Id.* ¶¶ 82, 90 (first emphasis added). It "*remained unchanged and fully stated the NCAA's policy* regarding the eligibility of transgender individuals" throughout that time period. *Id.* ¶ 217 (emphasis added).

It is undisputed that Plaintiffs were informed of Penn's decision to allow Thomas to compete on the women's team and attended practices with her in the "Fall of 2021". (Compl. ¶ 275.) Thus, Plaintiffs knew they would compete against Thomas in future meets *no later than* the fall of 2021. (*Id.* ¶¶ 287, 289-290.) Even using December 22, 2021 (winter solstice) as a conservative end to fall, Plaintiffs' claims accrued a *minimum* of three years, one month, and 13 days before Plaintiffs filed their Complaint. (*See* ECF No. 1.) And those claims certainly accrued

no later than when they were allegedly told in December 2021 that Thomas swimming on the team was "non-negotiable." (*Id.* ¶¶ 294-297, 319-321, 327-344.)

In *Ricks*, the plaintiff's claim accrued when the college informed him that he would be denied tenure because he had explicit notice that his employment would end when his one-year contract expired. *Ricks*, 449 U.S. at 258. Termination of his employment, while delayed, was an inevitable consequence of the denial of tenure. *Id.* at 258–59. Similarly, here, the clock on Plaintiffs' Title IX claims began to run when they first learned of Penn's decision to follow the NCAA Policy and certainly no later than when they were unequivocally advised Thomas would swim in the Ivy League Championships. Thomas' competition with and against Plaintiffs at the Ivy League Championships was an inevitable consequence of that announcement. Thus, Plaintiffs' Title IX claims are barred under either the Pennsylvania or Massachusetts statute of limitations.

> ### ii.    Plaintiffs' Claims Are Time-Barred Because Pennsylvania's Two-Year Statute of Limitations Applies.

Barred under a three-year statute, Plaintiffs' claims are surely barred under a two-year statute. And, here, Pennsylvania's two-year statute—not Massachusetts' three-year statute— should govern this dispute. Because Pennsylvania's two-year statute applies, Plaintiffs claims are time-barred even if their claims accrued at the February 2022 Ivy League Championships.

In deciding which state's law to apply, a federal court follows the choice-of-law rules in the state where it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941). "Massachusetts courts apply a functional approach to choice-of-law issues that involve conflicting statutes of limitations." *Holbrook v. Bos. Sci. Corp.*, 487 F. Supp. 3d 100, 105 (D. Mass. 2020) (Young, J.) (*citing Elliston v. Wing Enters., Inc*., 146 F. Supp. 3d 351, 354 (D. Mass. 2015). Under this functional approach, a Massachusetts court will apply its own statute of limitations "unless: (a) maintenance of the claim would serve no substantial interest of the forum; and (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence." Restatement (Second) of Conflict of Laws § 142; *Holbrook*, 487 F. Supp. 3d at 105.

Pennsylvania has the more significant relationship to the Plaintiffs and their claims against Penn.[1] By stark comparison, Massachusetts does not have any interest—let alone a substantial interest—in Plaintiffs' claims because its only tie to this lawsuit is that the Ivy League Championships were hosted at Harvard. (*Id.* ¶¶ 2, 389, 390.) None of the Plaintiffs reside in Massachusetts. (Compl. ¶¶ 28, 38, 45.) The Plaintiffs have no connection to Massachusetts other than that Ms. Estabrook and Ms. Kaczorowski traveled there once. *Id.* ¶¶ 365, 366. That does not constitute a "substantial interest" such that Massachusetts law should govern this dispute. The state with the most significant relationship to the parties and claims in this case is Pennsylvania, where Thomas was rostered on Penn's women's swim team and where the team, including Plaintiffs, were told she would compete throughout the season. Therefore, Pennsylvania's two-year statute of limitations should apply. *Gordon v. Starwood Hotels & Resorts Worldwide, Inc.*, 238 F. Supp. 3d 229, 233 (D. Mass. 2017).

## B. Plaintiffs' Claims Fail Because Excluding Thomas from the Ivy League Championships Based on Her Transgender Status Would Violate Title IX.

