EXHIBIT

A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GRACE ESTABROOK,<br>ELLEN HOLMQUIST, and<br>MARGOT KACZOROWSKI,<br><br>                  Plaintiffs,<br><br>   v.<br><br>THE IVY LEAGUE COUNCIL OF<br>PRESIDENTS, PRESIDENT AND<br>FELLOWS OF HARVARD COLLEGE,<br>TRUSTEES OF THE UNIVERSITY OF<br>PENNSYLVANIA, and NATIONAL<br>COLLEGIATE ATHLETIC<br>ASSOCIATION,<br><br>                Defendants. | Civil Action No. 1:25-cv-10281-WGY<br><br><br>**RESPONSE IN OPPOSITION TO<br>MOTIONS TO DISMISS** |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .......................................................................................... v

INTRODUCTION AND FACTUAL BACKGROUND ................................................. 1

STANDARD OF REVIEW .......................................................................................... 4

ARGUMENT ................................................................................................................ 4

*The 2022 Women's Ivy League Swimming Championships* ........................................ 1

*The NCAA's Radical Plan to Re-Write Title IX* ....................................................... 2

*The Ivy League's Adherence to Transgender Ideology Ensured Thomas' Participation in the 2022 Ivy League Women's Swimming Championships* .............................................. 2

*Defendants Walk Back Their Eligibility Rule, But Still Want to Re-Write Title IX* .... 3

I.   Title IX Was Intended to Increase Women's Opportunities in Scholastic Sports ...... 4

   A.   Title IX Forbids Discrimination and Protects Women's Opportunities in Scholastic Sport Based on "Sex" Not Gender Identity ........................................................................ 5

   B.   Title IX Permits Sex-Separated Sports and Athletics Facilities When Necessary to Ensure Equal Opportunity ............................................................................................... 5

   C.   The Title IX Athletics Regulation Contains Unique Sport-Related Protections for Women ........................................................................................................................ 7

      1.   The Athletics Regulation Endorses Sex-Separated Teams ............................ 7

      2.   The Athletics Regulation Requires Protection of Women's Equal Opportunity to Seek the Rewards of Athletic Competition ........................................................................ 8

      3.   The Athletics Regulation Guarantees Women Separate and Comparable Locker Rooms and Showers ..................................................................................................... 9

   D.   Colleges and Universities—Including the Ivies—Have Universally Applied Title IX's Equal Opportunity Mandate by Creating Sex-Separated Teams ................................ 10

II.   Authorizing A Trans-Identifying Man to Compete in Women's Sex-Separated Scholastic Sports Violates Title IX ................................................................................................ 11

   A.   Plaintiffs Have Stated a Claim that Lia Thomas's Participation in the 2022 Ivy League Championships Violated Title IX ............................................................................... 11

   B.   Trans-Identifying Men Cannot Lawfully Access Women's Sports Teams, Locker Rooms and Showers Via Title IX ........................................................................................... 15

   C.   The Ivies Misconstrue the Title IX Proportionality Inquiry as the Be All End All of Title IX Analysis ............................................................................................................... 16

   D.   The Ivies Misread the Athletics Regulation's Equal Opportunity Requirement ....... 20

   E.   The Ivies Misrepresent Their Own Decision to Create Sex-Separated Athletic Categories ................................................................................................................... 22

III.   Title IX Applies to the NCAA And the Ivy League ............................................. 23

A.    The Scope of Title IX's Coverage Was Intended to Be Broad                                          23

B.    The NCAA and Ivy League Are Covered by the Civil Rights Restoration Act        24

C.    Title IX Applies to Athletic Associations that Exercise Controlling Authority Over
Scholastic Sports Programs                                                                                              26

D.    The NCAA is Covered by Title IX as An Indirect Recipient of Federal Funding    30

IV.    All Plaintiffs Have Standing to Pursue Their Claims                                                  32

A.    Plaintiffs Have Alleged Cognizable Injuries                                                            34

1.    Kaczorowski Has Alleged Competitive Injury on Behalf of Herself and Those
Similarly Situated                                                                                                              34

2.    Holmquist Has Alleged Competitive Injury                                                          35

3.    Estabrook and Kaczorowski and Other Similarly Situated Competitors Were Deprived
of a Women-Only Locker Room and Showers                                                              35

4.    Estabrook and Kaczorowski and Other Similarly Situated Competitors Were Deprived
of Publicity and Recognition                                                                                          36

5.    Estabrook and Kaczorowksi Were Forced to Compete on Co-ed Relay Teams    37

B.    Harvard and Penn Have a Causal Connection to Plaintiffs' Title IX Claims          38

1.    Harvard Provided the Pool                                                                                    38

2.    Penn Rostered Thomas                                                                                          40

3.    Harvard Conspired and Collaborated in the Scheme                                          40

4.    Harvard Caused Holmquist's Injury                                                                    41

V.    Plaintiffs Can Recover Damages and Attorney's Fees Under Title IX                      41

VI.    Title IX Provides Clear Notice that a Man Competing against Women in Sex-Separated
Sports Destroys Equal Opportunity                                                                                  42

A.    The Text of Title IX Provides Clear Notice                                                            43

B.    The Biden DoE Regulations Do Not Help Defendants                                          44

C.    Clear Notice Rules are Inapplicable to Intentional Conduct.                                47

D.    *Ricci v. DeStefano* Does Not Apply                                                                      48

VII.    The Statute of Limitations Does Not Bar Plaintiffs' Claims                                  49

A.    Plaintiffs' Title IX Claims Accrued After February 5, 2022                                50

B.    Massachusetts' Three-Year Statute of Limitations Applies                                  53

VIII.    The Court Should Not Stay Any Aspect of this Case Under the First-to-File Rule    55

IX.    Plaintiffs Should Be Granted Leave to Amend if Dismissal is Granted                  56

CONCLUSION                                                                                                                    57

CERTIFICATE OF SERVICE                                                                                              59

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.C. by M.C. v. Metro Sch. Dist. of Martinsville*,
   75 F. 4th 760 (7th Cir. 2023)..................................................................................... 18

*A.M. by E.M. v. Indianapolis Pub. Sch.*,
   617 F. Supp. 3d 950 (S.D. Ind. 2022), *vacated*, 2023 WL 11852464 (S.D. Ind. Jan. 19, 2023)
   ....................................................................................................................................... 22

*A.T. v. Olley Valley Sch. Dist.*,
   2023 WL 1453143 (E.D. Pa. Feb. 1, 2023)............................................................... 50

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022)............................................................................ passim

*Alabama v. U.S. Sec. of Edu.*,
   2024 WL 3981994 (11th Cir. Aug. 22, 2024)........................................................... 55

*Alexander v. Choate*,
   469 U.S. 287 (1985)................................................................................................. 24

*Amnesty Int'l, USA v. Battle*,
   559 F.3d 1170 (11th Cir. 2009)................................................................................ 50

*Andersen v. Lopez*,
   957 N.E.2d 726, 729 (Mass. Ct. App. 2011)..................................................... 61, 62

*Arkansas v. DOE*,
   2024 WL 3518588 (E.D. Mo. July 24, 2024) ......................................................... 54

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................ 12

*B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*,
   98 F.4th 542 (4th Cir.), *cert. denied sub nom. W. Virginia Secondary Sch. Activities Comm'n v. B.P. J. Next Friend Jack*son, 145 S. Ct. 568 (2024) ............................... 12, 22, 23, 34

*Barrs v. S. Conf.*,
   734 F. Supp. 2d 1229 (N.D. Ala. 2010) .................................................................. 34

*Baughman v. Beter*,
   2024 WL 4476532 (D. Mass. Oct. 11, 2024)........................................................... 63

*Bell Atlantic Corp. v.Twombly*,
   550 U.S. 544, 570 (2007) ............................................................................ 27, 28, 65

*Bennett v. Kentucky Dep't of Educ.*,
  470 U.S. 656 (1985) ................................................................................. 51

*Biediger v. Quinnipiac Univ.*,
  691 F.3d 85 (2d Cir. 2012) ....................................................................... 16

*Bostock v. Clayton Cnty., Ga.*,
  590 U.S. 644 (2020) ............................................................................... 9, 13

*Boston Alliance of Gay, Lesbian, Bisexual and Transgender Youth v. U.S. Dep't of Health & Human Servs.*,
  557 F. Supp. 3d 224 (D. Mass. 2021) ...................................................... 55

*Bowers v. NCAA*,
  118 F. Supp. 2d 494 (D.N.J. 2000) ...................................................... 39, 40

*Brannum v. Overton Cnty. Sch. Bd.*,
  516 F.3d 489 (6th Cir. 2008) .................................................................... 17

*Cannon v. University of Chicago*,
  441 U.S. 677 (1979) ....................................................................... 26, 34, 49

*Cape v. Tenn. Secondary Sch. Athletic Ass'n*,
  563 F.2d 793 (6th Cir. 1977) .............................................................. 15, 52

*Carroll Indep. Sch. Dist. v. DOE*,
  2024 WL 3381901 (N.D. Tex. Jul. 11, 2024) ........................................... 54

*Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*,
  695 F.2d 1126 (9th Cir. 1982) ...................................................... 14, 17, 52

Cohen v. Brown Univ.,
  809 F. Supp. 978 (D.R.I. 1992) .......................................................... 27, 29

Cohen v. Brown Univ.,
  991 F.2d 888 (1st Cir. 1993) ..................................................................... 27

*Cohen v. Brown University*,
  101 F.3d 155 (1st Cir. 1996) ..................................................................... 20

*Communities for Equity v. Michigan High Sch. Athletic Ass'n*,
  80 F. Supp. 2d 729 (W.D. Mich. 2000) ........................................ 34, 35, 36

*Cummings v. Premier Rehab Keller, PLLC*,
  596 U.S. 212 (2022) ................................................................................. 50

*Cureton v. NCAA*,
  198 F.3d 107 (3d Cir. 1999) ............................................................... 37, 38

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
    958 F.3d 38 (1st Cir. 2020) ............................................................. 46, 47

*Davis v. Monroe Cnty. Bd. of Ed.*,
    526 U.S. 629 (1999) ......................................................... 13, 23, 24, 56

*Delaware State College v. Ricks*,
    449 U.S. 250 (1980) ......................................................... 58, 59, 60, 61

*Dennett v. Archuleta*,
    982 F. Supp. 2d 166 (D.R.I. 2013) ........................................................ 57

*Dep't of Educ. v. Louisiana*,
    144 S. Ct. 2507 (Aug. 16, 2024) ............................................................ 55

*Doe v. Boyerton Area Sch. Dist.*,
    897 F. 3d 518 (3d Cir. 2018) ................................................................. 18

*Doe v. Fairfax Cnty. Sch. Bd.*,
    2023 WL 424265 (E.D. Va. Jan. 25, 2023) ............................................ 50

*Doe v. Hanover Cnty. Sch. Bd.*,
    2024 WL 3850810 (E.D. Va. Aug. 16, 2024) ......................................... 22

*Doe v. League Sch. of Greater Boston, Inc.*,
    2017 U.S. Dist. LEXIS 133011, *10 (D. Mass. 2017) ........................... 40

*Doe v. Town of North Andover*,
    2023 WL 3481494 (D. Mass. May 16, 2023) ......................................... 50

*Doe v. Virginia Polytechnic Inst. & State Univ.*,
    617 F. Supp. 3d 412 (W.D. Va. 2022) ................................................... 59

*Franklin v. Gwinnett Cnty. Public Schools*,
    503 U.S. 60 (1992) ........................................................................... 49, 52

*Gebser v. Lago Vista Ind. School Dist.*,
    524 U.S. 274 (1998) .............................................................................. 23

*Gent v. CUNA Mut. Ins. Soc'y*,
    611 F.3d 79 (1st Cir. 2010) ................................................................... 27

*Gray v. Evercore Restructuring L.L.C.*,
    544 F.3d 320 (1st Cir. 2008) ................................................................. 57

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ........................................................... 13, 18

*Grove City Coll. v. Bell*,
465 U.S. 555 (1984) ............................................................................................ 31

*Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*,
463 U.S. 582 (1983) ............................................................................................ 56

*Horner v. Kentucky High Sch. Athletic Ass'n*,
43 F.3d 265 (6th Cir. 1994) ............................................................................... 52

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) ........................................................................... 13, 18, 23, 24

*Kansas v. DOE*,
2024 WL 3273285 (D. Kan. Jul. 2, 2024) ......................................................... 54

*Katz v. Pershing, LLC*,
672 F.3d 64 (1st Cir. 2012) ........................................................................... 46, 47

*Kelley v. Bd. of Trs.*,
35 F.3d 265 (7th Cir. 1994) ............................................................................... 22

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ............................................................................................ 30

*Louisiana v. DOE*,
2024 WL 2978786 (W.D. La. Jun. 13, 2024) ................................................... 54

*Louisiana v. DOE*,
2024 WL 3452887 (5th Cir. Jul. 17, 2024) ....................................................... 54

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................................................ 41

*Mansourian v. Regents of Univ. of Calif.*,
602 F.3d 957 (9th Cir. 2010) ............................................................................. 56

*Martin v. Clemson University*,
654 F. Supp. 2d 410 (D.S.C. 2009) ................................................................... 59

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
370 F.3d 275 (2d Cir. 2004) ........................................................................ passim

*Montgomery v. D.C.*,
2022 WL 1618741 (D.D.C. May 23, 2022) ....................................................... 50

*Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*,
480 F.3d 1 (1st Cir. 2007) ................................................................................... 51

*Mukarker v. City of Philadelphia*,
   238 F. Supp. 3d 174 (D. Mass. 2017) ................................................................. 62

*N. Haven Bd. of Ed. v. Bell*,
   456 U.S. 512 (1982) ................................................................................... 24, 26

*Nat'l Ass'n of the Deaf v. Harvard Univ.*,
   377 F. Supp. 3d 49 (D. Mass. 2019) ............................................................ 57, 58

*Nat'l Collegiate Athletic Ass'n v. Smith*,
   525 U.S. 459 (1999) ............................................................................. 31, 32, 33

*NCAA v. Tarkanian*,
   488 U.S. 179 (1988) ................................................................................... 37, 38

*Neal v. Bd. of Trs. of Cal. State Univs.*,
   198 F.3d 763 (9th Cir. 1999) ...................................................................... 14, 52

*Nelson v. Univ. of Maine Sys.*,
   914 F. Supp. 643 (D. Me. 1996) ....................................................................... 58

*New England Tel. & Tel. Co. v. Gourdeau Const. Co.*,
   647 N.E.2d 42 (Mass. 1995) .............................................................................. 61

*Nierman v. Hyatt Corp.*,
   808 N.E.2d 290 (Mass. 2004) ........................................................................... 62

*O'Connor v. Bd. of Educ. of Sch. Dist. 23*,
   449 U.S. 1301 (1980) ....................................................................................... 16

*Oirya v. Auburn Univ.*,
   2019 WL 4876705 (M.D. Ala. Oct. 2, 2019), *aff'd*, 831 F. App'x 462 (11th Cir. 2020) ......... 59

*Oklahoma v. Cardona*,
   2024 WL 3609109 (W.D. Okla. Jul. 31, 2024) ..................................................... 54

*Parents for Privacy v. Barr*,
   949 F.3d 1210 (9th Cir. 2020) .......................................................................... 18

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ........................................................................................ 51

*Pederson v. La. State Univ.*,
   213 F.3d 858 (5th Cir. 2000) ........................................................................... 56

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ............................................................................................ 51

*Pike v. Budd*,
    133 F.4th 74 (1st Cir. 2025) ................................................................................. 12

*President & Fellows of Harvard Coll. v. Micron Tech., Inc.*,
    230 F. Supp. 3d 46 (D. Mass. 2017) ..................................................................... 65

*Reid v. James Madison Univ.*,
    90 F.4th 311 (4th Cir. 2024) .......................................................................... 59, 60

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ...................................................................................... 56, 57

*Simpson v. Univ. of Colo. Boulder*,
    500 F.3d 1170 (10th Cir. 2007) ............................................................................ 56

*Slusser v. Mountain W. Conf.*,
    2024 WL 4876221 (D. Colo. Nov. 25, 2024) ....................................................... 22

*Smith v. NCAA*,
    266 F.3d 152 (3d Cir. 2001) .................................................................... 37, 38, 39

*Soule v. Conn. Assoc. of Schools*,
    755 F. Supp. 3d 172 (D. Conn. 2024) .......................................................... passim

*Soule v. Connecticut Ass'n of Sch., Inc.*,
    90 F.4th 34 (2d Cir. 2023) ............................................................................ passim

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ............................................................................................. 12

*Tennessee v. Cardona*,
    2024 WL 3019146 (E.D. Ky. Jun. 17, 2024) ........................................................ 54