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Plaintiffs' Complaint relies on the premise that Penn was required to stop Thomas from swimming in the Ivy League Championships. But because Thomas was eligible under the NCAA Policy in effect at the time,[2] and she had been swimming on Penn's women's team the entire season under

---

[1] The claims stem from events that occurred while they were members of Penn's women's swim team. (Compl. ¶¶ 34, 41, 48.) Plaintiffs and Thomas all lived at Penn, trained at Penn, swam in home meets at Penn, used Penn's locker rooms, and were told that Thomas would participate on the team throughout the season at Penn. (*Id.* ¶¶ 33-34, 40-41, 47-48, 280, 284-285, 294-297.) Indeed, the bulk of Plaintiffs' allegations against Penn detail actions that occurred in Pennsylvania: Penn decided to roster Thomas on the women's swim team for the 2021-2022 season (*id.* ¶¶ 63-64); Plaintiffs were informed that Thomas would swim on Penn's women's team (*id.* ¶¶ 267-269, 287, 352-353); Thomas began practicing and competing with the women's team in the fall of 2021 (*id.* ¶ 275); Thomas swam all year for Penn's women's team and qualified for the Ivy League Championships (*id.* ¶¶ 3, 5, 63-64, 275, 290); Thomas used the women's locker room at Penn (*id.* ¶ 280); Plaintiff Ms. Holmquist lost the swim-off for the last spot to go to the Ivy League Championships (*id.* ¶¶ 353-356); and Penn's women's swim team was told that Thomas would swim in the Ivy League Championships (*id.* ¶¶ 348-350).

[2] *See* Compl. ¶ 190 ("Compliance by NCAA member institutions with the 2010 Transgender Participation Policy was mandatory."); *id.* at ¶ 141(5), (6) (the NCAA establishes "eligibility rules governing intercollegiate athletics and student-athletes" and "run[s] the eligibility rules enforcement process" to which all member institutions are subject).

the Policy, Penn could not have singled her out for exclusion from the Ivy League Championships without treating her differently based on her sex at birth.

> i.    **Because Penn Was Required to Follow The NCAA Policy, Applicable Legal Authority Mandated That Penn Allow Thomas to Swim at the 2022 Ivy League Championships.**

Assuming this Court adopts Plaintiffs' binary definition of "sex," the Supreme Court's 2020 decision in *Bostock* makes clear that to discriminate against Thomas because she is transgender is to discriminate against her on the basis of her sex, in violation of Title IX.

Justice Gorsuch first noted that the six-justice majority in *Bostock* would "proceed on the assumption that 'sex' [under Title VII] . . . refer[red] only to biological distinctions between male and female." 590 U.S. at 655. The majority then held that Title VII's prohibition against discrimination because of sex as so defined prohibits discrimination against an individual for being homosexual or transgender because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660. This is because "homosexuality and transgender status are inextricably bound up with sex." *Id.*

While *Bostock* was decided in the context of Title VII, "that has not stopped the First Circuit from interpreting Title IX's strictures consistently with Title VII in numerous contexts." *Tirrell v. Edelblut*, 748 F. Supp. 3d 19, 43 (D.N.H. 2024). Indeed, in considering a Title IX claim of same-sex sexual harassment for the first time, the First Circuit "[f]or guidance, [] turn[ed] to Title VII," found that the Supreme Court's reasoning in *Oncale* (holding that Title VII prohibits same-sex sexual harassment) was "fully transferable to Title IX cases," and noted there was "no principled basis for construing Title IX more grudgingly." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65–66 (1st Cir. 2002).

While the First Circuit has not yet considered the issue, the Fourth, Seventh, and Ninth Circuits have found that *Bostock* applies to Title IX claims.[3] *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–18 (4th Cir. 2020) ("After the Supreme Court's recent decision in *Bostock*

---

[3] These cases also demonstrate that Harvard's approach to the locker rooms at the Ivy League Championships was at the very least permitted by Title IX, requiring dismissal of Plaintiffs' locker room claims against Penn. *See* Harvard Brief, at Section II.B (incorporated by reference herein).