*Tennessee v. Cardona*,
    2024 WL 3453880 (6th Cir. Jul. 17, 2024) ........................................................... 54

*Texas v. United States*,
    2024 WL 3405342 (N.D. Tex. Jul. 11, 2024) ....................................................... 54

*Thakkar v. United States*,
    389 F. Supp. 3d 160 (D. Mass. 2019) ................................................................. 63

*Tirrell v. Edelblut*,
    748 F. Supp. 3d 19 (D.N.H. 2024) ................................................................. 22, 55

*U.S. v. Virginia*,
    518 U.S. 515 (1996) ...................................................................................... 14, 17

*United States DOT v. Paralyzed Veterans of America,*
477 U.S. 597 (1986) ........................................................................... 32

*United States v. All Funds on Deposit in Lee Munder Wealth Planning Res. Account No. ***-**1080,*
137 F. Supp. 3d 125 (D. Mass. 2016) ............................................... 65

*United States v. Massachusetts,*
781 F. Supp. 2d 1 (D. Mass. 2011) ................................................... 57

*Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.,*
454 U.S. 464 (1982) ........................................................................... 44

*Victim Rights Law Ctr. v. Cardona,*
552 F. Supp. 3d 104 (D. Mass. 2021) ............................................... 47

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
858 F.3d 1034 (7th Cir. 2017) ........................................................... 18

*Williams* v. *Board of Regents,*
477 F.3d 1282 (11th Cir. 2007) ................................................... 31, 34

*Williams v. Sch. Dist. of Bethlehem, Pa.,*
998 F.2d 168 (3d Cir. 1993) ..................................................... 14, 17, 52

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n,*
647 F.2d 651 (6th Cir. 1981) ......................................................... 14, 52

## **Statutes**

20 U.S.C. § 1681 ......................................................................... 31, 37

20 U.S.C. § 1681(a) ...................................................... 10, 13, 25, 35

20 U.S.C. § 1687(4) ............................................................................ 33

## **Regulations**

34 C.F.R. § 106.30 ............................................................................. 18

34 C.F.R. § 106.31(b)(7) ................................................................... 13

34 C.F.R. § 106.33 ............................................................................. 17

34 C.F.R. § 106.41 ....................................................................... 14, 28

34 C.F.R. § 106.41(a) ........................................................................ 26

34 C.F.R. § 106.41(b) .................................................................. 15, 16

34 C.F.R. § 106.41(c) ............................................................................................ 52

34 C.F.R. § 106.41(c)(1) ........................................................................................ 29

34 C.F.R. § 106.41(c)(10) ............................................................................. 16, 22, 44

34 C.F.R. § 106.41(c)(7) ................................................................................... 17, 22

## **Other Authorities**

117 Cong.Rec. 30 ................................................................................................... 22

118 Cong.Rec. 5 ..................................................................................................... 22

44 Fed. Reg. 71413 ........................................................................................... 20, 29

85 Fed. Reg. 30026 (May 19, 2020) ....................................................................... 18

86 Fed. Reg. 32637 (Jun. 21, 2021) ....................................................................... 53

86 Fed. Reg. 7023 ................................................................................................... 52

89 Fed. Reg. 104936 (Dec. 26, 2024) ..................................................................... 54

94th Cong. 1st ........................................................................................................ 22

President Biden's,
    Executive Order No. 13988 (Jan. 20, 2021) ..................................................... 52

Pub. L. No. 100-259, § 2(1), 102 Stat. 28, 28 (1988) .................................................. 33

S. Rep. No. 100-64 .................................................................................................. 33

## INTRODUCTION AND FACTUAL BACKGROUND

### *The 2022 Women's Ivy League Swimming Championships*

The Ivy League Women's Swimming Championships ("Ivy League Championships") have been held for over fifty years, beginning in 1974, two years after Title IX of the Education Amendments of 1972 ("Title IX") became law. For most Ivy League swimmers the conference championship is the culmination of their swimming career. Dkt. 1, Complaint ("Compl.") ¶ 8.

In 2022 the National Collegiate Athletic Association ("NCAA"), the Ivy League Council of Presidents ("Ivy League" or "League"), the Trustees of the University of Pennsylvania ("Penn"), and the President and Fellows of Harvard College ("Harvard") (The League, Harvard and Penn collectively the "Ivy Institutions" or "Ivies") (collectively "Defendants") turned the Ivy League Championships at Harvard's Blodgett Pool into a co-ed swim meet, allowing Lia Thomas ("Thomas"), a trans-identifying man[1] who had previously competed on the Penn men's team, to compete in eight events and share the women's locker room and showers used by the Penn women's swimming team and three other teams. *Id.* ¶¶ 2–19, 345–387. Thomas won all four individual events he contested and added another first-place, a third-place and two fourth-place finishes in the relays, setting four individual pool records and two meet records and receiving the lion's share of the publicity and media coverage from the meet. *Id.* ¶¶ 361–67. In doing so, Defendants discriminated against women on the basis of sex in violation of Title IX, depriving Plaintiffs Grace Estabrook, Ellen Holmquist and Margot Kaczorowski ( "Plaintiffs") and similarly situated women swimmers of their equal opportunity to participate in the Ivy League Championships.

---

[1] "Man" "woman" "women" "men" "male" "female" "she" "he" "him" "her" and "sex" are used herein in their strict biological sense as used in Title IX's sport-specific regulation adopted in chronological proximity to Title IX's passage, without regard for "gender identity." *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (Title IX defines "sex" "based on biology and reproductive function."); *Black's Law Dictionary* (5th ed. 1979) ("**Sex.** The sum of the peculiarities of structure and function that distinguish a male from a female organism[.]"); *see also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) ("sex" in the Civil Rights Act of 1964 "refer[s] only to biological distinctions between male and female").

### *The NCAA's Radical Plan to Re-Write Title IX*

Title IX, 20 U.S.C. § 1681(a), protects equal opportunities in women's sports for women. However, in 2011 the NCAA purposefully and precipitously chose to promote radical and unscientific transgender eligibility policies ("TEP") and to claim, without evidence, that men can fairly, safely, and in compliance with Title IX, compete against women in sports if they merely suppress testosterone and self-identify as women. Compl. ¶¶ 72–117, 203–264, 312–344. But now that the NCAA's misguided policies have led to lawsuits, the NCAA and member institutions are seeking to rewrite history and shift the blame for their own past decision to sacrifice women's rights to transgender inclusion policies that favor men who wish to compete in women's sports.

### *The Ivy League's Adherence to Transgender Ideology Ensured Thomas' Participation in the 2022 Ivy League Women's Swimming Championships*

As much as the NCAA is to blame for its TEP, it was Penn, Harvard, and the other six members of the Ivy League who through their concerted action with the NCAA harmed Plaintiffs by causing Thomas to be eligible for the 2022 Ivy League Women's Championships.

The Ivy Institutions were aware of the harmful effects that Thomas' participation in women's swimming was having on women student-athletes. In December 2021, at the Zippy Invitational mid-season competition, Thomas swam the fastest times in the nation in women's freestyle events from the 200 free to the mile. *Id.* ¶¶ 279, 289. In early February 2022, sixteen courageous Penn women's swimmers urged Penn and the Ivy League to "support us as biological women" and not allow Thomas to compete in the upcoming Ivy League Championships. *Id.* ¶ 335. But the Ivy Institutions ignored this plea and engaged in a behind-the-scenes pressure campaign to push the NCAA to rescind its recent amendment to the NCAA TEP that would have otherwise resulted in Thomas being ineligible for the Ivy League Championships. *Id.* ¶¶ 322–44. The NCAA Board of Governors relented, changing NCAA policy yet again to make Thomas eligible. *Id.* ¶¶

338–44. Thus, the NCAA Board of Governors, the Ivy League, Harvard, and Penn "conspired and collaborated … to permit Thomas to compete for the remainder of the 2022 season," including in the Ivy League Championships and the NCAA Championships. *Id.* ¶ 344.

### *Defendants Walk Back Their Eligibility Rule,*
### *But Still Want to Re-Write Title IX*

The Ivies now argue that Title IX requires allowing trans-identifying men to compete in women's collegiate athletics. Dkt. 68 at 19–20 (Harvard); Dkt. 67 at 15–17, 23–26 (Penn); Dkt. 73 at 16 (Ivy League). To do so, Defendants argue that "[u]nder *Bostock*, it is clear that if Penn had excluded Thomas (as Plaintiffs claim is required), it would have intentionally singled Thomas out because of her sex at birth in direct violation of Title IX. Title IX cannot be read to require that which it expressly prohibits." Dkt. 67 at 17. Harvard concurs, contending "it treated all individuals—male and female—the same by allowing every athlete to use the locker-room or bathroom facility consistent with their gender identity." Dkt. 68 at 20. The Ivy League agrees. Dkt. 73 at 16.

However, each of the Defendants have demonstrated through their recent conduct that their arguments misstate the law. About three months ago each Defendant adopted "a new policy stating that a 'student-athlete assigned male at birth may not compete on a women's team." Dkt. 67 at 17 n.5. *Had this new rule been enforced in 2022 it would have barred Thomas from competing in the 2022 Ivy League Championships*. Yet, Defendants apparently now believe their new policy aimed at keeping men out of women's sports "comports with Title IX" no matter how a man who wishes to compete in women's sports may identify. *Id*.

Of course, Title IX has not changed since 2022. Thus, Defendants' recent adoption of a rule barring trans-identifying males from competing in women's sports undercuts what the Ivies argue through much of their briefing—that Title IX allegedly required them to allow Thomas to compete in women's swimming in 2022. Defendants' recent conduct confirms they know the legal

analysis they have offered to justify their past conduct is incorrect. The rest of this brief explains more details, but Defendants' recent action destroys their bottom-line claim that Title IX allegedly compelled their decision to allow Thomas to compete in the Ivy League Championships.

## STANDARD OF REVIEW

The Court must accept all well-plead facts as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009), "and draw reasonable inferences from those facts in plaintiff's favor." *Pike v. Budd*, 133 F.4th 74, 82 (1st Cir. 2025). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (cleaned up).

## ARGUMENT

## I.    Title IX Was Intended to Increase Women's Opportunities in Scholastic Sports

Defendants' motions to dismiss perpetuate the legal misnomer that Title IX protects men at the expense of women. This is obviously wrong. "Given how biological differences affect typical outcomes in sports, ensuring equal opportunities for biological girls in sports requires that they not have to compete against biological boys." *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 571 (4th Cir.), *cert. denied sub nom. W. Virginia Secondary Sch. Activities Comm'n v. B.P. J. Next Friend Jackson*, 145 S. Ct. 568 (2024) (Agee, J., concurring and dissenting in part).

As noted above, the Ivies have adopted the NCAA's new TEP that purports to ban trans-identifying men from competing in women's sports without a female birth certificate. Nevertheless, the Ivies incongruously argue that Title IX requires allowing men to take women's opportunities and places in women's sports. Dkt. 68 at 19–20 (Harvard); Dkt. 67 at 15–17, 23–26 (Penn); Dkt. 73 at 16 (Ivy League) (incorporating arguments).

Title IX and its guarantees for equal opportunities for women's sports have never changed. The Court should say so and deny the motions to dismiss.

**A.    Title IX Forbids Discrimination and Protects Women's Opportunities in Scholastic Sport Based on "Sex" Not Gender Identity**

"Title IX prohibits sex discrimination by recipients of federal education funding," *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005), and equalizes opportunities for women by extending its protections based on "sex." 20 U.S.C. § 1681(a). "Sex" in Title IX "refer[s] only to biological distinctions between male and female." *Bostock*, 590 U.S. at 655; *accord Soule v. Conn. Assoc. of Schools*, 755 F. Supp. 3d 172, 194 n.17 (D. Conn. 2024) ("I agree that" interpreting "sex" in Title IX to mean "biological sex" "best reflects the term's ordinary public meaning in 1972"). Title IX protects biological women from being treated worse than biological men.

"Sex" in Title IX does not mean gender identity. *Adams*, 57 F.4th at 813–14 ("There simply is no alternative definition of 'sex' for transgender persons as compared to nontransgender persons under Title IX."). "Title IX was enacted in 1972, and its implementing regulations were promulgated shortly thereafter. And during that period of time, virtually every dictionary definition of "sex" referred to the *physiological* distinctions between males and females—particularly with respect to their reproductive functions." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632–33 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (Niemeyer, J., dissenting). Title IX is gender blind—it does not consider the gender a person subjectively identifies with or presume that sex could ever be mutable. However a person may identify, Title IX is focused solely on biology.

**B.    Title IX Permits Sex-Separated Sports and Athletics Facilities When Necessary to Ensure Equal Opportunity**

Title IX protects female students "from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity.'" *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 650 (1999) (quoting 20 U.S.C. § 1681(a)). *See also* 34 C.F.R. § 106.31(b)(7) ("a recipient shall not, on the basis of sex, … [o]therwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity"). Title IX does not ignore physical differences between men and

5

women. Rather, it accepts those biological differences and requires them to be taken into account where they are relevant to protecting women's equal opportunity. Title IX and its athletic regulation, 34 C.F.R. § 106.41, agree with the U.S. Supreme Court that, "[p]hysical differences" between the sexes are "enduring." *U.S. v. Virginia*, 518 U.S. 515, 533 (1996) (hereafter "VMI"). Thus, Title IX not only permits sex-based distinctions, but requires them where necessary to ensure equal opportunity for women.

For women to have "equal opportunity" in athletic competition, "relevant differences cannot be ignored." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). Equal opportunity in theory doesn't count. "[T]he mere opportunity for girls to try out" for a team is not enough if they cannot realistically make the roster because of competition from men. *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993). Nor is the mere chance to participate on a team enough if women cannot realistically "enjoy the thrill of victory" in sports where males dominate based on sex-linked advantages. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999). Title IX's promise of equal opportunity means nothing if institutions ignore biology to permit a man to take a woman's place.

In sport, the enduring physical differences between men and women trend in a single direction. In virtually every NCAA sport, males enjoy athletic performance advantages rooted in male biology. Compl. ¶¶ 218–264, 276–279. Therefore, where collegiate sports are sex-separated to comply with Title IX's equal opportunity mandate and due to enduring physical differences (*i.e.*, male advantages in size, strength, speed and performance) that separation must be maintained.

The law agrees with the facts. Due to the "average physiological differences" between the sexes, "males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir.

1982). Most "females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement" without sex-specific teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977), *abrogated on other grounds*; *accord Adams*, 57 F.4th at 820 (Lagoa, J., specially concurring). ("[I]f sport[s] were not sex segregated, most school-aged [biological] females would be eliminated from competition in the earliest rounds" or "may not even make the team." (cleaned up)).

### C.    The Title IX Athletics Regulation Contains Unique Sport-Related Protections for Women

#### 1.    The Athletics Regulation Endorses Sex-Separated Teams

In place since 1975, the Title IX athletics regulation endorses "separate teams for members of each sex" in sports requiring "competitive skill" and/or in sports which, due to collisions or "bodily contact," are considered a "contact sport." 34 C.F.R. § 106.41(b). Implicit in this accommodation for sex separated athletic teams is the recognition that biological differences between males and females, which affect "competitive skill" and the capacity to withstand "bodily contact," may require sex separation in many, if not most, sports. *Id*.

Moreover, the athletics regulation also requires that *a woman* be permitted to try out for a men's team in a non-contact sport if there is "no such" separate women's team in that sport. 34 C.F.R. § 106.41(b). The regulation allows women to try out for a men's team in non-contact sports for which there is no women's team because women are "members of that sex [whose athletic opportunities] have previously been limited" based on historic inequities. *Id.* However, under this regulation even the goal of correcting historic inequities for women yields to insurmountable biological differences between men and women in contact sports. Thus, a funding recipient need not allow women to try-out for a men's team in contact sports, including boxing, wrestling, rugby, ice hockey, football, and basketball, even if the school fields no women's team in that sport. *Id.*

Furthermore, the Title IX athletic regulation does not authorize a man to try out for a women's team even if there is no separate men's team in that sport. *See id.*

Thus, under the Title IX athletics regulation only women can try out for an opposite sex team because they are members of the sex as to which "athletic opportunities for members of that sex have previously been limited." *Id.* Title IX's athletics regulation purposefully protects and reserves women roster spots on women's sports teams.

### 2.    The Athletics Regulation Requires Protection of Women's Equal Opportunity to Seek the Rewards of Athletic Competition

The Title IX athletics regulation ensures women's equal access to the fruits of athletic competition typically enjoyed by males, such as postseason competitions, awards, publicity, and scholarships. Thus, 34 C.F.R. § 106.41(c)(10), provides that a Title IX denial of equal opportunity occurs when a man appropriates "[p]ublicity" that should go to women competing on a women's team and competing in a women's competition. The Title IX caselaw reaffirms the importance of women having an equal opportunity to seek the rewards of athletic competition. *See, e.g.*, *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 295 (2d Cir. 2004) (opportunity to compete in meaningful post season competition); *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 108 (2d Cir. 2012) (school required to close 3.62% disparity between the percentage of women students enrolled and the percentage of women listed on varsity sports teams).