. . . we have little difficulty holding that a bathroom policy precluding Grimm [a transgender boy] from using the boys restrooms discriminated against him 'on the basis of sex'" in violation of Title IX), *cert. denied sub nom. Gloucester Cnty. Sch. Bd. v. Grimm*, 141 S. Ct. 2878 (2021); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F. 4th 760, 769 (7th Cir. 2023) ("Applying *Bostock*'s reasoning to Title IX, we have no trouble concluding that discrimination against transgender persons is sex discrimination for Title IX purposes[.]"); *Doe v. Snyder*, 28 F.4th 103, 113–14 (9th Cir. 2022) (rejecting the district court's limitation of *Bostock* to Title VII claims).[4]

The court in *Slusser v. Mountain West Conference* recently considered a parallel situation to that before the Court. No. 1:24-cv-03155-SKC-MDB, 2024 WL 4876221, at *2 (D. Colo. Nov. 25, 2024). An athletic conference (MWC) adopted a Transgender Participation Policy and one of its member institutions rostered a transgender woman on its women's volleyball team in accordance with that policy. *Id.* at *2–3. The plaintiffs (women on other women's volleyball teams in the MWC) sought injunctive relief to prohibit the transgender woman from playing in an upcoming tournament. *Id.* at *6. Applying *Bostock*, the court found that the plaintiffs had failed to establish a likelihood of success on their Title IX claims. *Id.* at *9–11. Flowing from that analysis, the *Slusser* court noted that the plaintiffs' "Title IX theory" (that the transgender woman must be excluded despite the MWC's policy) "*directly conflicts* with Title IX's prohibition on discrimination against trans individuals." *Id.* at *11 (emphasis added).

Indeed, numerous courts have read *Bostock* even more broadly, striking down rules that would preclude transgender athletes from participating on teams associated with their gender identity, including a district court in the First Circuit. *See Tirrell*, 748 F. Supp. 3d at 24–25, 46–47 (finding that transgender girl plaintiffs were likely to succeed on the merits of their Title IX claims because a New Hampshire statute prohibiting transgender girls from participating in girls' sports

---

[4] To the extent courts have declined to extend *Bostock's* analysis beyond Title VII, such a narrow reading of *Bostock* is erroneous. *See, e.g., L.W. by Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (finding that Bostock's "text-driven reasoning applies only to Title VII" and declining to apply it to an equal protection analysis). There is nothing in *Bostock* to suggest that its holding was limited to Title VII. Rather, the Court in *Bostock* merely stated that other laws were not before it, so it would not "prejudge." *Bostock*, 590 U.S. at 681. This "suggests a proper exercise of judicial restraint, not a silent directive that its reasoning about the link between homosexual or transgender status and sex was restricted to Title VII." *Fowler v. Stitt*, 104 F.4th 770, 790 (10th Cir. 2024).

discriminates on the basis of sex); *B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024) (remanding and instructing the district court to enter summary judgment in favor of a transgender girl on her Title IX claim where a West Virginia law prohibited her from playing on girls' sports teams), *cert. denied sub nom. W. Va. State Bd. of Educ. v. B.P.J. ex. rel. Jackson*, 145 S. Ct. 568 (2024); *A.M. by E.M. v. Indianapolis Pub. Schs.*, 617 F. Supp. 3d 950, 966 (S.D. Ind. 2022) (finding that a transgender girl was likely to succeed on the merits of her Title IX claim and noting that "singling out of transgender females is unequivocally discrimination on the basis of sex"); *Doe v. Hanover Cnty. Sch. Bd.*, No. 3:24cv493, 2024 WL 3850810 (E.D. Va. Aug. 16, 2024) (finding that a transgender girl was likely to succeed on the merits of her Title IX claim where the Board denied her application to try out for her school's girls' tennis team).

While these cases go further than necessary or perhaps even appropriate here, the principles on which they rest apply in spades. The question before this Court is not whether a rule precluding Thomas from swimming on Penn's women's swim team would pass muster under Title IX,[5] but rather the much easier question of whether Penn was required by law to exclude Thomas from doing so despite an NCAA Policy in place that Penn was required to follow. Under *Bostock*, it is clear that if Penn had excluded Thomas (as Plaintiffs claim is required), it would have intentionally singled Thomas out because of her sex at birth in direct violation of Title IX. Title IX cannot be read to require that which it expressly prohibits. *United States Sugar Corp. v. Env't Prot. Agency*, 113 F.4th 984, 994 (D.C. Cir. 2024) ("[W]e should not lightly assume that a statute . . . 'demands the impossible.'") (citing *Anniston Mfg. Co. v. Davis*, 301 U.S. 337, 350–52 (1937)).