As the athletics regulation allows, equal opportunity for women is frequently achieved by requiring the exclusion of males from women's sports. "In fact, the Title IX framework effectively requires a recipient to maintain separate sports teams." *Soule v. Connecticut Ass'n of Sch., Inc.*, 90 F.4th 34, 63 (2d Cir. 2023) (Menashi, J. and Park, J., concurring). In many cases equal opportunity for women vis-à-vis men may not be achievable in any other way. *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers) ("Without a gender-based

classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events."); *Williams*, 998 F.2d at 175 ("If, to satisfy [T]itle IX, all that the School District were required to do was to allow girls to try out for the boys' teams, then it need not have made efforts ... to equalize the numbers of sports teams offered for boys and girls."); *Clark*, 695 F.2d at 1131 (approving exclusion of males from high school volleyball teams in Arizona).

### 3.    The Athletics Regulation Guarantees Women Separate and Comparable Locker Rooms and Showers

Finally, the athletics regulation requires women have "equal opportunity" with respect to "locker rooms," 34 C.F.R. § 106.41(c)(7), which requires "separate" and "comparable" locker rooms and showers. 34 C.F.R. § 106.33. The Ivies concede that factors "to be considered in assessing the provision of locker rooms [includes] . . . [e]xclusivity of use . . . [and the] [q]uality of locker rooms." Dkt 67. at 23 n.8 (citing 1979 Health Education and Welfare Policy Interpretation).

This reflects common sense and is consistent with the constitutional privacy interest "to shield one's body from exposure to viewing by the opposite sex." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008) (citation omitted). As Justice Ginsburg explained, integrating Virginia Military Institute "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *VMI*, 518 U.S. at 550 n.19. Particularly when it comes to swimming where women must get in and out of tight-fitting racing suits which can require their private parts to be exposed for as long as 20 minutes or more and where frequent showering is a necessity over a multi-day competition, these privacy interests dovetail with the preconditions for equal competitive opportunities.

Permitting men to use women's locker rooms is incongruent with Title IX. Equal educational benefits do not exist when Defendants allow men to invade women's private spaces, thereby

9

disrupting their mental preparation and the camaraderie that accompanies all group athletic en-
deavor. Turning women's locker rooms into co-ed locker rooms creates an unwelcome and hostile
experience that is "encompass[ed within the] diverse forms of intentional sex discrimination" rec-
ognized by the Supreme Court. *Jackson*, 544 U.S. at 183; *see also* 85 Fed. Reg. 30026, 30036
(May 19, 2020) (codified at 34 C.F.R. § 106.30) (defining "sexual harassment" as "conduct on the
basis of sex" that is "[u]nwelcome conduct that a reasonable person would determine is so severe,
pervasive, and objectively offensive that it effectively denies a person equal access to education").

The Title IX athletic regulation recognizes the unique need for privacy and separation of
the sexes in the context of locker rooms and showers used for scholastic sports competitions. This
is a powerful reason why the five middle school and high school restroom cases cited fifteen times
in Penn's and Harvard's briefs are entirely inapposite in the competitive sports context.[2]

* * *

The Title IX athletics regulations do not authorize, and Title IX's equal opportunity man-
date forbids, a man from competing on a woman's team and thereby depriving women of or di-
verting to a man equal opportunity in sport, including placements, awards, publicity, and locker
room access and privacy. The Ivies misconstrue Title IX and undersell its protections for women.

### D. Colleges and Universities—Including the Ivies—Have Universally Applied Title IX's Equal Opportunity Mandate by Creating Sex-Separated Teams

Colleges and universities have institutionalized Title IX's plain and unambiguous mandate
of equal opportunity for women by creating sex-separated teams in most intercollegiate sports.
Publicly available data compiled by the U.S. Department of Education ("DoE") confirms this.

---

[2] The restroom cases cited by Defendants include: *A.C. by M.C. v. Metro Sch. Dist. of Martinsville*, 75 F. 4th 760 (7th
Cir. 2023) (cited by Penn at Dkt. 67 at 16 and 25); *Doe v. Boyerton Area Sch. Dist.*, 897 F. 3d 518 (3d Cir. 2018)
(cited by Penn at Dkt. 67 at 18, 19, 25, by Harvard at Dkt. 68 at 20, 21); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d
586 (4th Cir. 2020) (cited by Penn at Dkt. 67 at 15, 18, 19, by Harvard at Dkt. 68 at 19, 20); *Parents for Privacy v.
Barr*, 949 F.3d 1210 (9th Cir. 2020) (cited by Penn at Dkt. 67 at 18, by Harvard at Dkt. 68 at 20); *Whitaker by Whitaker
v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) (cited by Penn at Dkt. 67 at 25).

For example, Equity in Athletics Data provided by Penn to DoE reflects total University enrollment of 5,542 women and 4,611 men and men's teams in 14 sports with 653 men's roster spots and women's teams in 14 sports with 443 women's roster spots. https://ope.ed.gov/athletics/#/institution/details. [3] Based on the publicly available data, and the Complaint's allegations that the Ivy League separated collegiate swim teams by sex, *see* Compl. ¶ 267 (noting men's and women's swim teams), the Ivies cannot dispute that they, like all other colleges and universities, did so to implement Title IX's mandate for eliminating sex discrimination in collegiate athletics.

## II.    Authorizing A Trans-Identifying Man to Compete in Women's Sex-Separated Scholastic Sports Violates Title IX

### A.    Plaintiffs Have Stated a Claim that Lia Thomas's Participation in the 2022 Ivy League Championships Violated Title IX

Plaintiffs are women who have alleged that they were not properly accommodated nor equally treated by Defendants when they were required to compete against a proficient male swimmer in sex-separated women's competitions and to share women's intimate spaces with that man. Compl. ¶¶ 423, 438. The male swimmer possessed unmatchable competitive advantages attributable to his being male. *Id*. ¶¶ 251, 276–279, 289–292. The Plaintiffs lost athletic and publicity opportunities and the rewards of competition (including recognition and placements) they would have had but for the Ivies allowing this man to compete against them and suffered dignitary harm by having to compete against him in sex-separated women's competition. *Id*. ¶¶ 291, 293, 301, 303, 355–57, 359, 362–63, 376-82, 387, 422–26, 437–41. And they suffered privacy and dignitary injuries when the man used women's intimate spaces to which the women were entitled to exclusive access along with other women. *Id*. ¶¶ 283, 286, 287, 288, 383–387, 422–26, 437–441.

The foregoing allegations state Title IX claims, but the Ivies disagree and contend the Court

---

[3] A chart distilling the publicly available statistics and demonstrating that none of the Ivy League schools proportionally accommodate female athletes is attached as Appendix A.

should not simply focus upon lost opportunities in women's swimming but should broaden the scope of this case to a "program wide" analysis, looking at every single sport in which the Ivy League conducts intercollegiate competition. Dkt. 67 at 19–23. Plaintiffs disagree. This Court need not hear voluminous evidence of "program-wide" discrimination against women pulling from every nook and cranny of the Penn and Harvard athletic departments and the administration of the Ivy League[4] to determine whether allowing Lia Thomas to compete in women's swimming and use women's locker rooms and showers violated Title IX. This case is not that complicated.

As the Second Circuit held, a significant disparity in a single program component "can alone constitute a Title IX violation if it is substantial enough in and of itself to deny equality of athletic opportunity to students of one sex at a school*." McCormick*, 370 F.3d at 293; *accord Soule v*, 755 F. Supp. 3d at 187. "[A] disparity disadvantaging one sex in one part of a school's athletics program can be offset by a comparable advantage to that sex in another area." *McCormick*, 370 F.3d at 293. However, once the significant disparity in a single program component is shown, the burden shifts to the defendant to "come forth with evidence that the disparity in this case has been offset by some comparable advantage to girls or disadvantage to boys[.]" *Id.* at 294. Otherwise, if the disparity meets the threshold for significance of being "'substantial enough' by itself to deny girls at the [relevant institution(s)] equality of athletic opportunity," a Title IX violation will be found. The Second Circuit has made clear that a denial of equal athletic opportunity can "result from a significant disparity in a single sport." *Id.* at 296 (finding a Title IX violation based on a scheduling disparity solely in girls' soccer); 44 Fed. Reg. 71413, 71414–17 (finding of ineffective accommodation need not be made on a program-wide basis but can be limited to "*disparities in*

---

[4] *See*, *e.g.*, *Cohen v. Brown University*, 101 F.3d 155, 161–64 (1st Cir. 1996) ("*Cohen IV*") (describing evidence received during two-week bench trial regarding whether Brown University violated Title IX by reducing the number of University funded varsity women's sports teams).

benefits, *treatment*, services, *or opportunities in individual segments of the program*[.]").

Here, Defendants' Motions allege no justification for authorizing Thomas to compete at the Ivy League Championships and take women's placements, titles, publicity and other rewards of competing, much less to use what the Title IX athletics regulation specifically requires to be "separate" locker rooms and showers, other than the desire to let a man self-identify onto a women's team. This justification, at odds with the purpose of Title IX and the explicit requirements of the athletics regulation, cannot justify dismissal of Plaintiffs' Complaint as Plaintiffs are entitled to the inference that the disparities they have alleged were significant enough to deny equal opportunities to women swimmers. Even if Title IX permitted the Court to weigh this justification (it does not), weighing such justifications at a minimum requires fact finding.

"A primary purpose of competitive athletics is to strive to be the best." *McCormick*, 370 F.3d at 294–95. Therefore, a disparity crosses the significance threshold necessary to support a Title IX violation when it caps or diminishes women's opportunity to strive for "the chance to be champions" or merely operates to deny them a higher team or individual placement in sport. *Id.* at 295. "[R]elative success" matters. *Id.* at 294. It is impermissible to subject girls to a glass ceiling on potential athletic attainment when "boys are subject to no such ceiling." *Id.* at 295. It unlawful to "send[] a message to . . . girls . . . that they are not expected to succeed and that the school does not value their athletic abilities as much as it values the abilities of the boys." *Id*. But Defendants did just that by allowing a swimmer from the Penn men's swim team to move to the women's team where he *established leading times in the nation in events ranging from long distance events to the sprints* and then went on to capture four record-breaking first place finishes and pool records along with two meet records at the Championship, devaluing the accomplishments of women swimmers on each Ivy League women's team, placing a ceiling on their accomplishments and sending the

13

message that the Ivies did not value females' athletic abilities as much as they did the abilities of a man who wished to be regarded as a woman. Moreover, as 34 C.F.R. § 106.41(c)(10) confirms, additional Title IX violations occurred when the Ivies put Thomas, a male athlete, in a position where the Ivies knew he would take away notoriety and publicity from women competitors. *See supra* at I.C.2. As 34 C.F.R. § 106.41(c)(7) confirms, additional Title IX violations occurred when Harvard arranged for Thomas to use the women's locker room and showers. *Supra* at I.C.3.

The Ivies argument that they were required to allow Thomas to compete, Dkt. 67 at 15-17; Dkt. 68 at 14-16, (a) is founded upon *Bostock*, a Title VII employment discrimination case with no similarity to this case,[5] (b) does not take into account the Title IX athletics regulation, and (c) is not supported by a single analogous case. The Ivies cite no case where a woman's claim that competing against a male in scholastic sports violated Title IX was dismissed via a 12(b)(6) motion, and they ignore *Soule* where such a motion by an athletic association was denied. *Soule,* 755 F. Supp. 3d at 194–97. The handful of Title IX sports cases they do cite (notably all decided after the 2022 Ivy League Championships) involved transgender children who obtained injunctive relief, because plaintiffs were minors who the court found *had not experienced and would not experience a male puberty due to taking puberty blockers*.[6] *B.P.J.*, 98 F.4th at 550; *Tirrell v. Edelblut*, 748 F. Supp. 3d 19, 26-27 (D.N.H. 2024); *Doe v. Hanover Cnty. Sch. Bd*., 2024 WL 3850810, at *2 (E.D. Va. Aug. 16, 2024); *A.M. by E.M. v. Indianapolis Pub. Sch*., 617 F. Supp. 3d 950, 959 (S.D. Ind. 2022), *vacated*, 2023 WL 11852464 (S.D. Ind. Jan. 19, 2023).

By contrast, Thomas is a man who experienced male puberty and competed on a college

---

[5] "Congress itself recognized that addressing discrimination in athletics presented a unique set of problems not raised in areas such as employment and academics. *See, e.g*., Sex Discrim. Regs., Subcomm. Hrg. on Post Secondary Educ. of the Comm. on Educ. and Labor, 94th Cong. 1st Sess. at 46, 54, 125, 129, 152, 177, 299–300 (1975); 118 Cong.Rec. 5,807 (1972) (Sen. Bayh); 117 Cong.Rec. 30,407 (1971) (same)." *Kelley v. Bd. of Trs*., 35 F.3d 265, 270 (7th Cir. 1994).

[6] The only other sports case the Ivies cite is *Slusser v. Mountain W. Conf*., 2024 WL 4876221, at *4 (D. Colo. Nov. 25, 2024), where the district court denied Plaintiffs' motion for preliminary injunction.

men's swimming team. His participation in the Ivy League Championships led to exactly the kind of deprivations of equal opportunities of women in sport that Title IX and the athletics regulation were designed to address. Plaintiffs have therefore adequately alleged lack of equal and effective accommodation for females in Penn's women's swimming program and for Ivy League women's swimmers caused by allowing a man to compete in the Ivy League Championships and use women's locker rooms and showers.

### B.    Trans-Identifying Men Cannot Lawfully Access Women's Sports Teams, Locker Rooms and Showers Via Title IX

Sex discrimination includes a federal funding recipient's deliberate indifference towards any conduct that deprives women of equal educational opportunity. *E.g.*, *Jackson*, 544 U.S. at 182 ("deliberate indifference constituted intentional discrimination on the basis of sex"); *Gebser v. Lago Vista Ind. School Dist.*, 524 U.S. 274, 290–291 (1998) (deliberate indifference to sexual harassment); *Davis*, 526 U.S. at 642 (deliberate indifference to hostile educational environment). The unwelcome and hostile environment created by allowing Thomas, a man with retained male advantage, to compete in a women's competition and steal women's opportunities and by intentionally removing women's privacy from locker rooms and showers constitutes deliberate indifference to sex discrimination, which is a separate basis for Title IX liability.

Deliberate indifference occurs when the environment the funding recipient controls "so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 650–51, *rev'g* 120 F.3d 1390 (11th Cir. 1997) (en banc); *accord Davis*, 120 F.3d at 1412 (Barkett, J. dissenting) (Title IX forbids "intentional discrimination which exposes one sex to disadvantageous terms or conditions to which members of the other sex are not exposed").

But Title IX sex discrimination takes many forms, not just "severe, pervasive, and

objectively offensive" student-on-student sexual harassment the U.S. Supreme Court addressed in *Davis*. The Supreme Court has "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson*, 544 U.S. at 183; *accord N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982) ("we must accord [Title IX] a sweep as broad as its language" (cleaned up)). A plaintiff need only establish that her environment "effectively denied [her] equal access to an institution's resources and opportunities," and the school was deliberately indifferent to that fact. *Davis*, 526 U.S. at 650–51; *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (acts that bar "meaningful access" to a desired benefit).

A recipient's duty not to be deliberately indifferent to sex discrimination is heightened where "the recipient retains substantial control" over the environment where discrimination occurs. *Davis*, 526 U.S. at 646. In facilities which a school controls, its power "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id.* (cleaned up). Title IX sex discrimination may, therefore, simply refer to any act which diminishes a female's use or enjoyment of a resource, school location, or opportunity to which she is entitled access, such as a locker room or a swimming pool. Where, as alleged here, the recipient was aware of the circumstances, a recipient's refusal to act to prevent loss of women's opportunities arising from a man's intrusion "fly[s] in the face of Title IX's core principles" and will subject the recipient to claims for monetary damages. *Id.* at 651. That's precisely the case here.