### C.    Title IX Does Not Require Sex Separate Teams.

Plaintiffs' claims fail because their theory depends on an incorrect assumption that Title IX requires teams separated based on biological sex where both sexes have interest in a sport. *See* Compl. ¶ 418. This argument finds no support in the statute or Title IX's regulations.

---

[5] On February 6, 2025, the NCAA adopted a new Policy stating that "a student-athlete assigned male at birth may not compete on a women's team." *Participation Policy for Transgender Student Athletes*, NCAA, https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (last accessed Apr. 18, 2025). Penn assumes that this Policy comports with Title IX, which does not mandate what eligibility rules an institution applies to transgender athletes, and will comply with it when its teams participate in NCAA sports.

Title IX does not require sex separate teams, regardless of how "sex" is defined. Rather, Title IX regulations for athletics establish a general rule that *prohibits* institutions from providing athletics separately on the basis of sex. 34 C.F.R. § 106.41(a). The regulations carve out an exception to the general prohibition against separating teams by sex, stating that "a recipient *may* operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). Thus, co-ed teams are favored and separation of teams by sex is merely permissive.

Schools are entitled to significant flexibility in meeting the requirements of Title IX; there are no "cookie cutter" answers. *See* Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test, Off. of Civ. R., Dep't of Educ., 44 Fed. Reg. 71,413, 71,417 (Jan. 16, 1996). The Court should not accept Plaintiffs' invitation to impede that flexibility where the regulations do not require it to do so. *See Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 656 (6th Cir. 1981) (enjoining athletic association because "[its] rule for contact sports has been interpreted and applied to prohibit girls from participating on a boys' team in any contact sport . . . It conflicts in this regard with Title IX, which is *purposely permissive and flexible* on this point, rather than mandatory.") (emphasis added).

The Third, Fourth, and Ninth Circuits have considered separation by sex in the context of restrooms and facilities, which is also permissive under Title IX and its regulations. *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018); *Grimm*, 972 F.3d 586; *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020); *see also* 34 C.F.R. § 106.33 ("A recipient *may* provide separate toilet, locker room, and shower facilities on the basis of sex . . .").

The Third and Ninth Circuits have rejected arguments that the only permitted basis on which restrooms may be segregated is biological sex and cannot encompass gender identity. *Parents for Privacy*, 949 F.3d at 1227; *Boyertown Area Sch. Dist.*, 897 F.3d at 533. The Third Circuit in *Boyertown* stated: "The touchstone of both Title VII and Title IX claims is disparate treatment *based on sex*. . . . [A] policy [that] allows all students to use bathrooms and locker rooms

that align with their gender identity . . . does not discriminate based on sex, and therefore does not offend Title IX." *Boyertown Area Sch. Dist.*, 897 F.3d at 533–34 (emphasis in original).

The Fourth Circuit explained that Title IX's permissive regulations allowing sex-separated restrooms "cannot override the statutory prohibition against *discrimination* on the basis of sex." *Grimm*, 972 F.3d at 618 (emphasis in original). Rather, "all [the implementing regulation] suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to students like Grimm, the Board may rely on its own discriminatory notions of what 'sex' means." *Id.*

Similarly, in *Tenn. v. Dep't of Educ.*, 104 F.4th 577, 610–11 (6th Cir. 2024), the Sixth Circuit affirmed an injunction halting the enforcement of the DOE's Notice of Interpretation, Dear Educator letter, and Fact Sheet interpreting Title IX to prohibit gender identity discrimination put in place under the Biden administration. However, in doing so, the Sixth Circuit expressly noted that Title IX "regulations *permit, but do not require*, aid recipients to organize their athletics programs and facilities by biological sex. Schools could, for example, choose coeducational teams and facilities. ***It follows that they could also separate programs and facilities by gender identity*.**" *Id.* at 586–87, 610–11 (emphasis added). In other words, even authority that approves of rules requiring sex separation recognizes that it is only an option and that Title IX's permissive structure equally allows division by gender identity, undercutting the foundation of Plaintiff's Complaint.