## C.  The Ivies Misconstrue the Title IX Proportionality Inquiry as the Be All End All of Title IX Analysis

Finding no support in Title IX, the athletics regulation, or emerging case law, for their contention that Plaintiffs fail to state a claim, the Ivies turn to a non-binding Policy Interpretation and 35-year-old DoE Investigator's Manual to concoct an argument for dismissal. First, Defendants claim (and Plaintiffs agree) that Penn and other Ivy schools, look to provide "intercollegiate

16

level participation opportunities for male and female students … in numbers substantially proportionate to their respective enrollments." Dkt. 67 at 20–21 (quoting 1979 HEW Policy Interpretation). In so doing, the schools hope to insulate themselves against scrutiny of their athletic programs from DoE. Thus, Penn claims the test set forth in the Policy Interpretation has led it to pursue "proportionality on a 'program-wide basis,' meaning a comparison of opportunities for women and men across all of Penn's athletic programs." *Id.* at 21 (quoting Policy Interpretation).

However, Title IX and its regulations make clear that proportionality alone does not guarantee equal athletic opportunities between the sexes. Proportionality is only *one of multiple means* by which Title IX promotes equal treatment. Yet, the Ivies misunderstand this, erroneously alleging that "[a]lowing one transgender women to swim on the women's team cannot possibly run afoul of the 1979 Policy Interpretation [because *t*]*he test speaks to proportionality on a 'program-wide basis,' meaning a comparison of opportunities for women and men across all of Penn's athletic programs*." Dkt. 67 at 21 (emphasis added). Penn says that the Title IX regulation permits claims only for "program-wide" disparities, leading it to assert that injuries arising from the participation of a single male athlete on a varsity women's team could never result in a successful Title IX claim. This reflects a profound misunderstanding of Title IX.

The Ivies' first mistake is failing to start with the statutory text. Title IX says "*No person … shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination[.]*" 20 U.S.C. § 1681(a)(1) (emphasis added). The focus of the text is on individual persons. Proportionality is an application of this first principle. Second, the statutory language focusing on individual opportunities is repeated verbatim in the athletic regulation, which reiterates Title IX's first principle in the athletics context, stating "*No person* shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another

17

person or otherwise be discriminated against in … athletics offered by a recipient[.]" 34 C.F.R. §
106.41(a) (emphasis added). Third, even the guidance documents Penn cites are not solely focused
on program-wide disparities.  For example, the 1979 HEW Policy Interpretation at Section VII.C.6.
states that an overall determination of compliance can be based on "*[w]hether* the *policies* of an
institution *are discriminatory in language or effect*" and/or "*[w]hether disparities in individual
segments* of the program with respect to benefits, treatment, services, or opportunities are substan-
tial enough in and of themselves to *deny equality of athletic opportunity*." (emphasis added).

Moreover, the Supreme Court has long interpreted Title IX to "sweep as broad as its
language." *N. Haven Bd. of Ed.*, 456 U.S. at 521. The statute's focus on individual injuries is why
in *Cannon v. University of Chicago*, 441 U.S. 677 (1979), the Court concluded that Congress in-
tended to supplement the administrative means of enforcement with an individual right of action.
"[T]he implied right of action enables an *individual* to challenge a practice by a funding recipient
that violates the statute's implementing regulations and therefore could provide the basis for ad-
ministrative enforcement action." *Soule*, 755 F. Supp. 3d at 188 (emphasis). In other words, a claim
by individual women-student-athletes challenging a rule that allows men to destroy equal oppor-
tunity by competing in a women's championship states a prima facie case of sex discrimination
even without any program-wide allegations. *Id*. at 194–97. The Ivies' cramped interpretation of
Title IX erroneously narrows the individual private right of action.

Furthermore, the Ivies misread the case law in this Circuit and misapplied the "Three-Part
Test" referenced at Dkt. 67 at 20, where Penn claims that a "complaint will be assessed under three
prongs and schools will be found to comply with Title IX if they meet any of those prongs[.]"
Because the Ivies are asking this Court to assess the three-part test on a motion to dismiss they are
apparently contending it was the duty of Plaintiffs to plead faults on the three prongs in the non-

binding Policy Interpretation. However, even in a case where the three prongs were relied upon, a District Court in this Circuit found that where Plaintiffs can establish a lack of substantial proportionality the burden will *shift to* the university to prove either of the remaining two factors to avoid a Title IX violation under the three-part test. *Cohen v. Brown Univ.*, 809 F. Supp. 978, 991–92 (D.R.I. 1992) ("*Cohen I*"), *aff'd*, 991 F.2d 888 (1st Cir. 1993). Thus, given that two of the three factors are affirmative defenses *that must be established by the Defendant*, Plaintiffs plainly could not be required to plead the three-part test, especially under federal notice pleading standards. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("we do not require heightened fact pleading of specifics").

Even if Plaintiffs needed to cite program-wide statistics at the pleading stage (they do not), the Complaint alleges that NCAA member institutions are failing to satisfy Title IX's proportionality and program-wide equity requirements at egregious levels. Compl. ¶¶ 193–202. Thomas's participation merely compounds a pre-existing problem. This states a plausible claim.

If Plaintiffs must cite program-wide statistics for the Ivies, judicially noticeable facts in public documents filed by the Ivies are more than sufficient at this stage to demonstrate that Plaintiffs would prevail on the first prong of the three-part test. *See supra* at I.D, *see also* **Appendix A**.[7] In *Cohen I* the Plaintiffs successfully established "that Brown does not have a 'substantially proportionate' ratio of male and female varsity athletes to their respective undergraduate enrollments" where 2,917 men (51.8%) and 2,716 women (48.2%) 2,716 were enrolled as undergraduates and there were 529 men (63.4%) and 305 women (36.6%) in varsity sports, an 11.6% short fall in women's roster spots necessary to make the sexes proportional. *Cohen I*, 809 F. Supp. at 991.

The proportionality numbers are even worse for the Ivies. Enrollment at Penn is 4,611 men

---

[7] *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 (1st Cir. 2010) (noticing "facts provided on the [CDC's] website").

(45%) and 5542 women (55%) and there are 653 (60%) men's roster spots and only 443 (40%) women's roster spots, a 15% short fall in women's roster spots necessary to make roster spots for women proportional. Thus, if Plaintiffs are required to allege information publicly available in reports Penn makes to the federal government (they are not under *Twombly*), Plaintiffs can easily satisfy notice pleading requirements by reciting judicially noticeable facts in an amended pleading.

In this case, Plaintiffs, on behalf of a class of women similarly situated, have alleged disparities that include multiple denials of fairness and lack of a level playing field in competition, unequal access to privacy in showers and locker rooms, and deprivation of equal access to the rewards of athletics competition including placements, honors, prizes, dignitary affirmation and publicity. These are well-plead Title IX violations.

### D.    The Ivies Misread the Athletics Regulation's Equal Opportunity Requirement

The Ivies claim to debunk Plaintiffs' "equal treatment claim" because they say Plaintiffs must allege a program-wide denial of equal opportunity. Dkt. 67 at 22–23. Here again, however, the Ivy institutions err by attempting to restrict Title IX claims to "*program-wide imbalance[s] in the allocation of benefits between sexes, or* alternatively, '*substantial' disparities in the treatment afforded to comparable male and female teams*." *Id.* at 22. (emphasis added). The Ivies' hyper-narrow reading of Title IX is rebutted above. Their contention that a single man competing on a collegiate women's team can never be a Title IX violation of equal opportunity is unsupportable.

The athletics regulation, 34 C.F.R. § 106.41, shows that a single male on a women's team violates Title IX when his participation deprives women of significant opportunities for wins, points, accolades, publicity, and enjoyment of privacy in locker rooms. It states DoE will consider—"*Whether* the selection of sports and *levels of competition effectively accommodate the* interests and *abilities* of members *of both sexes*." (emphasis added). This accommodation provision recognizes both (a) that the athletic "abilities of [the] members of both sexes" differ, and (b) that

the abilities of both sexes must be independently and effectively accommodated; both are principles which Plaintiffs' claims seek to vindicate. *See* Compl. ¶ 93 (citing 34 C.F.R. § 106.41(c)(1)).

In *Cohen I*, Brown University, like Penn in this case, argued (in reliance upon the 1979 Policy Interpretation and the Investigator's Manual) that a Title IX violation could not "be grounded solely upon" 34 C.F.R. § 106.41(c)(1). *Cohen I*, 809 F. Supp. at 988. However, the District Court disagreed finding that § 106.41(c)(1) "is the most important criteria listed," and holding that a "violation under Title IX *may solely be limited to* [a violation of] *§ 106.41(c)(1)*. *Id.* at 989 (emphasis added). The Ivies' argument here must be rejected for the same reason.

As well, the Second Circuit in *McCormick* relied on § 106.41(c)(1) to find a Title IX violation based on a school district scheduling rule which applied to a single girls' sport and required girls in that district to play soccer only in the Spring, limiting their competitive opportunities. *McCormick*, 370 F. 3d at 301. The *Soule* court likewise relied upon § 106.41(c)(1) to find Plaintiffs had adequately alleged a Title IX claim based on a rule which allowed trans-identifying boys to compete in girls' track and field competitions. *Soule*, 755 F. Supp. 3d at 194–97.

Contrary to Penn's argument, Plaintiffs need not tailor their allegations to "the very specific meanings" of the 1979 Policy Interpretation and a DoE investigator's manual, Dkt. 67 at 20, especially when that guidance imposes a methodology not in the text of Title IX or even in Title IX's athletics regulation but in a nearly fifty-year-old guidance document setting forth "the [former] Department of Health, Education, and Welfare's interpretation of the intercollegiate athletic provisions of Title IX … and its implementing regulations," 44 Fed. Reg. 71413 (Dec. 11, 1979), and a 1990 DoE Investigator's Manual. Defendants also omit that in *Cohen I*, 809 F. Supp. at 988, the Rhode Island District Court held that the very same "Policy Interpretation and the unpublished Investigator's Manual [relied upon by the Ivies in this case] do not carry the force of law or

establish controlling standards." The Ivies' attempt to narrow Title IX claims to those described in non-binding agency guidance documents are a misguided effort to resurrect the *Chevron* doctrine so recently buried by the Court in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

### E.   The Ivies Misrepresent Their Own Decision to Create Sex-Separated Athletic Categories

Finally, The Ivies assert "Plaintiffs' claims fail because their theory depends on an incorrect assumption that Title IX requires teams separated based on biological sex where both sexes have interest in a sport. *See* Compl. ¶ 418." Dkt. 67 at 17. However, Plaintiffs have not claimed that sex-separation is mandated *per se*, only that "Title IX requires sex-separation from men *where women have less opportunity without it*." Compl. ¶ 418 (emphasis added). As explained above, colleges and universities have almost universally adopted sex-separation as the preferred means of implementing Title IX's guarantee of equal opportunity given the inherent biological differences that make competition fundamentally unfair and unequal without sex-separation. Penn, Harvard, and all other Ivy League universities have done the same. *Supra* at I.D; *see also* **Appendix A**.

Plaintiffs' case is therefore about whether Defendants have the right to change the rules of the game mid-course by implementing sex-separated categories to guarantee Title IX equal opportunity, one day, only to remove sex-separation when it is ideologically expedient the next day. In other words, this case addresses whether *after Penn decided to have a sex-separated women's swim team* and whether *after the Ivy League decided to conduct a separate women's swimming championship and Harvard agreed to host it*, they all violated Title IX by allowing a man to compete in the women's Ivy League Championships.

Plaintiffs need not carry the burden of establishing that Title IX requires sex separation of all sports teams based on biological sex, *per se*. Instead, Plaintiffs' claims are founded upon whether a specific man, Lia Thomas, a proficient male swimmer who had demonstrated *the leading*

*times in the nation* for women during the 2021–22 season across a wide range of distances, Compl. ¶¶ 276–279, 289–292, was required by Title IX to be excluded from the Ivy League Championships because allowing a man with unfair physiological advantages to compete *in the women's championship* deprived women of equal opportunities. *Id.* ¶¶ 423, 438.

## III.    Title IX Applies to the NCAA And the Ivy League

The NCAA and Ivy League argue that they are not subject to Title IX because they are not recipients of federal funding, either directly or indirectly. Dkt. 70 at 4; Dkt. 73 at 10–12. They also argue that the "controlling authority" test recognized by the Eleventh Circuit in *Williams* v. *Board of Regents*, 477 F.3d 1282 (11th Cir. 2007), does not apply because the Third Circuit has rejected this test and, as a factual matter, they claim to have no say over collegiate athletic programs. Dkt. 70 at 8; Dkt. 73 at 12–16. The NCAA and the Ivy League are mistaken on both fronts. They also overlook that via the Civil Rights Restoration Act of 1987, both are covered by Title IX.

### A.    The Scope of Title IX's Coverage Was Intended to Be Broad

Title IX applies to "any education program or activity" that "receives federal financial assistance." 20 U.S.C. § 1681. Title IX's "inclusive terminology" "encompass[es] all forms of federal aid to education, direct or indirect." *Grove City Coll. v. Bell*, 465 U.S. 555, 564 (1984) (cleaned up) (emphasis in original). Recognizing the "need to accord Title IX a sweep as broad as its language," the Court is "reluctant to read into [Title IX] a limitation not apparent on its face." *Id.* "[I]f any part of the NCAA received federal financial assistance, all NCAA operations would be subject to Title IX." *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 460 (1999) (*Smith I*).

The NCAA argues that Supreme Court precedent settles the issue of federal financial assistance for the NCAA. Dkt. 70 at 1, 4. The Ivy League says the same analysis applies to it. Dkt. 73 at 10–12. Neither are correct. In 1999, the Supreme Court issued its only opinion regarding the

applicability of Title IX to the NCAA. *Smith I*, 525 U.S. at 469. The Court held that because a student-athlete had not alleged that "NCAA members paid their dues with federal funds earmarked for that purpose," proof of the NCAA's "receipt of dues" merely "demonstrates that it indirectly benefits from the federal assistance afforded its members." *Id.* at 468. The Court concluded that "this showing, without more, is insufficient to trigger Title IX coverage." *Id.* The Court did not reach the merits or any other argument for Title IX applicability.

Moreover, the Court declined to address at least three alternative theories for bringing the NCAA under Title IX because those theories had not been previously addressed in the litigation. *Id.* at 469. The first theory is that the NCAA indirectly "receive[d] federal financial assistance through the National Youth Sports Program" administered by the NCAA. *Id.* The second theory is that "when a recipient cedes controlling authority over a federally funded program to another entity, the controlling entity is covered by Title IX regardless of whether it is itself a recipient." *Id.* at 469–70. As explained below, both alternative theories that were acknowledged but not addressed in *Smith I* make the NCAA liable under Title IX in this case.

The Supreme Court also left room for a third basis for NCAA liability: the fact that the NCAA is "'created by and comprised of' schools that receive federal funds, and … governs its members 'with respect to athletic rules.'" *Id.* at 469 (cleaned up). The Court noted this argument was a potential basis to distinguish the NCAA from an entity addressed in *United States DOT v. Paralyzed Veterans of America*, 477 U.S. 597 (1986), which held that merely benefiting from a federal funding recipient does not trigger Title IX coverage. Ultimately, the Court said "[e]vident as these distinctions may be, they do not bear on the narrow question we decide today—whether an entity that receives dues from recipients of federal funds is for that reason a recipient itself." *Id.* Bottom line, *Smith I* is extremely narrow. It is not the last word, only the first.

**B.    The NCAA and Ivy League Are Covered by the Civil Rights Restoration Act**

Congress passed the Civil Rights Restoration Act ("CRRA") to expand the definition of "program or activity" of a Title IX covered entity to include "all of the operations of … (4) any other entity which is established by two or more [colleges or universities] … *any part of* which is extended Federal financial assistance … ." 20 U.S.C. § 1687(4) (emphasis added), Pub. L. No. 100-259, *§ 2*(1), 102 Stat. 28, 28 (1988). "The purpose of the [CRRA] is to reaffirm broad coverage of [Title IX's] the anti-discrimination provisions." S. Rep. No. 100-64, at 4 (1987). *Grove City* limited Title IX to "only the specific program receiving federal funding," and not the entire entity. The CCRA restored Title IX to its full breadth, *Smith I*, 525 U.S. at 466, and under it the NCAA and the Ivy League fall squarely within the definition of a "program or activity."

The NCAA is such a "program or activity" subject to Title IX because of its unique structure as an entity created by "two or more" colleges and universities whose constituent "part[s]" include federal funding recipients. Compl. ¶ 68. The NCAA is "an unincorporated association comprised of more than 1,100 member colleges and universities[.]" *Id.* ¶ 66. NCAA members are primarily (more than 90%) institutions which receive federal funds and are subject to Title IX. *Id.* ¶ 67. Thus, most of the NCAA's "part[s] consist of federal funding recipients.

The Ivy League is also a "program or activity" covered under Title IX because the Ivy League's unique founding documents state that it is a entity created by "two or more" universities whose constituent "part[s]" are none other than its own federally funded recipient member universities. As the Ivy Manual explains, the Ivy League was formed as "The Ivy Group" pursuant to the 1954 Presidents Agreement signed by the presidents of the Ivy League member institutions. Compl. ¶ 118; *see also* Dkt. 74-1 at 34 ("The subscribing institutes constitute themselves, for the purposes covered by this agreement, members of a group to be known as "The Ivy Group"). Its internal operating structure is likewise comprised of "inter-institutional committees." Compl.