**D.    Plaintiffs Failed to Plead a Violation of Title IX's Equal Opportunity Requirement.**

Even if this Court finds that Penn could have targeted Thomas by kicking her off of the women's team right before the Ivy League Championships without violating Title IX, Plaintiffs still must adequately plead a viable cause of action. Plaintiffs do not allege that they were "singled out" and excluded from swimming on the women's swim team because of their sex. Rather, they argue that Penn's decision to allow one transgender athlete to swim in one meet violated Title IX because it deprived them of "access to equal and meaningful opportunities." (*See* Compl. ¶¶ 432, 447.) Thus, in order to prevail in this case, Plaintiffs must demonstrate that Penn violated Title

13

IX's "equal opportunity" requirement as set forth in its implementing regulations. *See* 34 C.F.R. § 106.41(c). Plaintiffs have not plead facts establishing an "equal opportunity" violation.

Title IX's "equal opportunity" requirement has two components: (1) effective accommodation, and (2) equal treatment. *See* 34 C.F.R. § 106.41(c). The implementing regulations set forth one factor relating to "effective[] accommodat[ion]" in 34 C.F.R. § 106.41(c)(1), and nine factors relating to "equal treatment" in § 106.41(c)(2)-(10).[6] Importantly, in 1979, the Department of Health, Education and Welfare (the DOE's predecessor) published in the Federal Register a policy interpretation of these regulations. *See* Title IX of the Education Amendments of 1972: A Policy Interpretation, 44 Fed. Reg. 71,413 (Dec. 11, 1979) ("1979 Policy Interpretation").

Plaintiffs sprinkle terms like "equal opportunity," "accommodation," or synonyms, throughout their Complaint. But those terms have very specific meanings under Title IX's regulations. They are not free-floating concepts tethered to Plaintiffs' beliefs about what is right or wrong. Plaintiffs' failure to plead facts plausible to show a violation of any of the *specific* regulations governing either the "effective accommodation" or "equal treatment" components of Title IX's equal opportunity requirement dooms their claims.

### i.    Plaintiffs Failed To Plead an Effective Accommodation Claim.

For "effective accommodation" claims relating to participation opportunities, the 1979 Policy Interpretation sets forth a Three-Part Test, stating that compliance will be assessed under three prongs and schools will be found to comply with Title IX if they meet *any of those* prongs, also commonly referred to as safe harbors. (*Id.* at 71,418, § VII.C.5.a.) ("Compliance will be assessed in *any one* of the following ways . . .") (emphasis added). The Court need not spend too much time here. A quick look at the first safe harbor shows why.

The first safe harbor in the Three-Part Test assesses "[w]hether intercollegiate level participation opportunities for male and female students are provided in numbers substantially

---

[6] *See generally McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 291–94 (2d Cir. 2004) for a summary of how the regulations are separated into "effective accommodation" and "equal treatment" components.

proportionate to their respective enrollments." (*Id.* § VII.C.5.a.1.) Thus, it focuses on a school-wide analysis that compares *all of the sports teams offered to men and women* in light of total enrollment numbers, and by definition often includes situations where the same sports team is not offered to both men and women, which is permissible. *See Kelley v. Board of Trs., Univ. of Ill.*, 35 F.3d 265, 271 (7th Cir. 1994) (noting that the three part test "measures compliance by analyzing how a school has allocated its various athletic resources.").

This case has nothing to do with any disparities for sports teams at Penn writ large, let alone any disparities substantial enough to trigger a violation of the regulations. And Plaintiffs' Complaint does not include any allegations about any such disparities. It focuses on one team and one swimmer. That cannot form the basis of an "effective accommodation" claim as the term is used in Title IX's regulations and interpretive guidance.

The 1979 Policy Interpretation also covers "effective accommodation" claims as they relate to competitive schedules and opportunities for men's and women's teams. That part of the 1979 Policy Interpretation provides the following two-part test to determine if a school is in compliance:

> (1) Whether the competitive schedules for men's and women's teams, *on a program-wide basis*, afford proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities; or
>
> (2) Whether the institution can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.

(1979 Policy Interpretation, 44 Fed. Reg. at 71,418, § VII.C.5.b) (emphasis added).