¶ 121. As a "group" it "has acted as an agent of the [8] institutions of higher education that have belonged to the Ivy League athletic conference since its formation in 1954." Compl. ¶ 52.

Thus, while the NCAA and Ivy League are both separate entities "established by two or more [colleges or universities]," their "part[s]" include their individual member universities—most of whom are federal funding recipients. Pursuant to the CRRA, the NCAA and Ivy League are both "program[s] or activit[ies]" of their federally funded university members.

### C.    Title IX Applies to Athletic Associations that Exercise Controlling Authority Over Scholastic Sports Programs

Since *Smith I* both the Fourth and Eleventh Circuits have held that Title IX applies to associations that exercise "controlling authority" over funding recipients. *See Williams*, 477 F.3d at 1294; *B.P.J.*, 98 F.4th at 554 (citations omitted). The Eleventh Circuit adopted the "controlling authority" test because "if we allowed funding recipients to cede control over their programs to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations" that would leave a large loophole in Title IX coverage. *Williams*, 477 F.3d at 1294. *See also Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1230 (N.D. Ala. 2010) (holding an NCAA member college athletic conference satisfied the "controlling authority" test).

In *Williams*, the Eleventh Circuit relied upon the Western District of Michigan's analysis in *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 733–35 (W.D. Mich. 2000), which relied heavily on the Supreme Court's decision in *Cannon*, 441 U.S. at 691–92, which held that Title IX "was enacted for the benefit of . . . those discriminated against on the basis of sex" as opposed to simply being a "ban on discriminatory conduct by recipients of federal funds" or "a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." Accordingly, "any entity which has controlling authority over a 'program or activity receiving Federal financial assistance' is subject to Title IX's anti-

discrimination rule, even if that entity does not itself receive the federal funds which finance the program or activity." *Communities for Equity*, 80 F. Supp. 2d at 733 (quoting 20 U.S.C. § 1681(a)).

Plaintiffs have sufficiently alleged that the NCAA and Ivy League member institutions, which are federally funded recipients, have ceded "controlling authority" to the NCAA and the Ivy League over areas of college athletics relevant to this case. The NCAA and the Ivies point the finger at each other regarding who controls the programs and activities in the Ivy League. The Ivy League claims its governing document "explicitly leaves . . . control with the member schools themselves." Dkt. 73 at 5. Penn blames the "NCAA [eligibility] policy . . . that Penn was required to follow." Dkt. 67 at 17; *see also* Dkt. 67 at 7 ("NCAA member institutions with transgender student-athletes who seek to participate in an NCAA competition are required to follow the NCAA policy."). Harvard adopted Penn's argument that NCAA policy was controlling, Dkt. 68 at 5 n. 2, and added that "the NCAA conceived of the policy, determined the scope of its application, and then implemented and enforced it." *Id*. at 8. The NCAA disclaimed responsibility for its policy, however, saying, "[i]ndeed, Plaintiffs affirmatively allege that member institutions retained control of their programs: UPenn controlled the selection of its swim team roster, Compl., ¶¶ 63, 265–275, 348– 352, and the Ivy League member schools controlled and administered the rules for their own Ivy League Championships." Dkt. 70 at 8.

*Communities for Equity* predicted Defendants' finger pointing, expressing concern that failing to hold an athletic association accountable under Title IX would leave student-athletes without a remedy because the schools and the athletic association would cast blame on each other. *Communities for Equity*, 80 F. Supp. at 738 n.3.

Both the NCAA and Ivy League make summary judgment arguments, ignoring the well-plead allegations of how college sports actually work in practice. Here, Plaintiffs have sufficiently

alleged that federally funded NCAA member entities—over 90% of NCAA members, including all Ivy League institutions—and 100% of the Ivy League members, ceded the rulemaking and enforcement components and the transgender athlete eligibility component of their athletic programs to the NCAA and the Ivy League. Compl. ¶¶ 16, 56, 71, 118–128, 137–161, 183–84, 429, 444. The NCAA and the Ivy League worked hand in glove to decide who could compete at the Ivy League Championships, *id.* ¶¶ 7-17, 332–344, which themselves operated as the gateway to the NCAA Championships, which the NCAA entirely controls. *Id.* ¶ 370

*Communities for Equity* noted relevant facts about whether the schools had ceded controlling authority, including:

- The association required member schools to "adopt the Regulations and Interpretations" of the association that covered all aspects of athletic programs "as their own and agree to be primarily responsible for their enforcement." *Id.* at 737.

- The association had a "de facto monopoly over interscholastic sports" as all high schools in Michigan were members. *Id.*

- School's decision to "disregard [association] rules, or leave the [association]" would subject the school to "sanctions (including possible expulsion), jeopardize its ability to compete in statewide tournaments, find it difficult to schedule opponents, and in general providing interscholastic athletic programs." *Id.*

The Complaint makes similar allegations about how the NCAA exerts control over rules, rules enforcement, and championship events, including eligibility rules such as the NCAA TEP, and controls all aspects of entry into and management of end of season national championships. Compl. ¶¶ 16, 56, 71, 118–128, 137–161, 183–84, 429, 444.

The NCAA argues these allegations are insufficient because ceding control allegedly requires "explicit allegations of complete operational and financial control" "over [university] athletic programs." Dkt. 70 at 8. To the contrary, the Complaint plainly alleges that the NCAA effectively controls schools' athletic "programs" and/or "activit[ies]" of schools' athletic departments,

*see* 20 U.S.C. § 1681, by controlling significant aspects of college athletics for its member institutions. Compl. ¶¶ 137–161. As the Ivy League's pressure campaign against the NCAA demonstrates, what the NCAA says or does not say about athlete eligibility controls who can participate in the athletic programs of its member institutions, including who can participate in conference championships and the NCAA collegiate national championships. *Id.* ¶¶ 16–17, 332–344.

The NCAA asks this Court to apply decades-old Third Circuit decisions in *Smith v. NCAA*, 266 F.3d 152, 161 (3d Cir. 2001) (*Smith II*) and *Cureton v. NCAA*, 198 F.3d 107 (3d Cir. 1999), which opined NCAA member institutions retain control over their athletic programs no matter what the NCAA does because schools retain the choice to (1) resist the NCAA's policies, or (2) to withdraw fully or partially from the NCAA. Dkt. 70 at 7–8. Yet, this reasoning guts the controlling authority test, making it easy for recipients of federal funds to avoid Title IX duties by outsourcing them to third parties of which they are constituent parts, like the Ivy League or the NCAA.

Instead, the Court should apply the analysis in *Williams* and *Communities for Equity*, not *Smith II* or *Cureton*. First, *Smith II* and *Cureton* are not binding on this Court or the First Circuit. Second, *Cureton* was a Title VI case, not a Title IX case. Third, in both cases the Third Circuit incorrectly relied on the Supreme Court's decision in *NCAA v. Tarkanian*, 488 U.S. 179 (1988), holding the NCAA was not a "state actor" pursuant to § 1983. *Tarkanian* addressed the narrow circumstance of whether a state university's "actions in compliance with the NCAA rules and recommendations [in relation to the employment discipline of a single coach] turned the NCAA's conduct into state action." *Tarkanian*, 488 U.S. at 193.

Thus, *Tarkanian* was not a Title IX case and is factually inapposite regarding the issues here. Indeed, as the dissent argued in *Cureton*, "Tarkanian [actually] illustrates the extent of absolute control the NCAA has over its member[s]." *Id.* at 122 (McKee, J. dissenting). The reason this

29

"control" was insufficient to make the NCAA a state actor in *Tarkanian* was that the Supreme Court was focused on whether one university controlled the NCAA, not on whether the NCAA controlled the university or aspects of its athletics program, *id.* at 124, or upon whether public institutions in each state are intertwined with the NCAA.

Fourth, *Smith II* and *Cureton* are distinguishable. Reduced to their facts, they addressed student admissions decisions, not control of athletic competition itself. *Cureton*, 198 F.3d at 117–118 (holding member schools and not the NCAA decides which "applicants to admit" and which athletes compete on their rosters); *Smith II*, 266 F.3d at 157 ("Similar to the plaintiffs in *Cureton*, Smith is attacking an eligibility rule that NCAA members may choose to enforce or ignore."). Thus, with respect to the student admission decisions at issue in *Cureton* and *Smith*, the school had final authority over every admission decision. By contrast, this case at its core concerns the NCAA's decision not to delay enforcement of its 2022 TEP for the sole purpose of ensuring that Thomas would remain eligible to compete in the Ivy League Championships and later the 2022 NCAA Division I Women's Swimming Championships. Regardless of Penn's decision to continue rostering Thomas, the Ivy League's decision to allow Penn to do so, and Harvard's decision to allow Thomas to use its pool and locker rooms, the NCAA was the gatekeeper. The Ivy League's (acting on behalf of all its members, including Penn and Harvard) pressure campaign to compel the NCAA not to enforce its new TEP in February 2022 is proof enough.[8]

### D.    The NCAA is Covered by Title IX as An Indirect Recipient of Federal Funding

Finally, the NCAA is an indirect recipient of federal funding through its "Grand Alliance"

---

[8] The Ivy League parrots the same arguments made by the NCAA. Dkt. 73 at 12–13, 15. It also contends that a controlling authority theory of Title IX applies only when plaintiffs plead facts demonstrating that state athletic associations exercised complete control over their member schools' athletic programs, often pursuant to state statute. Dkt. 73 at 13. But both the number of states in which member schools are located and statutory authority are irrelevant. The test is "control" as a practical matter, not as a statutory matter. And control can exist over institutions in more than a single state. The Ivy Council of Presidents have formed an unincorporated "group" to jointly govern their schools' athletics and thereby allow the University Presidents to retain control over everything the group does.

"partnership" with the DoD by which the NCAA channels federal funds to member institutions the NCAA chooses for concussion research and education. Compl. ¶¶ 159, 162–180. "At least $85 million in funding for the NCAA-DoD Grand Alliance has come from the federal government." *Id.* ¶ 173. These indirect funding allegations plausibly allege indirect funding and are analogous to the indirect funding allegations addressed in *Smith II*—the Third Circuit's opinion on remand from the Supreme Court's decision in *Smith I. Smith v. Nat'l Collegiate Athletic Ass'n*, 266 F.3d 152, 160–63 (3d Cir. 2001) (*Smith II*). The Third Circuit addressed a program, known as the "National Youth Sports Program" ("NYSP"), that was funded by federal dollars provided to the NYSP "Fund" ("NYSPF"). *Id.* at 155. The Third Circuit held that Plaintiff's allegations "establish[ed]" that the NCAA "truly assumed control of the NYSP and its Fund . . . the NCAA did more than 'indirectly benefit' from federal assistance . . . rather . . . it was in a position to decide whether to 'receive' federal funds and thereby accept the concomitant obligations of Title IX." *Id.* at 162 (cleaned up); *see also Bowers v. NCAA*, 118 F. Supp. 2d 494, 528 (D.N.J. 2000) (holding "obvious administrative entanglements that exist between the NCAA and the NYSPF" and the NCAA's "ability to significantly influence how NYSPF's federal funding is spent" was evidence of indirect funding). *Smith II* focused on "the degree to which the [NCAA] is able to control decisions made with respect to the money, the most important decision being whether the grant money should be accepted at all." *Smith II*, 266 F.3d at 161.

The NCAA argues that its DoD partnership is not indirect funding because "Plaintiffs fail to allege that the NCAA 'is able to control decisions made with respect to the [federal] money,' especially 'the most important decision [of] whether the grant money should be accepted at all.'" Dkt. 70 at 4 (quoting *Smith II*, 266 F.3d at 161). But Plaintiffs made this allegation of control by alleging that the NCAA is operating a comprehensive concussion research study in "partnership"

with the DoD. Compl. ¶¶ 169–170. By being in "partnership" with the DoD, the NCAA has control over how federal dollars are used in the study and "shares with some NCAA member institutions [the] research funding obtained by the NCAA from the U.S. federal government." *Id.* ¶¶ 159.[9]

The NCAA argues that the allegation of partnership is not enough. Dkt. 70 at 6. They say Plaintiffs "allege merely that the DoD and the NCAA … separately fund the Grand Alliance effort." *Id.* But the NCAA is asking too much at this stage of the litigation. "Partnership" is the exact term the NCAA uses in its own documents, Compl. ¶¶ 169–171, and the term used by the President of the United States when announcing the federal funding. *Id.* ¶¶ 170. The Complaint, which must be taken as true and is based on the NCAA and government's self-description of their relationship, plausibly alleges indirect funding. Holding otherwise "ignore[s] . . . evidence [of informal control and] . . . would be to elevate form over substance in a way that should not be countenanced." *Bowers*, 118 F. Supp. 2d at 529. Further argument on this point is for summary judgment.

* * *

As "unincorporated associations" or "groups" of members covered by Title IX, the NCAA and the Ivy League cannot do that which Title IX forbids of their members. Under any or all of the coverage tests discussed above, both are subject to Title IX.

## IV.    All Plaintiffs Have Standing to Pursue Their Claims

All Defendants—to some extent or another—argue that Plaintiffs lack standing, saying they either did not cause Plaintiffs' injuries or that those injuries are not "injuries-in-fact." Dkt. 68 at 10–18; Dkt. 67 at 23 n.7. To establish standing a plaintiff must show an "injury in fact" and a "causal connection between the injury and the conduct complained of" and that it is "likely, as

---

[9] The NCAA notes that *Doe v. League Sch. of Greater Boston, Inc.*, 2017 U.S. Dist. LEXIS 133011, *10 (D. Mass. 2017), distinguished "a private school that indirectly received funds earmarked for special education services for students placed at that school, from the NCAA under *Smith I*, which 'merely benefited from federal funds' that were not earmarked for payment to the NCAA." Dkt. 70 at 6. But neither *Doe* nor *Smith I* said anything about the NCAA's receipt of federal funds from the Grand Alliance. Those cases are not dispositive.

opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

Defendants' standing arguments misconstrue the nature of Plaintiffs' Title IX claims. Defendants (mostly Harvard)[10] dissect the Complaint as a series of lesser claims regarding various aspects of the Ivy League Championships: the "eligibility claim," "participation claim," the "facilities claim," and the "statement and media claims." Defendants then try to distance themselves from some or all of these sub-claims or label them as causing merely psychological or emotional injury. But what the Complaint *actually* alleges is that Plaintiffs and all swimmers at the meet were injured by Thomas's presence and participation—in the pool, in the locker rooms, and the attention his presence generated from spectators and the media—which turned the *women's* Ivy League Championship into a *co-ed* swim meet that celebrated a man's achievements that came at the expense of women. Defendants caused this injury by playing their respective roles in the scheme to allow and tolerate a man's presence and participation in the Ivy League Championships. Plaintiffs' injury is not the deprivation of any single component of the meet in isolation (though every deprivation is an injury-in-fact all the same). Rather, Plaintiffs were deprived of their right to enjoy an equal opportunity to compete in a *women's* Division I NCAA conference championship.

In *Soule* the Second Circuit *en banc* found denial of "equal athletic opportunities" and loss of publicly recognized titles and placements in track and field competitions, in violation of Title IX" to be a concrete injury. *Soule*, 90 F.4th at 46. The injury was "particularized because Plaintiffs are athletes who personally competed in [athletic association] sponsored events, rather than, for instance, bystanders who simply wish to challenge the [eligibility] Policy because they disagree

---

[10] Penn makes its standing argument by incorporating by reference eight and a half pages of Harvard's Memorandum of Law. Dkt. 67 at 23 n.7. The Court should not credit Penn's arguments because its incorporation puts Penn's brief well-above the 20-page limit. Moreover, Penn's cursory analysis in footnote 7 of its brief fails to sufficiently explain how Harvard's fact-sensitive analysis about its involvement in Plaintiffs' injuries applies to Penn.

with it on principle." *Id*. Finally, the athletes' injuries in *Soule* were redressable because they sought nominal and compensatory damages and injunctive relief to alter public athletic records. *Id*. 47—52. This Court should find standing for the same reasons.