Allowing one transgender woman to swim on the women's team cannot possibly run afoul of this part of the 1979 Policy Interpretation. The test speaks to proportionality on a "program-wide basis," meaning a comparison of opportunities for women and men across all of Penn's athletic programs. (*Id.* § VII.C.5.b.1.) While the two-part test is rarely litigated, the DOE's 1990 Investigator's Manual sets forth an analysis to be used by OCR investigators for assessing "competitive opportunities." The first factor demands a comparison of all competitive events at an institution wide level. (Valarie M. Bonnette, Lamar Daniel, *Title IX Athletics Investigator's*

*Manual*, OFF. OF CIV. R., DEP'T OF EDUC., (1990) https://eric.ed.gov/?id=ED400763 (emphasis added)). Plaintiffs' Complaint does not speak to these issues at all, let alone plead that Penn failed to satisfy even the first factor by allowing one transgender woman to swim on the women's team.

### ii.    Plaintiffs Failed to Plead an Equal Treatment Claim.

Plaintiffs' "equal treatment" claims under Title IX's regulations deserve even less ink. The majority of the "equal treatment" factors listed in 34 C.F.R. § 106.41(c)(2)-(10) have nothing to do with this case. Those factors largely focus on resources, like equipment and supplies, per diem allowances, tutoring, and training facilities. Again, "schools [] have considerable flexibility in complying with Title IX" with respect to these factors, as the analysis continues to look at *program-wide* benefits and opportunities, for example, "a school that provides better equipment to the men's basketball team than to the women's basketball team would be in compliance with Title IX if it provided comparably better equipment to the women's soccer team than to the men's soccer team." *McCormick*, 370 F.3d at 293–94; *Anders v. Cal. State Univ.*, No. 1:21-cv-179-AWI-BAM, 2021 WL 1564448, at *18 (E.D. Cal. Apr. 21, 2021) (1979 Policy Interpretation "indicates that 'equal treatment' claims under Title IX generally require a showing of a program-wide imbalance in the allocation of benefits between sexes, or alternatively, 'substantial' disparities in the treatment afforded to comparable male and female teams"). Plaintiffs' Complaint does not allege that Penn's women's swim team was provided less resources than the men's team, or that any disparity between swim teams affected Penn's program-wide benefits and opportunities.

While one of the "equal treatment" factors, 34 C.F.R. § 106.41(c)(3), is "scheduling of games and practice time," the Complaint does not allege a factual scenario that might give rise to such a claim, for example, that Penn somehow treated women differently by establishing a season-long schedule for women's swimming that deprived the women's team of being able to compete against women's teams from other schools in the post-season. *Cf.*, *McCormick*, 370 F.3d at 299 (sustaining unequal treatment claim by women's soccer team where "off-season scheduling [] disadvantaged members of only one sex").

As to Plaintiffs' allegations relating to Thomas' use of women's locker rooms,[7] which obviously has little relationship to their central claim that she was allowed to swim at one meet, 34 C.F.R. § 106.41(c)(7) does list as an "equal treatment" factor "provision of locker rooms, practice and competitive facilities." But as the 1979 Policy Interpretation explains, this team-based factor is also resource focused, and relates to the quality, size, and location of women's locker rooms. (1979 Policy Interpretation, 44 Fed. Reg. at 71,417, § VII.B.3.f.)[8] The Complaint does not suggest that the women's locker rooms at the Ivy League Championships were somehow inferior to the locker rooms provided to men. In fact, the Complaint describes how Harvard "converted the Men's Locker Room at Blodgett Pool into a second Women's Locker Room." (Compl. ¶ 383.) And any suggestion that allowing one transgender woman to use the women's locker room (or one transgender man to use the men's locker room, which was also permitted) somehow violates this factor, or amounts to an equal treatment claim, is specious.

### E.    Penn Had a Strong Basis in Evidence to Believe That It Would Violate Title IX If It Excluded Thomas from the Ivy League Championships.