### A.    Plaintiffs Have Alleged Cognizable Injuries

#### 1.    Kaczorowski Has Alleged Competitive Injury on Behalf of Herself and Those Similarly Situated

Margot Kaczorowksi has alleged that she was injured by not being able to participate in a collegiate women's conference championship though the meet was billed as such. Compl. ¶¶ 9–12, 21–22, 359, 361–63, 376–82; *see also* ¶¶ 290–91. She like the other female swimmers at the event lost out because the media coverage and publicity concerning the meet were dominated by the only male participant. *Id.* ¶¶ 345, 361–63, 376–77, 379. She lost out because arrangements were made for Thomas to use the women's locker rooms and showers. *Id.* ¶¶ 347, 386–87. She was also injured because she competed against Thomas in the 200-yard freestyle final, losing a placement to Thomas. *Id.* ¶¶ 365, 367, 371. She was also required to compete with Thomas on three Penn team relays, which became co-ed, not women's, relays: the 200-yard freestyle, the 400-yard freestyle, and the 800-yard freestyle relays. *Id.* ¶¶ 367, 381–82. In the 100-yard freestyle, in which Margot also competed in the preliminaries, the second-place finisher from Yale University would have set pool and meet records but for Thomas' participation in the event. *Id.* ¶ 372.

At the Ivy League Championships, Margot experienced "a chaotic environment dominated by a singular focus upon Thomas and near total disregard for the women competing." Compl. ¶ 359. She and teammate Grace Estabrook saw their most important athletic competition "turned into a public spectacle geared to maximizing Thomas' notoriety and support for Thomas shattering sex-based gender norms." *Id.* ¶ 363. Both Plaintiffs competed in prior Ivy League championships and the 2022 event was nothing like those women-only championships. Thomas' participation in

the 2022 Championship "cast a shadow over the entire event" which was all for the worse for women. *Id.* ¶¶ 377–79. In short, the "2022 Ivy League Championship [became] a public spectacle centered around Thomas rather than a celebration of the achievements of the women[.]" *Id.* ¶ 379.

### 2. Holmquist Has Alleged Competitive Injury

Ellen Holmquist was injured because, due to the NCAA rules implemented by the Ivy League and Penn and Harvard, she was deprived of the opportunity to compete in the Ivy League Championships at Blodgett Pool. Compl. ¶¶ 353–57. If any one of the Defendants had refused to implement the discriminatory TEP she would have been able to compete at the Ivy League Championships. Thus, all of the Defendants are jointly responsible for Ellen's spot in the conference championships being taken by a man.

### 3. Estabrook and Kaczorowski and Other Similarly Situated Competitors Were Deprived of a Women-Only Locker Room and Showers

The Ivies argue that Estabrook and Kaczorowski did not suffer a concrete injury because they did not use a locker room while Thomas was present—either using it when he was not there or using a different locker room. Dkt. 68 at 10–11; Dkt. 67 at 23 n.7; Dkt. 70 at 10–11. This again misconstrues the Title IX claim alleged. The locker room dilemma was one of several for women that arose from Defendants turning the women's Ivy League Championships into a co-ed event. That Plaintiffs faced *any* dilemma over whether to share a locker room with a man at a meet that Defendants said was for women is a Title IX injury. Plaintiffs thus were deprived of the equal opportunity to participate in the event for which Title IX required separate locker rooms for women and had to seek out second-best changing and showering facilities away from their teammates.

Harvard reframes injury from this unlawful dilemma as the psychological injury of "feelings of discomfort" and "psychological 'disruption.'" Dkt. 68 at 11–12. They say Plaintiffs' injury with respect to both the statement and media claims must come down to suffering some

"psychological consequence presumably produced by observation of conduct with which [they] disagree[]," be it being present for the reading of the anti-discrimination statement or watching the media give Thomas significant attention. *Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). No. The injury was the loss of a women's-only space at a women's-only meet.

### 4.    Estabrook and Kaczorowski and Other Similarly Situated Competitors Were Deprived of Publicity and Recognition

Harvard argues Plaintiffs lack "standing to challenge the reading of the anti-discrimination statement and Harvard's interactions with the media." Dkt. 68 at 12. This argument has two problems. First, it devalues the loss of publicity and recognition all women suffered at the Championship due to the Defendants' preoccupation with Thomas and turning the meet into a co-ed competition where Thomas could compete. These are concrete Title IX injuries in their own right. *See supra* at I.C.2 & II.A; 34 C.F.R. § 106.41(c)(10) (noting "publicity" is part of equal opportunity). Second, Plaintiffs allege Harvard participated in the "media claims," not by making particular statements but by making Thomas eligible so that Thomas rather than women would receive publicity and recognition which contributed to the cumulative deprivation of a women's Ivy League Championship. Plaintiffs allege that it is a reasonable inference that because Harvard and the Ivy League knew they were depriving women of opportunities that Harvard and the Ivy League felt the need to continually and robotically remind participants and the public that if anyone protested in favor of the rights of women they would be labeled "transphobic" and removed from the meet, but Plaintiffs' allegations cannot be fairly read as requesting relief ordering Harvard or the Ivy League to make or not make any particular announcement at future swim meets.[11]

---

[11] Harvard also argues that "[a]fter *Bostock*, there can be no question that the use of transphobic language could, in certain circumstances, contribute to the existence of a hostile environment based on sex in violation of Title IX" and that "Title IX has never been held to preclude a funding recipient from encouraging others to refrain from transphobic conduct." Dkt. 68 at 16. Harvard also argues that "Plaintiffs' attempt to challenge Harvard's media statements raises

**5.    Estabrook and Kaczorowksi Were Forced to Compete on Co-ed Relay Teams**

The NCAA and Ivy League argue that Estabrook "presents only an ideological objection to Thomas's participation but not a concrete, personalized harm necessary for Article III standing" because she did not compete against Thomas but rather competed alongside him in the 400-medley relay. Dkt. 70 at 10–11; Dkt. 73 at 16–17 (incorporating NCAA argument by reference). The 400-medley relay is a group event—Thomas swam the freestyle leg and Estabrook the breaststroke leg. Likewise, in the 400- and 800-freestyle relay Thomas swam the first leg and Kaczorowski the second, and in the 200-freestyle relay Kaczorowski led off and Thomas swam the second leg. As explained above, Plaintiffs' fundamental allegation is that Thomas's participation turned the Ivy League Championships into a co-ed swim meet. Compl. ¶¶ 377–82. Estabrook and Kaczorowski were forced to participate in a co-ed swim meet, not a women's swim meet, regardless of whether they were competing directly against Thomas or not.

The NCAA and the Ivy League also argue that granting relief to Estabrook in the form of vacated records would harm her because she swam with Thomas in the 400-medley relay. Dkt. 70 at 11 n.3. But this is not the Defendants' argument to make. First, Estabrook seeks relief beyond removing all women's records tainted by a man's presence, including nominal and compensatory damages and attorney's fees. Second, Estabrook's (and Kaczorowski's) request for relief should be taken at face value: they do not want their names in a record book that mendaciously inscribes a man's records in the women's category. Compl. ¶¶ 381–82. The fact that the Ivy League has forever associated Estabrook's and Kaczorowski's names with this hoax is an injury-in-fact, and they are entitled to seek injunctive relief that sets the record straight. Third, Estabrook like all

---

serious First Amendment concerns." Dkt. 68 at 17. But the Complaint is not alleging that it is the speech itself that is at issue but that Defendants' conduct detracted from the publicity and recognition of the women athletes at the competition. Moreover, these arguments are all irrelevant and moot if the Court holds that Thomas should never have been participating and competing at the Ivy League Championships in the first place.

competitors at the Ivy League Championship experienced the indignity of the lion's share of the publicity at a "women's championship" going to a man. *Id.* ¶¶ 361–63.

### B.    Harvard and Penn Have a Causal Connection to Plaintiffs' Title IX Claims

Harvard argues that it could not have caused the alleged injuries because it "was merely the host of this event" and "had no say in Thomas's eligibility or participation." Dkt. 68 at 11. The Complaint alleges otherwise. This case is about the Ivy League Championships that happened in a real pool at a real University. Harvard provided the space and place for Thomas's unlawful participation in the co-ed swim meet. Compl. ¶¶ 58–60, 345, 347, 359, 383–84. Harvard's media team aggressively sought to obtain exposure for Thomas but not for the women at the event. *Id.* ¶¶ 345, 361–63. As for eligibility, Harvard necessarily participated in the pressure campaign against the NCAA to delay enforcement of its 2022 TEP by virtue of Harvard's President's membership on the Ivy League Council of Presidents. *Id.* ¶¶ 7–19, 314, 322–24, 330–37, 342, 344.

### 1.    Harvard Provided the Pool

Harvard's decision to open its pool which it "owns and controls," Compl. ¶ 58, to a co-ed swim meet is fairly traceable, and has a "sufficiently direct causal connection," to Plaintiffs' Title IX claims. *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012)). The swim meet did not happen on paper or in the abstract, but in an actual pool on Harvard's campus. Harvard owns the pool, locker rooms and showers that Plaintiffs and Thomas used for the Ivy League Championships. As the owner of Blodgett Pool, Harvard controlled who could use the pool and its locker rooms and showers, when they could use them, and under what conditions. Thus, Harvard's opening its pool for a co-ed swim meet that Harvard billed as a "women's championship" violated Title IX's equal opportunity guarantee for the Plaintiffs.

Harvard also overlooks that it assigned pool records to Thomas in every event in which he

competed individually. Compl. ¶¶ 367–68, 372. This honor and recognition should have been reserved to only female athletes. This loss of public recognition is a concrete injury in fact that is fairly traceable to Harvard for pool records and to the Ivy League for meet records. The Second Circuit has held, *en banc*, that women "adequately ple[ad] … concrete, particularized, and actual injury in fact" by "alleg[ing] denial of equal athletic opportunity and concomitant loss of publicly recognized titles and placements during [athletic competition] in which they participated against and finished behind [trans-identifying men]." *Soule\*, 90 F.4th at 41.

This is not a case where Harvard's actions are "overly attenuated" or "stem from the independent action of a third party." *Dantzler, Inc.*, 958 F.3d at 47 (quoting *Katz*, 672 F.3d at 71–72). Harvard's causal relationship is not "indirect," nor does it "depend[] on actions of a third party." *Victim Rights Law Ctr. v. Cardona*, 552 F. Supp. 3d 104, 123 (D. Mass. 2021) (Young, J.). There is only one pool in this case. And there is no allegation that anyone forced Harvard to knowingly use its pool for a giant social experiment in February 2022.

Harvard tries to reduce this case to the NCAA's and Ivy League's policy decisions and argues that it played no role in those policies or decisions. Dkt. 68 at 7. This argument re-writes the Complaint. This case is about a swim meet with more than a hundred women competitors, not merely the policies at issue in the abstract. By giving a place and a space to hold a co-ed swim meet that it advertised as a women's championship, Harvard brought the Title IX violations to completion. The events that occurred at the actual swim meet are fairly traceable to Harvard.

Harvard argues Plaintiffs failed to show that because Harvard "had control over the pool, it also had control over who participated in the meet. Plaintiffs have not made that showing." Dkt. 68 at 9. But this is an argument for summary judgment. At the pleading stage it is sufficient to allege that ownership of property conferred the right to exclude from that property. If there is

something unusual about Harvard's ownership interest that suggests it had no control over what happened at its own pool and locker rooms that is a matter that can be explored in discovery.

### 2. Penn Rostered Thomas

Penn says it incorporates Harvard's lack of direct causal connection to the so-called "facilities claim," saying "Harvard [**not Penn**] did not provide a unisex bathroom" for Thomas or other participants in the Ivy League Championships. Dkt. 67 at 23 n.7. But this argument ignores there would be no need for a unisex bathroom or any need to accommodate a man at a women's swimming championship if Penn had never rostered Thomas to begin with. Both Harvard and Penn took direct actions that were not contingent upon the actions of any other party to cause Plaintiffs' injury of being deprived of an equal opportunity to participate in every aspect of a women's swimming championship, including a locker room and showers that protected their bodily privacy and allowed for full participation in the preparation for the event alongside their teammates and including the loss of placements, awards, records, and publicity.

### 3. Harvard Conspired and Collaborated in the Scheme

Harvard argues that there are no factual allegations that Harvard "conspired and collaborated" with the other Defendants to "allow Thomas to participate in the Ivy League Championships and use the women's locker room." Dkt. 68 at 9 n.3. Again, this misstates the holistic claim alleged in the Complaint that Defendants deprived Plaintiffs of "a meaningful and equal opportunity to compete in the Ivy League Championships" that is "comparable in every way to opportunities for men." Compl. ¶¶ 422, 437, 446, 447. The Ivy League Championships could not have happened without a real pool, real locker rooms, on a real campus. Harvard provided all that. Discovery will show the extent to which this collaboration and conspiracy was overt or merely tacitly understood. But Plaintiffs have sufficiently alleged a conspiracy at this stage of the case by showing it happened on Harvard's campus and because Harvard controls its campus.

Moreover, the Complaint plainly alleges that Harvard's President participated in the eligibility decisions of the Ivy League Council of Presidents. Compl. ¶ 3 ("the Ivy League Council of Presidents … including the Presidents of Harvard, and … UPenn, allowed a trans-identifying male swimmer … to compete against female swimmers in Ivy League Competition."); *id.* ¶ 7 ("the Ivy League Council of Presidents had labored for months behind the scenes"). This is not legal conclusion or conjecture. The Complaint describes the structure of the Council of Presidents, which is "comprised of the Presidents of the eight Ivy League Schools," including Harvard's President. *Id.* ¶¶ 52, 120–122. Plaintiffs have alleged Harvard's President participated in the Ivy League's actions and decisions in this case and thus is causally connected to the eligibility decisions.

### 4. Harvard Caused Holmquist's Injury

Regarding Holmquist in particular, Harvard argues "as the mere host of the championship meet that Holmquist did not attend, [it] could not have caused" a Title IX injury to her. Dkt. 68 at 9. This argument turns reality into abstraction. Holmquist was not competing for the right to participate in the Ivy League Championships on paper, but to actually swim at Blodgett Pool in Cambridge, Massachusetts. Had Harvard followed Title IX and refused to participate in the Defendants' unlawful scheme to allow a man to swim against, change clothes with, shower with, and steal the limelight from, women then Holmquist would have taken Thomas's spot in Massachusetts.

## V. Plaintiffs Can Recover Damages and Attorney's Fees Under Title IX

Forty-five years ago, the Supreme Court recognized a private right of action to seek monetary damages and injunctive relief for violations of Title IX. *Cannon*, 441 U.S. at 709; *see also Franklin v. Gwinnett Cnty. Public Schools*, 503 U.S. 60 (1992).

Harvard argues Plaintiffs are not entitled to relief under Title IX because "the only conceivable damages they could allege for these claims are damages for 'mental and emotional distress, suffering, and anxiety'" and Supreme Court precedent [allegedly] "precludes damages for

emotional distress under Title IX. *Doe v. Town of North Andover*, 2023 WL 3481494, at *11 (D. Mass. May 16, 2023) (citing *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212 (2022))."[12] Dkt. 68 at 17–18. Harvard's argument is not a bar to Plaintiffs' claim.

First, Plaintiffs have "standing to bring a [Title IX] claim for nominal damages even without alleging a specific injury flowing from the violations." *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1177 (11th Cir. 2009); *accord Soule*, 755 F. Supp. 3d at 202. Plaintiffs must simply show that their Title IX rights were violated. *Id.* Second, some compensatory damages are allowed under a contract remedy, including for lost future income, *A.T. v. Olley Valley Sch. Dist.*, 2023 WL 1453143, at *4 (E.D. Pa. Feb. 1, 2023), lost opportunities, *Doe v. Fairfax Cnty. Sch. Bd.*, 2023 WL 424265 at *4–5 (E.D. Va. Jan. 25, 2023), *Montgomery v. D.C.*, 2022 WL 1618741, at *25 (D.D.C. May 23, 2022), and lost tuition and expenses. *Doe v. Town of North Andover*, 2023 WL 3481494, at *12 (D. Mass. May 16, 2023).

## VI.    Title IX Provides Clear Notice that a Man Competing against Women in Sex-Separated Sports Destroys Equal Opportunity[13]

The Ivy Institutions argue "it was insufficiently clear at the time of the Ivy League Championships that Title IX prohibited" Defendants from excluding trans-men from participating and competing in women's collegiate swimming. Dkt. 68 at 18–21; Dkt. 67 at 20 n.9; Dkt. 73 at 16. This argument rests solely on misguided application of *Bostock*, which expressly stated that it did not apply to Title IX, and DoE guidance, which has been soundly struck down. Neither *Bostock* nor any DoE regulations rescinded the clear notice that the plain meaning of Title IX and the

---

[12] *Cummings* was a Title VI case not a Title IX case. Plaintiffs do not concede that emotional distress damages are not available in a Title IX case, particularly one where the athletic regulations are clearly directed at preventing competitive, dignitary, and psychic injury. Moreover, as explained below, emotional distress damages are available in this case due to the Defendants' intentional discrimination. *See infra* at VI.C.