The Court need not get this far in its analysis given the foregoing four independent bases warranting dismissal. Nonetheless, if the Court finds that Plaintiffs could establish a Title IX claim, the legal framework announced by the Supreme Court in *Ricci v. DeStefano*, 557 U.S. 557 (2009) should guide further analysis and is another independent basis for dismissal. The plaintiffs in *Ricci* were white and Hispanic firefighters who had taken an examination necessary to qualify for promotions and outperformed minority candidates, but the city threw out the examinations based on racial disparities reflected in the results. *Id.* at 562. The firefighters alleged that by discarding

---

[7] Penn also incorporates by reference the standing discussion, and cited legal standard and authority, set forth in Section I of Harvard's brief. Plaintiffs lack standing to assert their locker room claims against Penn for two reasons. First, they cannot establish causation against Penn because they do not allege that Penn played any role in establishing the locker room set up at the Ivy League Championships. *See* Compl. ¶ 384 ("Harvard [*not Penn*] did not provide a unisex bathroom" for Thomas or other participants in the Ivy League Championships). Second, for the same reasons detailed in Harvard's brief, Plaintiffs failed to plead that they suffered a concrete injury related to this claim sufficient to confer standing against Penn.

[8] Section VII.B.3.f of the 1979 Policy Interpretation lists the following to be considered in assessing the provision of locker rooms, practice and competitive facilities: "Quality and availability of the facilities provided for practice and competitive events; Exclusivity of use of facilities provided for practice and competitive events; Availability of locker rooms; Quality of locker rooms; Maintenance of practice and competitive facilities; and Preparation of facilities for practice and competitive events."

the test results, the city discriminated against them based on their race in violation of Title VII. *Id.* at 562–63. The city argued that certification of the results could have resulted in liability under Title VII for adopting a practice that had a disparate impact on Black firefighters. *Id.* The Court held that a disparate treatment claim is avoidable based on concerns about disparate-impact liability if there is a "strong basis in evidence" of such liability. *Id.* at 585.

While *Ricci*'s application of the strong-basis-in-evidence standard addressed the specific claims that were before the Court, the Court contemplated, in dicta, the reverse scenario—one in which concerns of disparate-treatment liability were supported by a strong basis in evidence. "If, after it certifies the test results, the City faces a disparate-impact suit, then in light of our holding today it should be clear that the City would avoid disparate-impact liability on the strong basis in evidence that, had it not certified the results, it would have been subject to disparate-treatment liability." *Id.* at 560.

Here, Penn can easily demonstrate that it had a strong basis in evidence to believe that excluding Thomas from the Ivy League Championships would have subjected it to disparate-treatment liability under Title IX. While the strong basis in evidence standard requires more than a mere "fear of litigation," it is not so restrictive that it requires an actual, provable violation of law. *Ricci*, 557 U.S. at 583, 592. To conclude that Penn's decision to let Thomas swim was rooted in far more than a mere "fear of litigation," this Court need only put itself in Penn's shoes and survey the legal and regulatory landscape when the decision was made.

First, as demonstrated by Plaintiffs' Complaint and as described herein, Penn was required to comply with the NCAA eligibility rules in effect at the time if its athletes were to participate in NCAA sponsored events. The 2010 Policy allowed Thomas to swim on the women's team in NCAA competitions because she met the eligibility requirements at the start of the 2021-2022 season. That policy was supplemented by NCAA guidance indicating the eligibility rules should not be changed mid-season. The Policy has been in place for over a decade. (*See* Exs. A, B.)

Second, before *Bostock*, the Third Circuit (where Penn sits) in 2018 "agreed with [a] School District's position that barring transgender students from restrooms that align with their gender

identity *would itself pose a potential Title IX violation*" and noted that a school "[could] hardly be faulted for being proactive in adopting a policy" permitting transgender students to use bathrooms consistent with their gender identity because "that avoids the issues that may otherwise have occurred under Title IX." *Boyertown Area Sch. Dist.*, 897 F.3d at 533, 536 (emphasis added). Penn did precisely what the Third Circuit had suggested would allow it to avoid a Title IX violation.

    *Boyertown Area Sch. Dist.* was hardly an outlier. While Plaintiffs' Complaint relies on a definition of "sex" limited to "binary, biological sex," that definition was not (and is not) accepted by all courts. (*See* Compl. ¶ 414.) Because Plaintiff's definition of sex is not found anywhere in the statute or the regulations, courts have grappled with how to define the term under Title IX and other statutes. *See* 20 U.S.C. § 1681(a); *see also Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1047 (7th Cir. 2017) ("Neither [Title IX] nor [its] regulations define the term 'sex.' Also absent from the statute is the term "biological," which [the defendant] maintains is a necessary modifier."). Some courts have concluded that a binary definition cannot account for the complexity of the necessary inquiry, asking "what, for instance, should we do about someone who is intersex?" *Metro Sch. Dist. of Martinsville*, 75 F.4th at 770. These courts note that "several conditions . . . can produce XX males or XY females, or other chromosomal combinations . . . People with this genetic make-up are entitled to Title IX's protections, and an educational institution's policy . . . would fail to account for them if biological sex were the only permissible sorting mechanism." *Id.* These courts undoubtedly would have found Penn liable to Thomas because they interpreted Title IX to prohibit discrimination against transgender individuals even apart from the link between transgender status and birth sex that *Bostock* relied upon.