[13] First and foremost, the Court must consider the "merits before or in tandem with the question of notice." *Soule*, 90 F.4th at 42. As the foregoing discussion explains, the plain meaning of Title IX is clear and provided sufficient notice that failing to prevent men from taking women's places and spaces is sex discrimination.

athletics regulation has always provided.

**A.      The Text of Title IX Provides Clear Notice**

All Defendants misapply the clear notice requirement established by *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981), and its progeny by failing to focus on the text of Title IX and its accompanying athletics regulation. As the First Circuit has said, the principal place to look for such notice, of course, is the text of the" statute itself." *Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 14 (1st Cir. 2007) (holding that the statutory definition of "disability" sufficiently put Maine on notice of its obligations under the Individuals with Disabilities Education Act); *cf. Bennett v. Kentucky Dep't of Educ.,* 470 U.S. 656, 666 (1985) ("*Pennhurst* does not suggest that the Federal Government may recover misused federal funds only if every improper expenditure has been specifically identified and proscribed in advance"). As explained above, Title IX's definition of "sex" refers only to biological sex. *See supra* at I.A. Universities have complied with Title IX for decades through sex-separated sports categories to ensure women have the same opportunities as men to enjoy full participation and rewards of fair competition. *See supra* at I.B.

Further, *Pennhurst* is a "mere defense to damages liability" and not akin to immunity from suit. *Soule*, 90 F.4th at 54 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Unlike a qualified immunity analysis that considers whether rights are "clearly established" and whether a reasonable official "would have known" about those rights, *Pennhurst* and its progeny focus on the need for an absence of ambiguity in Congressional spending clause legislation. *Pennhurst*, 451 U.S. at 17 (Congress must condition funds "unambiguously"). Title IX's mandate is clear enough: don't discriminate on the basis of sex by favoring men over women. That's sufficient notice.

Conflicting interpretations of Title IX are, likewise, not an escape hatch for the Defendants. It has long been well-settled that Title IX protects women vis-à-vis men based on biological sex alone by awarding damages when women's right to equal opportunities is disregarded. *See*, *e.g*.,

*Jackson*, *supra* (2005) *Franklin*, *supra* (1992); *Gebser*, *supra* (1998); *Davis*, *supra* (1999). More-over, the Supreme Court has never held that "sex" under Title IX means gender identity.[14]

The law did not become recently unsettled. Indeed, a district court in Connecticut has found that girls required to compete against trans-identifying boys in high school girls' sports *during 2017-2019* stated a claim for sex discrimination in violation of Title IX. *Soule*, 755 F. Supp. 3d at 191–92 (holding "failure to provide [women athletes] with sex-separated competition" states a Title IX claim). Likewise, the DoE and numerous Title IX cases before 2022 specifically applied Title IX to protect women's equal opportunities in scholastic sport based on biological sex.[15]

### B.     The Biden DoE Regulations Do Not Help Defendants

Nevertheless, the Ivies claim that, "[a]t the time Thomas swam in the Ivy League Champi-onships, the federal government, through Executive Orders and interpretive guidance issued by the [DoE], *specifically told institutions like Penn the following: if you stop transgender athletes from competing on a team when they are otherwise eligible to do so, you violate Title IX*." Dkt. 67 at 7; *see* Dkt. 68 at 24-25 & n.8 (incorporating argument); Dkt. 73 at 16 (same). Not so.

President Biden's Executive Order No. 13988 (Jan. 20, 2021), and a handful of communi-cations from the DoE early in the Biden administration which indicated an intent to interpret Ti-tle IX in light of *Bostock*, did not render ambiguous Title IX's application to collegiate sport.  In-stead, the government's communications merely reflect an intent to "prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary." Executive Order 13988, 86 Fed. Reg. 7023. None of the documents

---

[14] *See also Adams*, 57 F.4th at 817 ("equating 'sex' to 'gender identity' or 'transgender status'" implausibly under-mines "the validity of sex-separated sports teams").

[15] 34 C.F.R. § 106.41(c) ("A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes"); *McCormick*, 370 F.3d at 293; *Neal*, 198 F.3d at 773; *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994); *Clark*, 695 F.2d at 1131; *Yellow Springs*, 647 F.2d at 657; *Cape*, 563 F.2d at 795; *Williams*, 998 F.2d at 175.

to which the Ivies cite state an intent to discontinue enforcing either Title IX's prohibition on sex discrimination or the Title IX athletics regulation.

In fact, the DoE guidance on which the Ivies place the greatest weight, "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*," 86 Fed. Reg. 32637 (Jun. 21, 2021), does not refer to "athletics," "athlete" "student-athlete" "sport" "sports" or "team" even one time. Instead, the document cautions against stigmatizing individuals based on gender identity, while citing no sports cases and relying on a handful of middle school and high school bathroom and other stigma cases brought under Title IX following *Bostock*, such *as Doe v. Boyerton Area Sch. Dist.*, *Grimm v. Gloucester Cnty. Sch. Bd.* and *Whitaker by Whitaker v. Kenosha Unified Sch. Dist.* (discussed *supra* at 10 n.2 and accompanying text). Likewise, each of the hypothetical "[e]xamples of the kinds of incidents CRT and OCR can investigate" in the "Resource for Students and Families" document appended as Exhibit B to Mr. Sturgeon's Declaration, Dkt. 72 at 9, focuses on stigmatization in everyday school settings not eligibility in competitive scholastic sport. Contrary to their claim about what the federal government allegedly "specifically told institutions like Penn," the Ivies have not cited a single government guidance document regarding transgender eligibility in competitive sport supporting their claim that they were told by the federal government that the Ivies had to roster Thomas and allow him to compete in the Championships.

To be clear, Plaintiffs do not contend that individuals who claim a gender identity discordant with their sex can be deprived of legal rights based solely on their expressed identity. But that, of course, is an entirely distinct question from whether in competitive collegiate sport a man must be permitted to opt-onto a sex separated women's team based on the man's self-professed gender identity. The uniform enforcement of Title IX's protections for women in scholastic sport is not

sex discrimination, it is simply a recognition that competitive sport is a context where sex-differences must be considered to protect the rights of women to fair and equal treatment. Because the Ivies cite no document actually supporting their claim of a change in the meaning of Title IX, much less its enforcement in college athletics, their lack of notice claim fails.

Furthermore, the *Bostock*-based legal arguments made in support of the NCAA's TEP have been fully and emphatically rejected by numerous courts, including most recently by all nine Justices of the U.S. Supreme Court. Starting with the Ivies' Exhibit B itself, the fine print at the top of Exhibit B states that the federal government was enjoined by mid-July 2022 from enforcing the non-athletics focused "Resource for Students and Families" in at least 21 states. Dkt. 72 at 9.

Indeed, the Biden Administration itself stated scholastic athletics would be addressed in a proposed regulation *separate* from its general proposed Title IX regulation. 87 Fed. Reg. 41390 (Jul. 12, 2022). Thereafter, the proposed athletics regulation was never issued in final form and ultimately withdrawn. 89 Fed. Reg. 104936 (Dec. 26, 2024).

Moreover, the abject legal failure of the *general Title IX regulation* that was issued in 2024 has fully gutted the entire legal position of the Ivies, including their notice argument. Within weeks after issuance of the new Title IX (non-athletics) regulation which, relying on *Bostock*, imported gender identity discrimination into the Title IX regulations, seven district courts and three courts of appeal preliminarily enjoined enforcement of the regulation[16] specifically because importing restrictions on gender identity discrimination into Title IX was inconsistent with Title IX's clear

---

[16] *See Tennessee v. Cardona,* 2024 WL 3453880 (6th Cir. Jul. 17, 2024) (denying DoE's motion for a partial stay of the district court's preliminary injunction that enjoined enforcement)*; Louisiana v. DOE,* 2024 WL 3452887 (5th Cir. Jul. 17, 2024) (denying motion for partial stay of injunction that enjoined enforcement)*; Oklahoma v. Cardona,* 2024 WL 3609109 (W.D. Okla. Jul. 31, 2024) (enjoining enforcement)*; Arkansas v. DOE,* 2024 WL 3518588 (E.D. Mo. July 24, 2024) (same)*; Carroll Indep. Sch. Dist. v. DOE,* 2024 WL 3381901 (N.D. Tex. Jul. 11, 2024) (partially enjoining enforcement)*; Texas v. United States,* 2024 WL 3405342 (N.D. Tex. Jul. 11, 2024) (enjoining enforcement)*; Kansas v. DOE,* 2024 WL 3273285 (D. Kan. Jul. 2, 2024) (same)*; Tennessee v. Cardona,* 2024 WL 3019146 (E.D. Ky. Jun. 17, 2024) (same)*; Louisiana v. DOE,* 2024 WL 2978786 (W.D. La. Jun. 13, 2024) (same)*.

meaning. The only outlier was the Northern District of Alabama, and in that case the Eleventh Circuit enjoined enforcement of the Rule pending appeal.[17] The Supreme Court soon took up the matter on its motions docket and *unanimously* accepted that the plaintiffs challenging the new DoE regulation "were entitled to preliminary injunctive relief as to … the central provision that newly redefines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507, 2509–10 (Aug. 16, 2024).

The blizzard of decisions enjoining the DoE rule, with which the NCAA TEP before February 5, 2025, was consonant, confirms that there has never been any legal ambiguity concerning Congress's clear statement that Title IX guarantees equal opportunity for women and that the athletics regulation permits sex-based distinctions without regard for gender identity. *Adams*, 57 F.4th at 812.[18] Again, the Ivies and the NCAA know this, which is why they changed their TEP; they are simply unwilling to acknowledge it for purposes of this case.[19]

### C.    Clear Notice Rules are Inapplicable to Intentional Conduct.

The Supreme Court in *Gebser* and *Davis* held that "*Pennhurst* does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates

---

[17] *Alabama v. U.S. Sec. of Edu.*, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) (enjoining enforcement).

[18] This Court's statement in *Boston Alliance of Gay, Lesbian, Bisexual and Transgender Youth v. U.S. Dep't of Health & Human Servs.*, 557 F. Supp. 3d 224, 244, 246 (D. Mass. 2021), that *Bostock* "applies equally outside of Title VII" did not eliminate clear notice. This statement was dicta. And this was not a Title IX equal athletic opportunity case. Also, the District of New Hampshire's decision in *Tirrell*, 748 F. Supp. 3d at 45, is inapplicable to this case. First, it was decided two years after the Ivy League Championships, so it has nothing to do with the notice available to Defendants during the relevant time. Second, *Tirrell* awarded preliminary injunctive relief to minors, not NCAA Division I athletes, based on the court's finding that "[a] trans[-identifying boy] who does not experience male puberty and who receives hormone therapy to induce female puberty will not have an athletic advantage over other girls as a result of being born with a male anatomy." *Id.* at 26. The scientific studies referenced in the Complaint call this into question. Compl. ¶¶ 218–264. In any case, the *Tirrell* court's reliance on pre-pubertal physical development renders that case far afield from the facts in this case.

[19] Harvard tries to bootstrap its clear notice argument to its standing argument, that it did not have a causal connection to the alleged discrimination because it had no control over Thomas's participation and eligibility in the Ivy League Championships. It says "it would be unreasonable to expect Harvard to know that the mere act of hosting a tournament … would subject Harvard to damages liability under Title IX." Dkt. 68 at 19. But the reasonableness of Harvard's knowledge is not the standard. It's textual ambiguity. And the law is not ambiguous that allowing a man to use Harvard's pool and women's locker rooms and showers during a women's competition would create a hostile environment and illegally take places and spaces from women. *See supra* at I.C.3.

the clear terms of the statute." *Davis*, 526 U.S. at 642 (citing *Gebser*, 524 at 283); *see Soule*, 90 F.4th at 55 (Menashi, J. concurring) ("intentional conduct … [is] not subject to the notice requirement [of *Pennhurst*] at all" (quoting *Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 600 (1983)). Further, "three circuits have held, in the Title IX context, that the official acts— including policies … qualify as intentional conduct and are not subject to a further *Pennhurst* notice requirement." *Soule*, 90 F.4th at 60 (Menashi, J. concurring) (citing *Mansourian v. Regents of Univ. of Calif.*, 602 F.3d 957, 967 (9th Cir. 2010); *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) *Pederson v. La. State Univ.*, 213 F.3d 858, 882 (5th Cir. 2000)).

Title IX plainly prohibits federal funding recipients from taking away women's opportunities and places and giving them to men. But Defendants did this intentionally by (1) adopting the TEP (NCAA), (2) not enforcing the new TEP against Thomas after the TEP was initially modified in February 2022 (NCAA), (3) pressuring the NCAA not to enforce its new TEP against Thomas and allowing Thomas to participate in the Ivy League Championships (Ivy League, Penn, Harvard), (4) bringing Thomas to the Championships (Penn), (5) permitting Thomas to compete at the Championships (Penn, Harvard and the Ivy League), (6) providing the space and place for Thomas to participate in the Championships (Harvard), and (7) working to maximize Thomas's publicity at the Championships (Ivy League, Harvard, Penn). Each of these acts was an intentional choice to give preferential treatment to a man and detrimental treatment to the women he displaced. Accordingly, *Pennhurst* simply does not apply as a defense for the Defendants in this case.

### D.    *Ricci v. DeStefano* Does Not Apply

Penn argues that it had a strong basis in evidence to believe that "excluding Thomas from the women's swim team would have subjected Penn to liability for having engaged in disparate treatment on the basis of sex in violation of Title IX," Dkt. 67 at 26, relying upon *Ricci v. DeStefano*, 557 U.S. 557 (2009). This is a false dilemma.

First, Penn concedes, any defense to disparate treatment against women based on committing a different kind of disparate treatment against transgender athletes was not recognized in *Ricci*. Dkt. 67 at 24 (stating "reverse scenario" of *Ricci* is "dicta"). Second, were such a defense to exist (which it does not as Penn has completely misread *Ricci*),[20] it would be an affirmative defense, *United States v. Massachusetts*, 781 F. Supp. 2d 1, 4 n.3 (D. Mass. 2011), Plaintiffs do not have to plead around.[21] The *Ricci* case itself was resolved on summary judgment not on a motion to dismiss. It is Penn's burden to prove its novel alleged "strong-basis-in-evidence" defense that avoiding discrimination against women would require impermissible discrimination against transgender athletes using actual evidence in a motion for summary judgment or at trial. Penn cannot establish with certitude that it would have been subject to liability for protecting women instead of Thomas at this stage of the case.

## VII.    The Statute of Limitations Does Not Bar Plaintiffs' Claims

The Ivies incorrectly argue that either Plaintiffs' claims accrued before Massachusetts' three-year statute of limitations ("SOL") or Pennsylvania's two-year SOL applies. Dkt. 67 at 12; Dkt. 68 at 10 (incorporating Penn's arguments); Dkt. 73 at 16 (same). First, a SOL defense is an affirmative defense that Plaintiffs have no obligation to plead around. *See Nat'l Ass'n of the Deaf*, 377 F. Supp. at 68 (quoting *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 324 (1st Cir. 2008) and *Dennett v. Archuleta*, 982 F. Supp. 2d 166, 169 (D.R.I. 2013)). Second, Plaintiffs' claims accrued when Thomas competed at the Ivy League Championships, or at least no earlier

---

[20] *Ricci* is not a Title IX case, nor did the Court find a disparate treatment claim "avoidable" in *Ricci* as Penn incorrectly claims, nor did the *Ricci* Court suggest in any way that there is an escape hatch from discriminatory treatment liability based on potential disparate impact liability which was theory of the unsuccessful plaintiffs in *Ricci*, nor did the Court suggest that the "reverse scenario," as Penn calls it, (*i.e.*, that disparate impact liability could be avoided due to discriminatory treatment liability) could be true. Penn has completely misread *Ricci*.

[21] If "a court grants a Rule 12(b)(6) ... motion based on an affirmative defense, the facts establishing that defense must: (1) be definitively ascertainable from the complaint and other allowable sources of information, and (2) suffice to establish the affirmative defense with certitude.'" *Nat'l Ass'n of the Deaf v. Harvard Univ.*, 377 F. Supp. 3d 49, 68 (D. Mass. 2019) (cleaned up).

than when the NCAA confirmed on February 10, 2022, that it would not enforce its new TEP and when all other Defendants agreed to follow the NCAA's further revised TEP excluding USA Swimming's relevant eligibility rule. Compl. ¶¶ 327-30, 338–41. As for which states' limitations period applies, this case is about a swim meet in Massachusetts, so Massachusetts' choice of law rules say its SOL should apply.