    Third, just one year before the 2021-2022 college swimming season, the Supreme Court issued its decision in *Bostock*. Then, in January and March 2021, President Biden issued two Executive Orders relating to *Bostock*. In Executive Order 13,988, President Biden cited *Bostock* and proclaimed that other federal laws that prohibit discrimination "including Title IX . . ., along with their respective implementing regulations[,] prohibit discrimination on the basis of gender

identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, 86 Fed. Reg. 7023 (Jan. 21, 2021). In Executive Order 14021, President Biden stated: "It is the policy of my Administration that all students should be guaranteed an educational environment free from discrimination on the basis of sex . . . including discrimination on the basis of sexual orientation or gender identity" and that "this guarantee is codified, in part, in Title IX[.]" Exec. Order No. 14,021, 86 Fed. Reg. 13803 (Mar. 8, 2021).

Additionally, in June 2021, the DOE published a Notice of Interpretation in the Federal Register to make clear its intent to "fully enforce" Title IX to prohibit discrimination based on gender identity and sexual orientation in light of *Bostock*. 86 Fed. Reg. 32,637 (June 22, 2021). The DOE also published a "Dear Educator" Letter and accompanying "Fact Sheet." *See* Exhibit B. The Fact Sheet provided the following as an example of the kinds of incidents DOE could investigate: "[A] transgender high school girl . . . joins her friends to try out for the girls' cheerleading team and **the coach turns her away from tryouts solely because she is transgender.** When the student complains, **the principal tells her 'those are the district's policies.'**" *Id* (emphasis added). It is worth noting the obvious. If Penn stopped Thomas from swimming, it would have been in an even more precarious position than the principal in this hypothetical. Thomas complied with the NCAA Policy.

The NCAA Policy that had been in place for a decade, the Supreme Court precedent in *Bostock*, legal authority across circuits pre- and post-*Bostock* (including from the Third Circuit where Penn sits), presidential Executive Orders, and DOE enforcement guidance—all of which were in effect during the 2022 Ivy League Championships—point to one conclusion: excluding Thomas from the women's swim team would have subjected Penn to liability for having engaged in disparate treatment on the basis of sex in violation of Title IX.[9]

For the reasons set forth herein, Plaintiffs' claims against Penn fail as a matter of law.

---

[9] As detailed in Section II.D of Harvard's brief, incorporated by reference herein, the regulatory and legal framework in place during the relevant time period also makes it clear that Penn lacked notice that any of its actions violated Title IX, dooming Plaintiffs' damages claims.

Dated: April 21, 2025

Respectfully submitted,

PAUL HASTINGS LLP

By: _____
   Jeffrey A. Sturgeon

Jeffrey A. Sturgeon (*pro hac vice*)
200 Park Avenue
New York, NY 10166
jeffreysturgeon@paulhastings.com
Telephone: 1(212) 318-6017

Paul C. Evans (*pro hac vice*)
200 Park Avenue
New York, NY 10166
paulevans@paulhastings.com
Telephone: 1(212) 318-6009

Remy D. Snead (*pro hac vice*)
71 S. Wacker Dr., Suite 4500
Chicago, IL 60606
remysnead@paulhastings.com
Telephone: 1(312) 499-6086

Matthias A. Kamber
101 California Street, 48th Floor
San Francisco, California 94111
matthiaskamber@paulhastings.com
Telephone:      1(415) 856-7000
Facsimile:      1(415) 856-7100

Attorneys for Defendant
TRUSTEES OF THE UNIVERSITY OF
PENNSYLVANIA

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of this document was filed through the Electronic Case Filing system and will be served upon the attorney of record for each party registered to receive electronic service on this 21st day of April, 2025.

_____

Jeffrey A. Sturgeon