### A.    Plaintiffs' Title IX Claims Accrued After February 5, 2022

Title IX borrows its limitations period from the personal injury SOL in the forum state. Massachusetts' SOL is 3 years, and a Title IX claim accrues when a plaintiff knows, or has reason to know, of the injury on which the action is based. On these points, Defendants are correct. Dkt. 67 at 10–11 (citations omitted); *see also Nelson v. Univ. of Maine Sys.*, 914 F. Supp. 643, 650 (D. Me. 1996). For Title IX, this means that "the proper focus is upon the time of the discriminatory acts." *Delaware State College v. Ricks*, 449 U.S. 250, 258–59 (1980).

However, Defendants misread the Complaint to argue that Plaintiffs' claims accrued when they "knew they would compete against Thomas in future meets no later than the fall of 2021." Dkt. 67 at 12. Contrary to the Ivies' claims, it is not "definitively ascertainable from the complaint and other allowable sources of information" that Plaintiffs had reason to know that Thomas qualified for the Ivy League Championships or that his eligibility and actual participation were certain before February 5, 2022. *Nat'l Ass'n of the Deaf*, 377 F. Supp. at 68.

The "discriminatory acts" were the loss of equal opportunity of competing against and with only women in the Ivy League Championships, not the loss of equal opportunity at Penn during the regular season. The discriminatory acts did not occur until February 16, 2022, for Estabrook and Kaczorowski (when they started competing with and against Thomas) and after the swim off on February 5, 2022 for Holmquist (when she was told she had failed to make Penn's Ivy League Championships Team because of Thomas's participation). Compl. ¶¶ 352–56.

Defendants wrongly argue that Thomas's participation in the Championships constituted merely the "consequences of the [discriminatory] acts," not the discriminatory act itself. They say that a Title IX claim accrues "when the decision is made and communicated to the injured party," which here was "Penn's decision to allow Thomas to compete on the women's team … no later than the fall of 2021." Dkt. 67 at 11–12. Defendants reach this erroneous conclusion by relying exclusively on Title IX employment, tenure, or grant funding cases, not athletic competition cases.[22] Each of the Ivies' cases address a determination of a plaintiff's ineligibility for some benefit that Title IX protects. They do not address the situation here: the wrongful determination that a third-party may in the future be eligible for some benefit that Title IX categorically forbids. Defendants' cases cannot be analogized to the unique situation of announcing that a man may steal women's opportunities during the regular season and *potentially* qualify for an end-of-season championship. Plaintiffs did not "know" that they would actually face that man in the end-of-season competition. A host of intervening events might prevent *any* competitor from competing in a championship, *e.g.*, injury, disqualification, or any other circumstance that renders the athlete ineligible for the privilege of post-season competition.

Even if the Court were to analogize Defendants' inapposite cases to this one, these very cases distinguish between *separate* discriminatory acts from which a Title IX claim can accrue. The Supreme Court in *Ricks* distinguished between a decision denying tenure to a professor and the actual termination of employment several months after the tenure decision. *Delaware State College v. Ricks*, 449 U.S. 250, 257 (1980). The Supreme Court held that the Title IX claim accrued when the tenure decision was made but that the plaintiff could have brought a separate wrongful

---

[22] *Reid v. James Madison Univ.*, 90 F.4th 311, 320 (4th Cir. 2024) (employment case); *Doe v. Virginia Polytechnic Inst. & State Univ.*, 617 F. Supp. 3d 412, 433–35 (W.D. Va. 2022) (grant funding); *Martin v. Clemson University*, 654 F. Supp. 2d 410, 421–22 (D.S.C. 2009) (tenure); *Oirya v. Auburn Univ.*, 2019 WL 4876705, at *4–5 (M.D. Ala. Oct. 2, 2019), *aff'd*, 831 F. App'x 462 (11th Cir. 2020) (employment).

discharge claim if he identified additional "discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment." Instead, the plaintiff did not allege that the termination was anything but the inevitable result of the tenure decision. *Id.*

Likewise, in *Reid*, the Fourth Circuit recently applied *Ricks* to a Title IX employment discrimination claim arising from a university's alleged mishandling of an investigation and finding of sexual harassment against the plaintiff. The Fourth Circuit held that plaintiff's claim did not accrue until the university "made clear its official" "non-tentative" "final" decision about its finding of sexual harassment. *Reid*, 90 F.4th at 320. Thus, *Ricks* and *Reid* cases illustrate the difference between an initial decision that leads to a pre-determined and inevitable outcome (*Ricks*) and a tentative decision that does not become "official" and "final" until later (*Reid*).

Here, Defendants also ignore that Thomas's eligibility for the Ivy League Championships was not official, non-tentative, and final until February 10, 2022, when the NCAA said that it would not follow its own, new transgender eligibility policy of deferring to the policies of national governing bodies ("NGBs") in Olympic sports, including USA Swimming. Compl. ¶¶ 318–339. Only then did Plaintiffs know that Thomas could compete at the Ivy League Championships, because before then he was ineligible under the previously announced NCAA rule.

The Ivy League "subscribes to the principles and practices approved by the NCAA." Compl. ¶ 131. On January 19, 2022, the NCAA "pledged to apply sport-by-sport the eligibility policy of the relevant U.S. Olympic Sport [NGB], or, if the NGB had no policy, the rules of the relevant international sport federation." Compl. ¶ 318. At this time, neither the NGB for swimming nor the international swimming federation "had rules on their books regarding eligibility for transgender athletes," *id.* ¶ 319, which "created immediate ambiguity regarding the eligibility of Thomas for the upcoming Ivy League … Championships." *Id.* ¶ 321. The Ivy League understood

the implications, prompting its executive director to express "ang[er]" and "dismay[]" over "a new policy that could negatively impact a student-athlete's eligibility immediately." *Id.* ¶¶ 323–324. The Ivy League's fears came true. On February 1, 2022, USA Swimming adopted transgender eligibility rules that would have prohibited Thomas from competing at the Ivy League Championships. *Id.* ¶¶ 327–330. The Ivy League—and its members—"engage[d] in a non-stop pressure campaign against the NCAA" to stall the implementation of USA Swimming's new policies, which the NCAA had said it would follow. *Id.* ¶ 334. Then, on February 10, 2022, the NCAA "rejected USA Swimming's rules" saying that "implementing additional changes at this time could have unfair and potentially detrimental impacts on schools and student-athletes intending to compete in the 2022 NCAA women's swimming championships." *Id.* ¶ 339 & n.31.

Thus, Thomas's participation on the women's Penn swimming team during the season did not make his participation in the Ivy League Championships inevitable or pre-determined. Rather, the Complaint alleges that the way Defendants discriminated against Plaintiffs with respect to the Ivy League Championships "differed from the manner in which" Penn discriminated against Plaintiffs during the regular season. *Ricks*, 449 U.S. at 258. This fresh act of discrimination occurred no sooner than February 10, 2022, less than three years before Plaintiffs filed this lawsuit.

### B.    Massachusetts' Three-Year Statute of Limitations Applies

Massachusetts has a substantial interest in enforcing its own three-year SOL. "[T]he Legislature's election not to protect its citizens by 'borrowing' shorter limitations periods from other States when shorter periods are available emphasizes the interest Massachusetts has in allowing the three-year period to run its course." *Andersen v. Lopez*, 957 N.E.2d 726, 729 (Mass. Ct. App. 2011) (citations omitted); *see also New England Tel. & Tel. Co. v. Gourdeau Const. Co.*, 647 N.E.2d 42, 45 (Mass. 1995) ("Massachusetts could have, but has not, … import[ed] the statutes of limitations of other States").

Massachusetts' three-year SOL applies to the Title IX claims and the claims of the putative class they anticipate representing. Under the functional approach to choice-of-law decisions, "Massachusetts will apply its own statute of limitations … unless some exceptional circumstances about the case make it unreasonable to do so." *Andersen*, 957 N.E.2d 726 at 728. Defendants contend exceptional circumstances are: "(a) maintenance of the claim would serve no substantial interest of the forum; and (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.'" Dkt. 67 at 13. This analysis "focus[es] on the statute of limitations issue, and not on the underlying tort." *Nierman v. Hyatt Corp.*, 808 N.E.2d 290, 293 (Mass. 2004) (cleaned up).

There are no exceptional circumstances that warrant deviating from Massachusetts' SOL. This case is about a swim meet in Massachusetts. That's where all the injuries occurred. Massachusetts will generally apply the SOL of another forum only if the injury and tortious conduct occur outside the state. *See Mukarker v. City of Philadelphia*, 238 F. Supp. 3d 174, 175-178 (D. Mass. 2017) ("the site of the injury and the alleged negligent acts took place in the non-forum state [of Pennsylvania]" and Massachusetts' only connection was that it was "the plaintiffs' domicile").

The Ivies argue Pennsylvania's two-year SOL applies because "Thomas was rostered on Penn's women's swim team" and Penn informed the Plaintiffs that he would compete "throughout the season." Dkt. 67 at 12, 14 & n.1; Dkt. 68 at 10 (incorporating Penn's arguments); Dkt. 73 at 16 (same). This argument re-writes the Complaint. The backstory of Thomas's in-season participation on the Penn team simply provides the context for pleading the Defendants' intentional violation of Title IX and Plaintiffs' injuries at the Ivy League Championships. The actual Title IX violations and injuries alleged are the lost opportunities and hostile environment created at Harvard's Blodgett Pool and adjacent locker rooms and showers. Penn caused these injuries not by

54

rostering Thomas "throughout the season" but only by bringing him to the Ivy League Championships. Plus, only one defendant is domiciled in Pennsylvania: Penn. Compl. ¶¶ 51, 57, 61, 65. The Complaint does not allege Plaintiffs are presently citizens or residents of Pennsylvania.

Penn's arguments also overlook that the Ivy League's pressure campaign (which necessarily included the presidents of Harvard and Penn) against the NCAA, and the NCAA's decision not to enforce its new TEP impacted only the Ivy League Championships, not the regular season. Compl ¶ 322–44. If there is any factual dispute about this collusion then "resolution of a choice-of-law question at the dismissal stage where facts relevant to that inquiry are disputed is improper." *Baughman v. Beter*, 2024 WL 4476532, at *8 (D. Mass. Oct. 11, 2024) (citation omitted).

The Ivies argue that "Ms. Holmquist lost the swim-off for the last spot to go to the Ivy League Championships" in Pennsylvania. Dkt. 67 at 14 n.1. But her injury only materialized when Thomas actually competed in Massachusetts, stealing her opportunity. Had Thomas never competed, Holmquist would have suffered no injury. All lanes ultimately still lead to Massachusetts.

## VIII.  The Court Should Not Stay Any Aspect of this Case Under the First-to-File Rule

The NCAA's request to stay this case under the first-to-file rule pending resolution of motions to dismiss in *Gaines, et al. v. National Collegiate Athlete Association, et al.*, No. 1:24-cv-01109-TRJ (N.D. Ga) ("*Gaines*") should be denied.  Dkt. 70 at 11. That rule applies only when "the overlap between two suits is 'nearly complete'" based on "the similarity of the parties and the similarity of the issues." *Thakkar v. United States*, 389 F. Supp. 3d 160, 170, 173 (D. Mass. 2019). It is "not to be applied in a mechanical way … [as] exceptions to the rule are not rare. *Id.* (cleaned up). The NCAA bears the burden. *Id.* at 170–71.

A stay is not appropriate because overlap of the two cases is not "nearly complete."  First, the issues are not substantially factually similar. This case focuses on the Ivy League Championships and *Gaines* focuses on the NCAA Division I Women's Championships, generally, *and upon*

*other NCAA sports and events. Compare* Compl. ¶ 1 *with* Dkt. 71-3 ¶¶ 419–725. Second, while

the lawsuits both involve the NCAA's TEP in early 2022 under Title IX, the *Gaines* lawsuit also

involves the lawfulness of subsequent iterations of the NCAA TEP since that time, including the

NCAA's current TEP, and this case does not. Third, *none* of the Plaintiffs in the two cases are the

same. *Compare* Compl. ¶¶ 26, 37, and 44 *with* Dkt. 71-3 ¶¶ 56–74. Fourth, comparing the putative

classes in both is premature.  The putative class here is far smaller and narrower than the putative

class in *Gaines*. At best, all that the NCAA can reasonably argue at this stage of the litigation is

that there is some potential overlap for those few, if any, class members who competed in both the

2022 Ivy League Championships and the 2022 NCAA Swimming Championships. *Compare*

Compl. ¶¶ 388–401 *with* Dkt. 71-3 ¶¶ 726–747. Fifth, the injunctive relief sought is different. The

Plaintiffs in *Gaines* seek prospective injunctive relief (*i.e.*, invalidation of the NCAA TEP going

forward) and the invalidation of NCAA records and seek additional eligibility for some athletes

while this case seeks only an injunction vacating Thomas' records from the Ivy League Champi-

onships. *Compare* Compl. at 90 *with* Dkt. 71-3 at 200–201. Sixth, the compensatory damages

sought in this case are limited to injuries suffered in connection with the Ivy League Championship

and the damages sought in *Gaines* cover a different, longer, and broader range.

The NCAA has not cited any case (and the Plaintiffs have not found one) where this degree

of dissimilarity (*i.e.*, regarding non-commonality of any Plaintiffs or Defendants (except for a sin-

gle defendant), time period covered, legal theories advanced and relief sought) resulted in a finding

that the first-to-file rule could apply, let alone that a stay should be granted. A stay would only

cause delay which is not in the best interests of the parties, the Court, or the public.

## IX.    Plaintiffs Should Be Granted Leave to Amend if Dismissal is Granted

The NCAA argues for dismissal with prejudice because further amendment would alleg-

edly be futile with respect to the NCAA, and unrelated plaintiffs have amended their complaint

already in *Gaines*. Dkt. 70 at 8–10. But the NCAA has not attempted to show futility, instead only cited immaterial information about amended complaints in *Gaines*. If an "amended complaint survives the *Twombly* [plausibility] standard, its filing would not be futile." *President & Fellows of Harvard Coll. v. Micron Tech., Inc.*, 230 F. Supp. 3d 46, 49 (D. Mass. 2017) (Young, J.). No Court has held that Plaintiffs' claims are meritless or implausible.

Dismissal with prejudice is warranted only "after several attempts at stating a complaint." Dkt. 70 at 9 (citing *United States v. All Funds on Deposit in Lee Munder Wealth Planning Res. Account No. ***-**1080*, 137 F. Supp. 3d 125, 132 (D. Mass. 2016). Plaintiffs here have not made any unsuccessful attempts to amend *their complaint*. Plaintiffs deserve their own day in court and the full benefit of Rule 15's liberal amendment standard, if needed.

Finally, the NCAA mischaracterizes the amendments made in the *Gaines* case. Those were the result of further factual development and investigation related to the NCAA's Grand Alliance partnership, Dkt. 71-2 at 3–49, the addition of another co-Defendant, Georgia Tech Athletic Association, the removal of certain defendants based on sovereign immunity concerns, and the addition of another plaintiff (a NCAA Division I volleyball player). *See Gaines*, No. 1:24-cv-01109-TRJ, ECF No. 88 at 2–9 (N.D. Ga Sept. 23, 2024) (summarizing amendments in Second Amended Complaint). These amendments are unrelated to the NCAA and do not support a futility argument.

## CONCLUSION

Since its adoption in 1972, Title IX's application to women's college athletics has consistently been interpreted to protect women's opportunities from being usurped by men. Grace Estabrook, Ellen Holmquist, and Margot Kaczorowski have stated a claim that granting trans-identifying male Lia Thomas eligibility to compete in the 2022 Ivy League Championships deprived Plaintiffs, and scores of women similarly situated, of equal opportunities in college athletics in violation of Title IX. Plaintiffs are entitled to the opportunity to prove their claim.

Dated: May 12, 2025                     Respectfully submitted,

                                        */s/ William Bock III*
                                        William Bock III, Atty. No. 14777-49[23]
                                        Justin R. Olson, Atty. No. 31450-49[24]
                                        Kroger Gardis & Regas, LLP
                                        111 Monument Circle, Suite 900
                                        Indianapolis, IN 46204
                                        Tel: (317) 692-9000
                                        Fax: (317) 264-6832
                                        E-mail: wbock@kgrlaw.com
                                        Email: jolson@kgrlaw.com

                                        */s/ Samuel J. Whiting*
                                        Samuel J. Whiting (BBO# 711930)
                                        Massachusetts Liberty Legal Center
                                        401 Edgewater Pl., Suite 580
                                        Wakefield, MA 01880
                                        Tel: (774) 462-7043
                                        Email: sam@malibertylegal.org

                                        ATTORNEYS FOR PLAINTIFFS

---

[23] *Pro Hac Vice*
[24] *Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a true and accurate copy of this document was filed through the Electronic Case Filing system and will be served upon the attorney of record for each party registered to receive electronic service this 12th day of May, 2025.

                         */s/ William Bock III*
                         William Bock III